# TABLE OF CONTENTS

**Relevant Record Materials, Pursuant to FRAP 8(a)(2)(B)(iii)**

**and Local Rule 8:**

Order (May 6, 2025) (Dkt No. 270) ……………………………………………2

Order (April 23, 2025) (Dkt No. 254) ……………………………………………3

Memorandum Opinion (April 23, 2025) (Dkt No. 253)……………………………6

Redacted Exhibit A to Motion to Vacate, Dkt No. 261

     (May 5, 2025) (Dkt No. 268) ……………………………………………25

Filed Settlement Agreement (July 30, 2024) (Dkt No. 199-2) …………………….29

Second Amended Complaint (January 11, 2021) (Dkt No. 145) ………………..47

2019 Redetermination Memo (July 1, 2019) (Dkt No. 3) ………………………106

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| J.O.P., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 8:19-CV-01944-SAG |
| U.S. Department of Homeland Security, *et al.*, | |
| Defendants. | |

### ORDER

For the reasons stated on the record at this morning's status conference, it is this 6th day of May 2025, ORDERED that:

1. Defendants' Motion to Vacate Section Two of the Court's Order Granting Plaintiffs' Motion to Enforce the Settlement Agreement or, in the Alternative, to Stay Section Two Pending Appeal, ECF 261, is DENIED IN PART and GRANTED IN PART;

2. Defendants' motion to vacate Section Two of ECF 254 is DENIED;

3. Defendants' motion to stay Section 2 of ECF 254 is GRANTED until close of business on Thursday, May 8, 2025 to permit Defendants to file an appeal. Should no appeal be filed by that date, the Court will amend ECF 254 to impose a deadline for action to be taken in compliance with Section 2; and

4. The Court amends its Order at ECF 266 to add minor redactions to ECF 268, Exhibit A, USCIS Indicative Asylum Decision. The Clerk is directed to file an updated version of Exhibit A, USCIS Indicative Asylum Decision with the additional redactions.

Dated: <u>May 6, 2025</u>

_____/s/_____
Stephanie A. Gallagher
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

J.O.P., *et al.*,

      Plaintiffs,

      v.

U.S. Department of Homeland Security, *et al.*,

      Defendants.

Civil Action No.
8:19-CV-01944-SAG

## <u>ORDER</u>

For the reasons stated in the accompanying memorandum opinion, Class Counsel's Emergency Motion to Enforce the Settlement Agreement, ECF 227, and Motions to Proceed Under Pseudonym, ECF 231, 236, will be GRANTED as follows:

1. Defendants are hereby ORDERED not to remove from the United States members of the certified "Class," defined in Section II.E of the Settlement Agreement, ECF 199-2 at 5, as "all individuals nationwide who prior to [February 24, 2025]: (1) were determined to be a[n] [Unaccompanied Alien Child, as defined in 6 U.S.C. § 279(g)(2)]; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits." Once USCIS adjudicates a Class Member's asylum application on its merits, the individual is no longer a Class Member and no longer enjoys the protection of the Settlement Agreement.

2.  Defendants are hereby ORDERED to facilitate Class Member Cristian's return to the United States to await the adjudication of his asylum application on the merits by USCIS under the terms of the Settlement Agreement. Facilitation includes, but is not limited to, a good faith request by Defendants to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States.

3.  Absent further court order, the parties will proceed using pseudonyms as to Class Members Cristian and Javier for the pendency of this matter.

Dated: <u>April 23, 2025</u>                    _____/s/_____

Stephanie A. Gallagher
United States District Judge

2

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

|  |  |
|---|---|
| J.O.P., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 8:19-CV-01944-SAG |
| U.S. Department of Homeland Security, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

In this class action litigation, filed in 2019, a Plaintiff Class comprised of persons who entered this country as unaccompanied minors and later sought asylum sued the government Defendants.[1] The Class sought to enforce its members' rights to have their asylum applications adjudicated on the merits by USCIS while they remained physically present in the United States. The two parties in this case worked for many months, with the assistance of two different magistrate judges, to agree on the terms of a comprehensive Settlement Agreement last year. Once fully agreed, the parties executed the agreement, provided notice of the proposed agreement to the Plaintiff Class, and attended a fairness hearing before this Court. This Court granted final approval of the parties' Settlement Agreement in November, 2024 and retained jurisdiction to enforce its provisions. ECF 205. Defendants have now removed at least one Class Member from this country without adjudication of his asylum petition on the merits by USCIS. As a result, at this stage of the proceedings, both parties agree that this is just a breach of contract

---

[1] Defendants are the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and several officials of these agencies (collectively "Defendants" or "government Defendants").

1

case. It is not a habeas case, or a case assessing the propriety of the government's recent invocation of the Alien Enemies Act ("AEA").

Currently pending are three motions: Class Counsel's emergency motion to enforce the Settlement Agreement, ECF 227, and two motions to proceed by pseudonym, ECF 231, 236. Defendants have opposed the motions, ECF 248, 249, and Class Counsel filed a reply in support of their motion to enforce, ECF 250. This Court held a motions hearing on April 22, 2025. For the reasons set forth below, this Court will enforce the terms of the parties' binding Settlement Agreement and will grant the two motions to proceed by pseudonym.

## I.    Background

Pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA") and the Due Process Clause of the Fifth Amendment to the United States Constitution, a group of undocumented immigrants who entered the United States as unaccompanied children ("Plaintiffs") brought this action for declaratory and injunctive relief on July 1, 2019. The Complaint alleged that Defendants unlawfully modified policies governing treatment of an asylum application by an unaccompanied alien child ("UAC")[2] in a May 31, 2019 USCIS Memorandum ("2019 Redetermination Memo").[3] ECF 1. The Complaint included four named Plaintiffs, each of whom submitted personal declarations describing their departures from their countries of birth and their arrivals in the United States, ECF 16, 18, 19, 20. The named Plaintiffs

---

[2] An "unaccompanied alien child" or "UAC" means "'a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody,' as set forth in 6 U.S.C. § 279(g)(2)." ECF 199-2 at 6, Section II.U.

[3] The Court incorporates herein the extensive discussion of the statutory and regulatory background in this matter from its prior opinion, ECF 54 at 2-7.

moved to proceed under pseudonyms in this litigation, ECF 12, and the Court approved that procedure, ECF 55.

In 2024, the parties reached a final Settlement Agreement providing relief to a certified class of young asylum seekers previously determined to be UACs, ECF 199-2, and the Court granted final approval of the Settlement Agreement on November 25, 2024, ECF 205. The Settlement Agreement defines the certified Class as "all individuals nationwide who prior to [February 24, 2025[4]]: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits." ECF 199-2 at 5, Section II.E.

Section III.B is among the Settlement Agreement's core protections for Class Members which are relevant to the motion at issue. Section III.B provides that "USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement and adjudicate them on the merits." *Id*. at 7. Other provisions of the Settlement Agreement require USCIS's exercise of initial jurisdiction over Class Member asylum applications. *See* ECF 199-2 at 9, Section III.H ("With respect to DHS's treatment of Class Members in removal proceedings, DHS will refrain from taking the position that USCIS

---

[4] Section III.A provides that USCIS has "fully rescinded the 2019 Redetermination Memo" and will issue "a superseding memorandum explaining and implementing this Settlement Agreement" which "will remain in effect for at least three years" from its effective date. ECF 199-2 at 7. "The superseding memorandum's effective date will be 90 days after the Court's final approval of this Settlement Agreement," which is February 24, 2025. *Id*. The Defendants filed a Compliance Report stating that USCIS had issued a superseding memorandum in accordance with Section III.A of the Settlement Agreement. ECF 217 ¶ A.

3

does not have Initial Jurisdiction over a Class Member's asylum application.").

Particularly relevant to Class Counsel's motion to enforce the Settlement Agreement are Section III.I, which states that "[w]ith respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement," and Section V.D., which provides that "the complaining Class Member shall not be removed from the United States" once a motion to enforce has been filed "unless and until the matter has been resolved in favor of Defendants." ECF No. 199-2 at 9, 14.

On March 14, 2025, President Trump signed a Proclamation titled *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua* ("AEA Proclamation"). ECF 227-2 at 37. Section 1 of the Proclamation directed that "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua ("TdA")], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* at 40. Section 3 of the Proclamation provides that "all Alien Enemies described in section 1 of this proclamation are subject to immediate apprehension, detention, and removal, and . . . shall not be permitted residence in the United States." *Id.* Section 4 directs "the Attorney General and the Secretary of Homeland Security" to "apprehend, restrain, secure, and remove every Alien Enemy described in section 1." *Id.*

According to Robert Cerna, Acting Field Office Director Enforcement and Removal Operations ("ERO") at ICE, on March 15, 2025, "aliens" were removed to El Salvador after the AEA Proclamation took effect. ECF 227-2 at 46. On that date, ICE removed Cristian, a 20-year-old Class Member from Venezuela with a pending asylum application, to prison in El Salvador,

which Class Counsel argue is "in clear violation of the Settlement Agreement." ECF 227-1 at 5.

Class Counsel filed an Emergency Motion to Enforcement the Settlement Agreement, ECF 227,

seeking "the Court's intervention to order Defendants to remedy this violation of the Settlement

Agreement and prevent any further such violations." *Id*.

## II.    Jurisdiction

Defendants argue that this Court lacks jurisdiction over Plaintiffs' claims. ECF 248 at 13.

This argument is a nonstarter. On November 25, 2024, this Court issued an Order granting final

approval of the Settlement Agreement, "incorporated" the Agreement "by reference in [the]

Order," and "directed" the parties "to implement and consummate the Agreement according to

the terms and provisions of the Agreement." ECF 205 at 3. This Court maintains jurisdiction to

enforce its own orders, and the Settlement Agreement in this matter is no different. *See Fairfax

Countywide Citizens Ass'n v. Fairfax Cty.*, 571 F.2d 1299, 1303 n.8 (4th Cir. 1978) ("Where the

settlement agreement is approved and incorporated into an order of court, the district court

possesses jurisdiction to enforce its own order.").

Moreover, the Settlement Agreement and this Court's final Order approving the

Settlement Agreement both clearly provide this Court with jurisdiction to enforce the

Agreement's terms. ECF 199-2 at 13, Section V.A ("This Court shall retain exclusive jurisdiction

to supervise the implementation of this Settlement Agreement and to enforce its provisions and

terms…"); ECF 205 at 3 ("The Court retains jurisdiction to enforce the Agreement during the

term of the Agreement[.]"). Contrary to Defendants' assertions, the instant motion does not sound

in habeas because Plaintiffs are not asking the Court to determine the scope of Defendants'

removal authority under the AEA or challenging the application of the AEA to Cristian or any

other individual Class Member. Rather, Plaintiffs' motion "seeks to enforce the existing

Settlement Agreement," ECF 227, which the Court clearly has jurisdiction to do. *See* ECF 199-2 at 13, Section V.A; ECF 205 at 3 ("Should any party to the Agreement fail to honor the terms of this Order, the breaching party may petition for enforcement of this Order[.]"); *Williams v. Pro. Transp., Inc.*, 388 F.3d 127, 132 (4th Cir. 2004) ("District courts have inherent authority, derived from their equity power, to enforce settlement agreements.").

At bottom, this case, unlike other cases involving the government's removal of individuals under the AEA, is a contractual dispute because of the Settlement Agreement, ECF 199-2. *See Davis v. Wash. Metro. Area Transit Auth.*, No. 23-1171, 2023 WL 7410855, at *2 (D. Md. Nov. 8, 2023) ("The question of whether to enforce a settlement agreement is governed by 'standard contract principles,' because a settlement agreement is nothing more nor less than a contract."); *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) ("[T]o exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions."). Neither party disputes the existence of the Settlement Agreement, the terms of which are readily ascertainable and were mutually agreed upon by both parties. *See Lopez v. XTEL Const. Grp., LLC*, 796 F. Supp. 2d 693, 699 (D. Md. 2011). This Court will thus apply standard contract principles to assess the enforceability of the Settlement Agreement. *See Hayward v. Brown*, No. PWG-15-3381, 2017 WL 2117364, at *2 (D. Md. May 16, 2017) ("Under Maryland law, '[s]ettlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts.'" (citation omitted)).

### III.    The Settlement Agreement

#### A.  The Class Definition Does Not Exclude Individuals Who are Subject to the AEA.[5]

---

[5] This Court assumes, without deciding, for purposes of interpreting the Settlement Agreement

Defendants argue that removal of Cristian did not violate the Settlement Agreement because "his designation as an alien enemy pursuant to the AEA results in him ceasing to be a member" of the Class as defined in Section II.E. ECF 248 at 16. Specifically, Defendants contend that "aliens designated as alien enemies pursuant to the AEA are no longer eligible for asylum, a requirement for class membership." *Id*.

The Class Definition contains four elements. ECF 205 ¶ 2, ECF 199-2 at 5, Section II.E. Defendants contend that as to Cristian (and any Class Member against whom the AEA is invoked), "prong No. 4 of the class definition is unmet" because the "AEA invocation moots the asylum application such that USCIS cannot adjudicate" and thus "adjudication is not pending." ECF 248 at 17. But, nothing in the plain language of the Class Definition or in the larger Settlement Agreement "requires that USCIS have a present ability to adjudicate the application on the merits." *Id*. Rather, the fourth prong of the Class Definition unambiguously states that the Class includes individuals "for whom USCIS has not adjudicated the individual's asylum application on the merits." ECF 199-2 at 5, Section II.E. Section II.B defines "[a]djudicate on the merits" as "to render a decision on the substance of an asylum claim by either granting an approval or issuing a determination of non-eligibility." ECF 199-2 at 4. Defendants attempt to import a temporal limitation into the fourth prong of the Class Definition for which there is no support within the four corners of the Settlement Agreement. *See ACAS, LLC v. Charter Oak Fire Ins. Co.*, 626 F. Supp. 3d 866, 874 (D. Md. 2022) ("When interpreting a contract's terms, courts must look to the entire language of the agreement, not merely a portion thereof, and must consider the customary, ordinary and accepted meaning of the language used." (cleaned up)).

The Settlement Agreement makes no mention of the AEA. As this Court has stated,

_____

that Cristian is subject to the AEA Proclamation and that the AEA Proclamation is lawful.

"[n]othing in the plain language of the Class definition mentions the AEA or exempts any persons otherwise meeting the Class definition from the protections the Settlement Agreement affords." ECF 247 at 3. Allegations that Class Members, like Cristian, are subject to the AEA do not exclude those individuals from the Class under the plain terms of the Settlement Agreement.

Defendants do not dispute that Cristian meets the first three elements of the Class Definition in Section II.E. ECF 248 at 17. As to the fourth element, "USCIS has not adjudicated" Cristian's application for asylum "on the merits" because USCIS has not "render[ed] a decision on the substance of [his] asylum claim by either granting an approval or issuing a determination of non-eligibility." ECF 199-2 at 4, Section II.B & at 5, Section II.E; ECF 228 (under seal) ¶ 6 & at 9. Thus, Cristian remains a Class Member and is still entitled to all rights afforded to him under the Settlement Agreement.

### B. Removal of a Class Member Who Has Not Received Final Adjudication on the Merits by USCIS of a Properly Filed Asylum Application is a Violation of the Settlement Agreement.

Under Section III.I, the Settlement Agreement provides that "ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed application under the terms of this Agreement." ECF 199-2 at 9. According to Defendants, "final removal order" as used in Section III.I "only applies to final orders of removal in removal proceedings under Title 8." ECF 248 at 21. Thus, Defendants contend, "removal pursuant to the AEA does not violate the settlement agreement" and therefore, removal of Cristian did not violate the Settlement Agreement. *Id*.

Here again, Defendants attempt to add language to the Settlement Agreement that does not comport with the Agreement's plain terms. The Settlement Agreement does not define "final removal order," and as such, the Court "must give effect to its plain meaning and not contemplate

what the parties may have subjectively intended…at the time of formulation." *ACAS, LLC*, 626 F. Supp. 3d at 874 (citation omitted). In giving the terms their "customary" and "ordinary" meaning, the Court looks to "the entire language of the agreement" and considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id*. (citations omitted). The Defendants' narrow definition of "final removal order" is not supported by the language of the Settlement Agreement or the facts and circumstances surrounding its execution. The Settlement Agreement specifically defines many terms in Section II, ECF 199-2 at 4-7, but it does not define or limit the phrase "final removal order." Here, the AEA Proclamation served as a final removal order. Defendants executed Cristian's final removal from the United States under the AEA Proclamation in contravention of their obligations under the Settlement Agreement. Defendants to date, in the motions hearing and elsewhere, have repeatedly asserted that AEA removal is final and irrevocable.

The Settlement Agreement does not limit the protection against removal provided in Section III.I to any specific statutory mechanism for removal. In a separate section dealing with protection against removal when a motion to enforce the Settlement Agreement has been initiated, the Agreement also contains no limitation on the type of removal, stating only that "the complaining Class Member shall not be removed from the United States unless and until the matter has been resolved in favor of Defendants." ECF No. 199-2 at 14, Section V.D.

Finally, Defendants' proposed interpretation of Section III.I is not supported by the general purpose of the Settlement Agreement, which was to address "a USCIS policy that would have resulted in the improper removal of many Class Members by causing their asylum applications to be rejected for lack of jurisdiction" and to allow "Class Members in removal proceedings to have their asylum applications adjudicated on the merits by USCIS while they

remain in the United States with access to their counsel." ECF 227-1 at 16. Indeed, a core purpose of the Settlement Agreement would be nullified if Class Members with pending asylum applications could be summarily removed from the United States and thus rendered ineligible for asylum. The Class Members' "benefit of the bargain," which they procured in exchange for releasing, relinquishing, and discharging their class-wide claims, *see* ECF 199-2 at 14, consisted primarily of the assurance that they would not be removed from the United States until USCIS adjudicated their asylum claims on their merits. *See* Restatement (Second) of Contracts § 17 (Am. Law Inst. 1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). Construing the undefined phrase "final removal order" in the narrow manner advocated by Defendants would relieve Defendants of their obligation to uphold the promises they made to Class Members as consideration for the relinquishment of Class Members' action. Excepting removal under the AEA from the requirements of the Settlement Agreement would also render Defendants' promises illusory, a construction that violates the illusory promises doctrine. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015) (finding that the illusory promises doctrine "instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract"); 3 Williston on Contracts § 7:7 (4th ed. May 2024 Update). And permitting Defendants to remove a Class Member without holding up their end of the bargain (which is to afford particular process to the pending asylum claims before removal) undermines the implied duty of good faith and fair dealing incorporated in every contract. *See* Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

10

Therefore, under the plain terms of the Settlement Agreement and fundamental tenets of contract law, removal from the United States of a Class Member, including but not limited to Cristian, without a final determination on the merits by USCIS on the Class Member's pending asylum application violates the Settlement Agreement.

### C. The Court Will Enforce the Terms of the Settlement Agreement.

Defendants' arguments that this Court should find Section III of the Settlement Agreement "void and unenforceable" because it "violates public policy," ECF 248 at 26, carry no weight. Defendants have not even attempted to meet their burden under Federal Rule of Procedure 60(b) to procure relief from a final order and instead merely argue common law principles. *See* Fed. R. Civ. P. 60(b); *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 380 (1992) ("[A] party may obtain relief from a court order when it is no longer equitable that the judgment should have prospective application, not when it is no longer convenient to live with the terms of a consent decree." (citation omitted)). The parties finalized the Settlement Agreement just five months ago. ECF 205. While Defendants now assert "there is a strong public interest in ensuring the safety of citizens of the United States and protecting them from foreign invasions and designated terrorist organizations," ECF 248 at 26, Defendants have provided no evidence, or even any specific allegations, as to how Cristian, or any other Class Member, poses a threat to public safety. *Cf.* ECF 248-1 ¶¶ 13-14 ("ICE determined that [Cristian] was subject to the [AEA] Proclamation…On March 15, 2025, [Cristian] was removed under the [AEA]…as a Venezuelan citizen 14 years of age or older who is a member of TdA."). This Court is a court of evidence, resolving disputes by determining the facts based on evidence presented and applying relevant law to those facts.

At the motions hearing, Defendants suggested that evidence would be prohibited, citing

Section VIII.D of the Settlement Agreement, which states "that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving the interpretation of this Agreement." ECF 199-2 at 15. But here, Defendants are not asking this Court to make a determination "involving the interpretation of this Agreement." Defendants are asking this Court to void the Settlement Agreement, which it just approved. The high bar of Rule 60(b) is not met by conclusory assertions alone.

Even if Rule 60(b) did not apply, this Court would decline, in the absence of any particularized showing, to void Section III of the Settlement Agreement on public policy grounds. In enforcing the Agreement's terms, this Court takes into account the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," *Nken v. Holder*, 556 U.S. 418, 436 (2009), and the public's "interest in seeing its governmental institutions follow the law," *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (citing *Roe v. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020)). *See also Alston v. TowneBank*, No. GJH-20-690, 2022 WL 971008, at *6 (D. Md. Mar. 31, 2022) (noting that "public policy considerations favor the enforcement of settlement agreements"). The fact that Defendants may have "second thoughts about the results of a settlement agreement does not justify setting aside an otherwise valid agreement." *Young v. FDIC*, 103 F.3d 1180, 1195 (4th Cir. 1997).

### D. Remedies

Defendants have breached the terms of the Settlement Agreement by removing at least one Class Member from the United States while his asylum application remains pending with USCIS. It is an axiomatic principle of contract law that when a defendant breaches a contract, that defendant must restore the situation that existed before the breach. *See* Restatement (Second)

of Contracts § 347 cmt. a (Am. Law Inst. 1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain…[and] put him in as good a position as he would have been in had the contract been performed."); *id*. § 344 cmt. a ("Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract…[and] attempting to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach."); *Hewitt v. Dyck-O'Neal, Inc.*, No. 20-1322, 2021 WL 3784867, at *1 (D. Md. Aug. 26, 2021) (describing a motion to enforce a settlement agreement as "tantamount to an action for specific performance of a contract" (citation omitted)). In the case of Cristian, this requires putting him in the position "to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, No. 24-A949, 604 U.S. __, 2025 WL 1077101, at *1 (Apr. 10, 2025). In other words, under contract law principles, Cristian, and any other Class Member who has been removed in violation of the Settlement Agreement, must be returned to the United States to await adjudication of his asylum application on the merits by USCIS. *See* ECF 199-2 at 9, Section III.I.

Of course, that ruling puts this case squarely into the procedural morass that has been playing out very publicly, across many levels of the federal judiciary, in *Abrego Garcia v. Noem*, No. 8:25-cv-00951 (D. Md.). As of the date of this order, discovery is underway regarding the government's efforts to comply with court orders (including from the United States Supreme Court) to "facilitate" Mr. Abrego Garcia's return to the United States. *See id*. at ECF 79. This Court is mindful of the Supreme Court's reminder to afford the "deference owed to the Executive Branch in the conduct of foreign affairs." *Noem*, 2025 WL 1077101, at *2. However, this Court

13

is also guided by, and fully agrees with, the definition of "facilitate" espoused by Judge Xinis and the United States Court of Appeals for the Fourth Circuit in *Abrego Garcia*. *See* No. 8:25-cv-00951, ECF 79 at 4 (D. Md. Apr. 15, 2025) ("Defendants therefore remain obligated, at a minimum, to take the steps available to them toward aiding, assisting, or making easier Abrego Garcia's release from custody in El Salvador and resuming his status quo ante."); No. 25-1404 (4th Cir. Apr. 17, 2025) ("'Facilitate' is an active verb. It requires steps to be taken as the Supreme Court has made perfectly clear…The plain and active meaning of the word cannot be diluted by its constriction…to a narrow term of art."); *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Wilkinson, J. concurring) (noting that removed individuals "can be afforded effective relief by facilitation of their return"). Standing by and taking no action is not facilitation. In prior cases involving wrongfully removed individuals, courts have ordered, and the government has taken, affirmative steps toward facilitating return. *See Nat'l Immigr. Project of Nat'l Laws. Guild*, No. 11-CV-3235 JSR, ECF No. 79-4 at 40-46 (S.D.N.Y. July 16, 2014) (describing "the government's procedures for facilitating return" after removal of noncitizen); *id.*, ECF 16-4 at 19-25 (engaging ICE Attaché in South Africa to facilitate the return of a removed noncitizen in Ethiopia); *id.*, ECF No. 38-6 at 31 (working with U.S. Embassy in Tokyo to secure return of removed noncitizen); *Hamama v. Adducci*, No. 2:17-cv-11910, ECF 513 (E.D. Mich. Jan. 15, 2019) (ordering defendants to "use all best efforts to ensure" return of noncitizen who was removed in violation of court's order and providing specific directives to facilitate return).

Thus, like Judge Xinis in the *Abrego Garcia* matter, this Court will order Defendants to facilitate Cristian's return to the United States so that he can receive the process he was entitled to under the parties' binding Settlement Agreement. This Court further orders that facilitating

Cristian's return includes, but is not limited to, Defendants making a good faith request to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States to await the adjudication of his asylum application on the merits by USCIS.[6]

### E. Motions to Proceed Under Pseudonym

Class Counsel filed two motions, ECF 231, 236, seeking to maintain the anonymity of the Class Members at issue in their filings by proceeding under pseudonym.[7] Specifically, Class Counsel notes that the Court has previously permitted the Named Plaintiffs in this litigation to proceed by pseudonym, ECF 55, 116, and requests that other Class Members be permitted to do the same because of "the strong public interest in restricting the asylum seeker's identity from the public;" the "risk of retaliation to the Class Member if his identity is made public;" and the lack of any prejudice to Defendants, who are aware of the Class Members' identities. ECF 231 at 2, ECF 236 at 2. Defendants object, arguing that Plaintiffs "have not established that the privacy concerns at issue outweigh the significant public interest in open proceedings." ECF 249 at 1.

Federal Rule of Civil Procedure 10(a) mandates generally that pleadings contain the names of parties. However, courts may exercise their discretion in allowing parties to proceed by pseudonym and consider "the circumstances of particular cases," including "that privacy or confidentiality concerns are sometimes sufficiently critical." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) (noting "a judicial duty to inquire into the circumstances of particular cases to

_____

[6] Of course, the Settlement Agreement does not entitle Class Members to USCIS approval of an asylum application. The Agreement does not guarantee results, but it does guarantee process. Defendants have deprived Cristian of the benefit of the Class's bargain.

[7] ECF 236 relates to a motion for Temporary Restraining Order concerning a Class Member called "Javier." ECF 235. At present, to this Court's understanding, Javier remains in the United States.

determine whether the dispensation is warranted"). The Fourth Circuit has articulated a list of

non-exhaustive factors "as guides to a proper exercise of discretion":

> [(1)] whether the justification asserted by the requesting party is merely to avoid the
> annoyance and criticism that may attend any litigation or is to preserve privacy in a
> matter of sensitive and highly personal nature; [(2)] whether identification poses a risk
> of retaliatory physical or mental harm to the requesting party or even more critically,
> to innocent non-parties; [(3)] the ages of the persons whose privacy interests are sought
> to be protected; [(4)] whether the action is against a governmental or private party; and
> [(5)] the risk of unfairness to the opposing party from allowing an action against it to
> proceed anonymously.

*James v. Jacobson*, 6 F.3d 233, 238–39 (4th Cir. 1993).

The Class Members at issue here are two "Venezuelan youth seeking asylum in the United

States." ECF 231-1 at 4; ECF 236-1 at 4. Courts have addressed "the unique vulnerabilities of asylum

seekers" and "allowed them to proceed pseudonymously as a result." *Doe v. U.S. Immigr. & Customs

Enf't*, No. 1:23-cv-00971-MLG-JMR, 2024 WL 4389461, at *2 (D.N.M. Oct. 3, 2024) (collecting

cases). Here, Plaintiffs' declarations make clear that they do not seek to proceed under pseudonym

"merely to avoid…annoyance and criticism" but "to preserve privacy" and security in a "sensitive"

matter. *See James*, 6 F.3d at 238; ECF 228 (under seal) ¶ 5 (Class Member Cristian came to the United

States "fleeing danger and threats in Venezuela"); ECF 242 (under seal) ¶¶ 5-6 (Class Member Javier

came to the United States "to escape political violence in Venezuela that directly targeted his

family."). Relatedly, Plaintiffs have sufficiently alleged that disclosure of their identities poses a risk

of retaliatory harm. Plaintiffs clearly face the risk of retaliatory harm in their home country, as well

as in detention in El Salvador and potentially within the United States, if their identities are made

public. The threat of physical retaliatory harm within El Salvador's prisons and within the United

States has prompted other courts considering analogous factual circumstances to permit

pseudonymity. *See, e.g.*, *D.B.U. v. Trump*, No. 25-cv-1163, ECF 11 (D. Colo. Apr. 14, 2025); *G.F.F.

v. Trump*, No. 25-cv 2886, ECF 10 (S.D.N.Y. Apr. 8, 2025). The first and second *James* factors thus

weigh in favor of permitting Plaintiffs to proceed under pseudonym.

As to the third *James* factor, Cristian is 20 years old, ECF 231-1 at 5, and Javier is 18 years old, ECF 236-1 at 5. While these Plaintiffs are no longer minors, this Court has previously permitted Named Plaintiffs, who were all at least 18 years old when this litigation was filed, to proceed using a pseudonym, *see* ECF 91, 55, 116. Moreover, early in this litigation, this Court approved a Protective Order that directs the parties to maintain the confidentiality of Class Members' "identifying information" including "their names." ECF 136-1 at 2-3 ("Plaintiffs' and other putative class members' identifying information, including their names…shall be subject to the terms of this Order, and pursuant to the Court's orders granting Plaintiffs' motions to proceed using pseudonyms, the Parties will, in all public documents or Court filings or discussions in open Court, reference Plaintiffs and other putative class members only by their initials"); ECF 144 at 3 (order entering proposed protective order). Thus, this factor also leans in favor of maintaining Plaintiffs' anonymity via using pseudonyms.

The final two *James* factors also weigh in favor of Plaintiffs. While "there is a heightened public interest when an individual or entity files a suit against the government," Plaintiffs' individual identities here are "incidental to the adjudication of [their] claims," which seek to enforce their rights under the Settlement Agreement. *P.K. v. U.S. Customs & Border Prot.*, No. 22-1983, 2022 WL 22626436, at *3 (D.D.C. July 12, 2022) (citation omitted). Finally, Plaintiffs' identities are already known to Defendants, and Defendants do not argue that they are prejudiced in any way if Cristian and Javier proceed by pseudonym.

**IV.    Conclusion**

For the reasons set forth above, Class Counsel's Emergency Motion to Enforce the Settlement Agreement, ECF 227, and Motions to Proceed Under Pseudonym, ECF 231, 236, will be GRANTED. A separate Order follows.

Dated: <u>April 23, 2025</u>                        _____

/s/

                                                    Stephanie A. Gallagher
                                                    United States District Judge

19

**REDACTED**

# Exhibit A



| | | |
|---|---|---|
| **U.S. Citizenship and Immigration Services** | Applicant ████████ | Officer: Monica Araujo<br>Assessment Date: May 1, 2025 |

## USCIS Affirmative Asylum Checklist Assessment – Indicative Asylum Decision

> **Indicative Asylum Decision**
> Mandatory Bar to a Grant of Asylum and
> Discretionary Denial
> Supervisor: Anthony Negrut      **A.N.**

### BIOGRAPHIC INFORMATION

| Age<br>**20** | Country of Birth<br>**Venezuela** | Citizenship(s)<br>**Venezuela** |
|---|---|---|
| Port of Entry<br>████████ | Date of Entry<br>████████ | Status at Entry<br>**EWI** |
| Current Status | Status Expiration | Asylum Application Filing Date<br>**2022-12-20** |

### BARS TO APPLYING FOR ASYLUM

Is the applicant eligible to apply for asylum?
**No (not physically presently in the United States); indicative decision below is based on evidence in the record if we were to obtain jurisdiction of the case and adjudicate**

ONE-YEAR FILING DEADLINE

One-Year Filing Deadline: Did the applicant establish by clear and convincing evidence that the application was filed within one year after the applicant's date of last arrival in the United States?
**N/A**
Application filed by:
**Unaccompanied Child (UC), as defined at 6 U.S.C. § 279(g)(2)**

PRIOR DENIAL OF ASYLUM BY EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (EOIR)

Prior Denial of Asylum by EOIR: Is there evidence of a prior asylum denial by EOIR?
No

### MANDATORY BARS

Does the evidence indicate that a mandatory bar to asylum applies to the applicant?
Yes



**U.S. Citizenship and Immigration Services**

| Applicant: ████████ | Officer: Monica Araujo |
|---|---|
| ████████ | Assessment Date: May 1, 2025 |

### Terrorism-Related Inadmissibility Grounds (TRIG)

Evidence indicates the applicant would be subject to TRIG and inadmissible under INA 212(a)(3)(B)(i)(V) as an alien who is a member of a designated terrorist organization, namely, Tren de Aragua (TdA). On February 20, 2025, TdA was designated by the Secretary of State, in accordance with section 219 of the Immigration and Nationality Act (INA), as a Foreign Terrorist Organization (FTO). *See* "Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana," A Notice by the State Department on 02/20/2025, 2025-02873 (90 FR 10030), available at: https://www.federalregister.gov/documents/2025/02/20/2025-02873/foreign-terrorist-organization-designations-of-tren-de-aragua-mara-salvatrucha-cartel-de-sinaloa. ████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████ and based on reviewed evidence, the applicant would be subject to TRIG as a member of a designated terrorist organization and inadmissible under INA 212(a)(3)(B)(i)(V), for which no exemption is available. The applicant would therefore be barred from asylum under INA 208(b)(2)(A)(v) as an alien subject to TRIG.

TRIG Exemption Outcome:
**Exemption Not Available**

### DISCRETION

Should USCIS exercise discretion to grant asylum?
No
Explanation:

- Evidence reveals grave negative factors that would weigh against a favorable exercise of discretion in this case. ████████████████ a group that has been designated by the Secretary of State as an FTO, as described above. The President has found and declared TdA to be "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Presidential Proclamation 10903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, March 14, 2025, 2025-04865 (90 FR 13033), available at: https://www.federalregister.gov/documents/2025/03/20/2025-04865/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua. Reports further note from its origins in Venezuela, TdA "has expanded into Colombia, Ecuador, Peru and Chile and diversified from extorting migrants into sex-trafficking, contract killing and kidnapping." Lisa Lambert, "What is Tren de Aragua, the Venezuelan gang targeted by Trump?," BBC News, March 17, 2025, available at: https://www.bbc.com/news/articles/cr421q5zl69o. A Chilean prosecutor described the group as a "'brutal organization'" that uses murder and torture to achieve its aims." *Id.* Considering the nature and targets of TdA's known activities ████████████████ ████████████ these factors would weigh so heavily against any favorable exercise of discretion in this case that they would be impossible to be outweighed. Moreover, ████████████

**U.S. Citizenship and Immigration Services**

Applicant █████████

Officer: Monica Araujo
Assessment Date: May 1, 2025

██████████████ As such, it would be unnecessary to make a determination as to whether the applicant meets the refugee definition in this case, considering even if he met the refugee definition, the severity of the negative factors would still weigh against an exercise of discretion to grant asylum.

## DETERMINATION

The application for asylum would be DENIED because there is evidence indicating that a mandatory bar to asylum would apply to the applicant and USCIS would not exercise its favorable discretion to grant asylum.

# EXHIBIT 1

## SETTLEMENT AGREEMENT

*J.O.P. v. D.H.S. et al.*
District of Maryland
Civil Action No. 8:19-CV-01944-SAG

Plaintiffs J.O.P., M.E.R.E., K.A.R.C., E.D.G., and L.M.Z. (the "Named Plaintiffs"), and the Class (defined in Section II of this Settlement Agreement) (collectively, "Plaintiffs"), and Defendants U.S. Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; U.S. Citizenship and Immigration Services ("USCIS"); Ur Mendoza Jaddou, in her official capacity as Director of USCIS; U.S. Immigration and Customs Enforcement ("ICE"); and  Patrick J. Lechleitner, in his official capacity as ICE Deputy Director and Senior Official Performing the Duties of the Director (collectively, "Defendants") (together with the Plaintiffs, the "Parties"), by and through their attorneys, hereby enter into this Settlement Agreement, as of the date it is executed by all Parties hereto and effective upon final approval of the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I.    RECITALS

**A.** On July 1, 2019, Plaintiffs J.O.P., M.A.L.C., M.E.R.E., and K.A.R.C. commenced this litigation for declaratory and injunctive relief (the "Action") based on allegations that USCIS had adopted policies, as reflected in the May 31, 2019 memorandum titled "Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children" ("2019 Redetermination Memo"), that changed how USCIS would implement protections provided to Unaccompanied Alien Children ("UAC") under the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), which policies were contrary to the TVPRA, and violative of the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  Under the 2019 Redetermination Memo, a child in immigration court removal proceedings who had previously been determined to be a UAC and who applied for asylum after turning 18 or reunifying with a parent or legal guardian would have their asylum application rejected by USCIS for lack of jurisdiction.  The 2019 Redetermination Memo also directed that a child previously determined to be a UAC would be subject to the One-Year Deadline for filing asylum applications—a deadline from which UACs are statutorily exempt—if they applied for asylum after turning 18 or reunifying with a parent or legal guardian.

**B.** The Court entered a temporary restraining order on August 2, 2019, and converted it to a preliminary injunction on October 15, 2019, enjoining and restraining Defendants, during the pendency of the litigation, from (i) applying the policy set forth in the 2019 Redetermination Memo, to bar individuals previously determined to be UACs from seeking asylum before USCIS; and (ii) rejecting jurisdiction over the application of any UAC (as defined in the Homeland Security Act, 6 U.S.C. § 279(g)(2)) under the TVPRA whose application would have been accepted under the USCIS policy predating the 2019 Redetermination Memo.  The Court also ordered Defendant USCIS to retract any adverse decision already rendered in an individual case applying the 2019

Redetermination Memo and reinstate consideration of such case applying the 2013 UAC Memorandum (also known as the 2013 Kim Memo).

**C.** On December 20, 2019, Plaintiffs J.O.P., M.A.L.C., M.E.R.E., K.A.R.C., and E.D.G. filed an amended complaint that included their prior allegations and also alleged, *inter alia*, that USCIS had adopted an unlawful policy, as reflected in the 2019 Redetermination Memo, to defer to a determination by an Executive Office for Immigration Review ("EOIR") immigration judge that USCIS does not have jurisdiction over an asylum application because it was not one filed by a UAC.

**D.** On December 21, 2020, the Court entered an amended preliminary injunction, such that Defendants, during the pendency of this litigation, are "(1) enjoined and restrained from relying on the policies set forth in the 2019 [Redetermination Memo] as a basis to decline jurisdiction over asylum applications of individuals previously determined to be unaccompanied alien children ("UACs"), to subject an asylum applicant to the one-year time limit for filing described at 8 U.S.C. § 1158(a)(2)(B), or for any other purpose; (2) enjoined and restrained from rejecting jurisdiction over any asylum application filed by Plaintiffs and members of the class whose applications would have been accepted under the 2013 Kim Memo; (3) enjoined and restrained from deferring to EOIR determinations in assessing jurisdiction over asylum applications filed by Plaintiffs and members of the proposed class; and (4) enjoined and restrained during the removal proceedings of any Plaintiff or member of the class (including EOIR proceedings before immigration judges and members of the Board of Immigration Appeals) from seeking denials of continuances or other postponements in order to await adjudication of an asylum application that has been filed with USCIS, from seeking EOIR exercise of jurisdiction over any asylum claim where USCIS has initial jurisdiction under the terms of the 2013 Kim Memo, or from otherwise taking a position in such individual's removal proceedings that, inconsistent with the 2013 Kim Memo, USCIS does not have initial jurisdiction over the individual's asylum application." The Court also ordered Defendant USCIS to "retract any adverse decision rendered on or after June 30, 2019 that is based in whole or in part on any of the actions enjoined and restrained by (1), (2), or (3) above."

**E.** On December 21, 2020, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the Court certified the following Class:

All individuals nationwide who prior to the effective date of a lawfully promulgated policy prospectively altering the policy set forth in the 2013 Kim Memorandum (1) were determined to be an Unaccompanied Alien Child; and (2) who filed an asylum application that was pending with the United States Citizenship and Immigration Services ("USCIS"); and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits.

2

**F.** On January 11, 2021, Plaintiffs J.O.P., M.A.L.C., M.E.R.E., K.A.R.C., E.D.G., and L.M.Z. filed a second amended complaint that included their prior allegations and also alleged, *inter alia*, that USCIS had adopted an unlawful policy or practice of treating recognitions or notations as to evidence that a child has turned 18 or been reunited with a parent or legal guardian as "affirmative acts" under the 2013 Kim Memo.

**G.** On February 19, 2021, Defendants filed an appeal from the Court's December 21, 2020 Order with the U.S. Court of Appeals for the Fourth Circuit.

**H.** On March 4, 2021, Defendants agreed as follows:  that USCIS will not make jurisdictional determinations under INA § 208(b)(3)(C) that rely solely on a UAC redetermination noted in ENFORCE Alien Removal Module ("EARM") or other ICE or DHS systems as terminating a prior UAC Determination, unless it documents that ICE placed the individual in ICE custody as an adult detainee; and that while this agreement remains in effect, USCIS will place on hold cases involving any other type of act that might qualify under the 2013 Kim Memo as an "affirmative act" before filing.

**I.** The Parties, through counsel, have conducted discussions and arm's length negotiations regarding a compromise and settlement of the Action with a view to settling all matters in dispute.

**J.** Considering the benefits that the Class (including Named Plaintiffs) will receive from settlement of the Action and the risks of litigation, counsel for the Class ("Class Counsel") have concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, adequate, equitable, and in the best interests of the Class.

**NOW, THEREFORE**, in recognition that the Parties and the interests of justice are best served by concluding this Action, subject to the Court's approval and entry of an order consistent with this Agreement, the undersigned Parties, through counsel, hereby STIPULATE and AGREE as follows:

## II.    DEFINITIONS

As used throughout this Settlement Agreement, the following definitions shall apply:

**A.** **"Action"** means the civil action captioned *J.O.P. et al. v. D.H.S. et al.*, Civil Action No. 8:19-CV-01944-SAG, United States District Court for the District of Maryland.

**B.** **"Adjudicate on the merits"** means to render a decision on the substance of an asylum claim by either granting an approval or issuing a determination of non-eligibility.

**C.** **"Adverse Jurisdictional Determination"** means a determination by USCIS that it lacks jurisdiction over an asylum claim.

D. **"Appeal"** means the Defendants' appeal from the December 21, 2020 decision in the Action, filed in the United States Court of Appeals for the Fourth Circuit, C.A. No. 21-1187.

E. **"Class"** means all individuals nationwide who prior to the effective date of the superseding memorandum discussed in Section III(A): (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits. As the Class is defined more specifically under this Settlement Agreement than in the Court's class certification order, the Parties agree to seek a modification of the Class definition from the Court.

F. **"Class Counsel"** means Goodwin Procter LLP, Public Counsel, National Immigration Project of the National Lawyers Guild ("NIPNLG"), Kids in Need of Defense ("KIND"), and Bet Tzedek Legal Services. Should any of the foregoing entities change their name or merge with other entities, those new entities shall also qualify as Class Counsel.

G. **"Class Member"** means a member of the Class.

H. **"Court"** means the U.S. District Court for the District of Maryland.

I. **"Defendants"** means DHS; Alejandro Mayorkas, in his official capacity as Secretary of DHS; USCIS; Ur Mendoza Jaddou, in her official capacity as Director of USCIS; ICE; and Patrick J. Lechleitner, in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of ICE.

J. **"Effective Date"** means the date this Settlement Agreement receives final approval by the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure.

K. **"EOIR"** means the Executive Office for Immigration Review, the U.S. Department of Justice body tasked with hearing immigration court proceedings and adjudicating appeals, which includes immigration judges and appellate immigration judges assigned to the Board of Immigration Appeals.

L. **"Final Determination"** means either that: (a) USCIS has made an adjudication on the merits, as defined in Paragraph II.B; or (b) USCIS has provided notice to the applicant that the asylum application has been dismissed, terminated, or returned to immigration court due to an Adverse Jurisdictional Determination as defined in Paragraph II.C, except that no Adverse Jurisdictional Determination shall give rise to a Final Determination: (1) while the Class Member is challenging the Adverse Jurisdictional Determination via the procedure described in Paragraph V.D; (2) if the Adverse Jurisdictional Determination was issued under Paragraph III.C, while the Class

4

Member is still within the time period to file a rebuttal as described in that paragraph and while the Class Member's rebuttal is pending before USCIS; or (3) if the Adverse Jurisdictional Determination must be re-examined under Paragraph III.E and that re-examination is not yet complete.

M. **"Initial Jurisdiction"** means USCIS jurisdiction over an individual's asylum claim pursuant to 8 U.S.C. § 1158(b)(3)(C) despite the individual's being in removal proceedings.

N. **"Named Plaintiffs"** means J.O.P., M.E.R.E., K.A.R.C., E.D.G., and L.M.Z.  The full names of the Named Plaintiffs have been provided to the Court under seal.

O. **"One-Year Deadline"** means the general requirement for asylum seekers to file any asylum application within one year of their last arrival in the United States, set forth at 8 U.S.C. § 1158(a)(2)(B).

P. **"Parties"** means Plaintiffs and Defendants in the Action.

Q. **"Settlement Agreement"** or **"Agreement"** means this Class Action Settlement Agreement between the Parties in the Action, including all exhibits.

R. **"Settled Claims"** means all claims for relief that were brought in the Action on behalf of Named Plaintiffs and Class Members alleged in Plaintiffs' Complaints.

S. **"Termination Date"** means the date that is 548 days after the Effective Date.

S.1 **"Termination Date – USCIS Memo"** means the date that is three years after the superseding memorandum's effective date as set forth in paragraph III.A of this Settlement Agreement.

T. **"TVPRA"** means the William Wilberforce Trafficking Victims Protection Reauthorization Act, Public Law 110-457, 122 Stat. 5044 (December 23, 2008).

U. **"Unaccompanied Alien Child"** or **"UAC"** means "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody," as set forth in 6 U.S.C. § 279(g)(2).

V. **"Prior UAC Determination"** means a finding by ICE or U.S. Customs and Border Protection that an individual is a UAC as defined in 6 U.S.C. § 279(g)(2).

W. "**2013 Updated Procedures Memo**" means the May 28, 2013 Memorandum, titled "Updated Procedures for Determination of Initial Jurisdiction over Asylum

5

Page 034

Applications Filed by Unaccompanied Alien Children" from Ted Kim (Acting Chief, Asylum Division, USCIS).

X. "**2019 Redetermination Memo**" means the May 31, 2019 Memorandum, titled "Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children" from John Lafferty (Chief, Asylum Division, USCIS).

## III.   AGREED UPON TERMS

A. USCIS has fully rescinded the 2019 Redetermination Memo. USCIS labelled the website with the 2019 Redetermination Memo with a banner stating the memo is no longer current.  USCIS will also issue a superseding memorandum explaining and implementing this Settlement Agreement no later than 90 days after the Court's final approval of this Settlement Agreement. The superseding memorandum's effective date will be 90 days after the Court's final approval of this Settlement Agreement. The superseding memorandum will apply to Class Members as well as other individuals with Prior UAC Determinations who file an asylum application when the memorandum is in effect. The superseding memorandum will remain in effect for at least three years from the superseding memorandum's effective date.

B. USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement and adjudicate them on the merits, and USCIS will hold such applications exempt from the One-Year Deadline.

C. **1.** Notwithstanding Paragraph III.B of this Settlement Agreement, USCIS may determine it lacks Initial Jurisdiction over the asylum application of a Class Member if the Class Member was placed in adult immigration detention after a Prior UAC Determination but before filing their asylum application. "Placed in adult immigration detention" does not include custody for the sole purposes of processing the Class Member prior to release on their own recognizance or release through another alternative to detention, such as an order of supervision, parole, enrollment in an alternative to detention program, or ICE bond. The Class Member must submit evidence of a Prior UAC Determination that USCIS may adopt. If the individual had contact with ICE as an adult, they may also submit evidence of any custodial determinations made by ICE after they attained 18 years of age, including but not limited to the Class Member's declaration made in accordance with 28 U.S.C. § 1746.

**2.** When USCIS declines Initial Jurisdiction based on this provision, USCIS must provide the Class Member and counsel, if any, with: (a) the jurisdictional rejection; (b) a detailed description of the information leading USCIS to believe that the Class Member was placed in adult immigration detention; and (c) an opportunity to rebut the information within 30 days (or 33 days if the rejection and accompanying detailed description are served by mail). USCIS shall simultaneously provide the Class Member and counsel, if any, with Class Counsel's contact information, using the language found at Exhibit A. USCIS shall retract the jurisdictional rejection within 30 days of having

received the Class Member's rebuttal if the Class Member has successfully rebutted the information USCIS relied upon to reject Initial Jurisdiction.

**3.** For Class Members who fall within this paragraph due to USCIS's rejection of Initial Jurisdiction and whose applications could otherwise be deemed untimely, DHS generally will agree to stipulate in their removal proceedings that the Class Member qualifies for an extraordinary circumstances exception under 8 U.S.C. § 1158(a)(2)(D), 8 C.F.R. § 208.4(a)(5), and has filed within a reasonable period given the circumstances under 8 C.F.R. § 208.4(a)(5) for purposes of the One-Year Deadline such that the One-Year Deadline does not bar the asylum application.

**D.** In assessing its jurisdiction over asylum applications filed by a Class Member, USCIS will not defer to any determinations by EOIR, including but not limited to determinations made pursuant to *Matter of M-A-C-O-*, 27 I&N Dec. 477 (BIA 2018). Notwithstanding the previous sentence, USCIS may adopt a previous EOIR determination that a Class Member was a UAC at the time of filing their asylum application for purposes of USCIS's accepting Initial Jurisdiction over a Class Member's asylum application.

**E. 1.** Defendants shall retract any Adverse Jurisdictional Determinations rendered on or after June 30, 2019 that merit retraction under the process described in Paragraph III.C.2 no later than 240 days after USCIS's issuance of the superseding memorandum described in Paragraph III.A.

**2.** Defendants shall retract all other Adverse Jurisdictional Determinations rendered on or after June 30, 2019 that are inconsistent with Paragraphs III.B and/or III.D no later than 180 days after USCIS's issuance of the superseding memorandum described in Paragraph III.A.

**3.** No later than 60 days after the Effective Date, Defendants shall mail to Class Members whose cases will be reviewed under this paragraph a notice of re-examination of jurisdictional determination indicating that USCIS will make a jurisdictional determination in the case pursuant to this Settlement Agreement. Defendants shall include in the notice Class Counsel's contact information, using the language found at Exhibit A.

**F.** No later than 60 days after USCIS's issuance of the superseding memorandum described in Paragraph III.A of this Settlement Agreement, Defendants shall release the holds placed beginning in March 2021 on certain Class Members' asylum applications involving acts that in USCIS's view might have qualified under the 2013 Kim Memo as an affirmative act before filing and shall mail to such Class Members a notice that their asylum application has been released from the hold. Defendants shall include in the notice Class Counsel's contact information, using the language found at Exhibit A.

**G.** Defendants will adopt procedures permitting Class Members to request that USCIS exercise its discretion to expedite adjudication of asylum applications pending with USCIS on the basis of circumstances that include but need not be limited to:

    **1.** The Class Member's immigration detention;

    **2.** The Class Member received a Notice of Lack of Jurisdiction that was retracted under Paragraph III.C or Paragraph III.E of this Settlement Agreement; or

    **3.** The Class Member has an order of removal.

All Class Members, including Class Members whose asylum applications were released from hold pursuant to Paragraph III.F of this Settlement Agreement, may also avail themselves of the general expedite procedures available at their local asylum offices.

**H.** With respect to DHS's treatment of Class Members in removal proceedings, DHS will refrain from taking the position that USCIS does not have Initial Jurisdiction over a Class Member's asylum application. DHS will join or non-oppose Class Members' motion(s) for a continuance, administrative closure unless unavailable under controlling law in a particular jurisdiction, and, where available, assignment of cases to the EOIR status docket, that have been filed or made orally on the record in immigration proceedings in order to await USCIS exercise of Initial Jurisdiction over their asylum application. Nothing in this provision prevents DHS from either filing a motion to dismiss or terminate removal proceedings of a Class Member to await USCIS's adjudication of the asylum application or as a matter of prosecutorial discretion, or from joining or non-opposing a motion to dismiss or terminate proceedings filed or made orally on the record by a Class Member. DHS will generally join or non-oppose Class Members' motion(s) to dismiss or terminate filed or otherwise made in order to await USCIS exercise of Initial Jurisdiction over their asylum application. Defendants retain discretion to oppose Class Members' motion(s) if it deems such opposition warranted based on the individual facts of the cases, as long as DHS's opposition is not based, in whole or in part, on a position that USCIS does not have Initial Jurisdiction over the Class Member's asylum application. Pursuant to this paragraph, Defendants agree that in cases where DHS chooses not to file any response with EOIR indicating its position on the Class Members' properly served motions for continuance, dismissal or termination, administrative closure unless unavailable under controlling law in a particular jurisdiction, adjournments or, where available, assignment of cases to the EOIR status docket, this provision of the Settlement Agreement serves as evidence of DHS's non-opposition.

**I.** With respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement. In order to comply with this provision, ICE Enforcement and Removal

Operations (ERO), the agency responsible for executing removal orders, will make an entry indicating there is a stay in its system of records for all identified Class Members, including Class Members identified by USCIS. This alert will not be removed from any individual case until such time as USCIS indicates it is appropriate to remove it.

**J.** Following a grant of asylum by USCIS to a Class Member with a removal order:

    **1.** Defendants agree that, where DHS has chosen not to file a response to a properly filed and served Class Member's motion to reopen, this provision of the Settlement Agreement serves as evidence of DHS's non-opposition to the motion filed on behalf of a Class Member described in this section. To avoid the time and number bars for motions to reopen, Defendants agree that Class Members may style their motions to reopen as a "joint motion to reopen" and include language that "Pursuant to the Settlement Agreement in *J.O.P. v. U.S. Department of Homeland Security*, No. 19-01944 (D. Md.), DHS is joining in the motion unless DHS files a response within 30 days opposing the motion." DHS will generally join or not oppose a motion to reopen. The use of this provision of the Settlement Agreement as evidence of joinder is solely limited to DHS's joinder for the purposes of acknowledging class membership and the terms of the Settlement Agreement, and as a factor for the applicability of any time or number bars that may otherwise apply to the motion. This provision may not be used for any other purpose. The Defendants agree that any opposition to the motion to reopen will not be based on a position that USCIS did not have Initial Jurisdiction over the Class Member's asylum application. The joinder framework found in this paragraph only applies to motions to reopen and shall have no effect on any combination or concurrently filed motions, e.g., motions to reopen and dismiss.

    **2.** In conjunction with or following reopening of such proceedings, DHS will generally join or non-oppose termination or dismissal of removal proceedings, but retains discretion to oppose termination or dismissal if it deems such opposition warranted based on the individual facts of a case, as long as DHS's opposition is not based, in whole or in part, on a position that USCIS did not have Initial Jurisdiction over the Class Member's asylum application.

    **3.** Nothing in this provision prevents DHS from filing an unopposed or joint motion to reopen the removal proceedings of a Class Member described in this section, or from filing an unopposed or joint motion to dismiss or terminate proceedings of a Class Member described in this section.

**K.** For any provision of this Settlement Agreement wherein DHS will join or non-oppose motions filed or made by Class Members, DHS will join or non-oppose such motions when they are submitted with sufficient evidence of Class membership. Any one of the following documents provides sufficient evidence of Class membership for purposes

of DHS's obligations to join or non-oppose motions as specified elsewhere in the Settlement Agreement. In its discretion, DHS may treat evidence other than that specified below as sufficient evidence of Class membership.

1. A copy of a receipt for an asylum application filed pursuant to INA § 208(b)(3)(C);

2. A copy of an asylum application cover letter sent to USCIS, along with a screenprint of the USCIS Case Status Online tool reflecting that USCIS has accepted the application for processing; or

3. A declaration made in accordance with 28 U.S.C. § 1746 stating that the individual was determined to be a UAC, filed an asylum application with USCIS that USCIS has not adjudicated on the merits, and on the date they filed their asylum application with USCIS they were 18 years of age or older, or had a parent or legal guardian in the United States available to provide care and physical custody.

## IV. CONDITIONS AND APPROVAL OF THE SETTLEMENT

**A. Effective Date of Agreement.** After this Agreement has been signed by all Parties, it will become effective upon final approval by the Court.

**B. Preliminary Approval.** As soon as practicable after the execution of this Agreement, the Parties shall jointly move for a Preliminary Approval Order, substantially in the form of Exhibit B, preliminarily approving this Settlement Agreement and finding this settlement to be fair, just, reasonable, and adequate, approving the Class Notice to the Class Members, substantially in the form of Exhibit C, and setting a hearing to consider final approval of the Settlement and any objections thereto.

**C. Effect of the Court's Rejection of the Agreement.** If the Court rejects this Agreement, in whole or in part, or other otherwise finds that the Agreement is not fair, just, reasonable, and adequate, the Parties agree to meet and confer to work to resolve the concerns articulated by the Court and modify the Agreement accordingly.

**D. Fairness Hearing.** At the fairness hearing, as required for final approval of the settlement pursuant to Federal Rule of Civil Procedure 23(e)(2), the Parties will jointly request that the Court approve the Settlement Agreement as fair, final, reasonable, adequate, and binding on the Class, all Class Members, and all Plaintiffs; and issue a Final Approval Order, substantially in the form of Exhibit D.

**E. Notice for Fairness Hearing.** Not later than 14 days after entry of the Preliminary Approval Order (unless this time period is modified by written agreement of the Parties' counsel or by order of the Court), the Parties shall effectuate the following:

10

1. Class Counsel shall post the Class Notice (in English and Spanish), including a copy of this Settlement Agreement, on Public Counsel's, NIPNLG's, and KIND's websites;

2. USCIS shall post the Class Notice (in English and Spanish), including a copy of the Settlement Agreement, on USCIS's website on the "USCIS Class Action, Settlement Notices and Agreements" and the "Asylum" sections;

3. ICE shall post the Class Notice (in English and Spanish), including a copy of the Settlement Agreement, on ICE's website on the "Legal Notices" section;

4. Class Counsel shall distribute the Class Notice (in English and Spanish), including a copy of the Settlement Agreement, on relevant (as determined by Class Counsel) email or list serv mailing lists for legal services providers; and

5. USCIS's Office of Public Affairs shall email the Class Notice (in English and Spanish), including a copy of the Settlement Agreement, to its approximately 47,000 subscribed users.

F. **Objections.**   Any Class Member who wishes to object to the Settlement and/or be heard at the fairness hearing must submit a written notice of objection and/or request to be heard at the fairness hearing, postmarked within 60 days of entry of the Preliminary Approval Order (or such other deadline as the Court may order), by mailing the notice of objection and/or request to be heard to the District Court for the District of Maryland, or by filing the notice of objection and/or request to be heard with the Court.  Each notice of objection or request to be heard must be served on the Parties as set forth in the Class Notice and must include: (i) the case name and number, *JOP v. DHS*, No. 8:19-CV-01944-SAG, (ii) the Class Member's name, (iii) the Class Member's current address and telephone number, or current address and telephone number of the Class Member's legal representative, (iv) the grounds upon which the claimed Class membership is based; (v) an explanation of why the Class Member objects to the Settlement, including the grounds therefore, any supporting documentation, and (vi) whether the Class Member requests the opportunity to be heard at the fairness hearing.  Any such objection or notice of request to be heard may be filed under seal to avoid disclosure of any personal identifying information on the public record.  Failure to comply with all requirements of this section shall constitute grounds for striking an objection or denying a request to be heard, if any. The Parties will have 14 days following the objection period in which to submit answers to any objections that are filed.

G. **Opt-Outs.**  Due to the nature of the relief offered to the Class Members, there are no grounds for Class Members to opt-out.

**H. Final Approval.**  The Court's final approval of the settlement set forth in this Agreement shall consist of its Final Approval Order granting each of the Parties' requests made in connection with the fairness hearing, resolving all claims before the Court, giving effect to the releases as set forth in Section VI, dissolving the preliminary injunction, and dismissing the Action with prejudice, with the exception that following final approval of this Agreement, the Court shall retain jurisdiction over only the following matters as provided in this section and only until the date the Agreement terminates as described in Section IV.K:

1. Claims by any Party in accordance with the provisions laid out in Section V of this Agreement that any other Party has committed a violation of this Agreement;

2. The express repudiation of any of the terms of this Agreement by any Party; and

3. Plaintiffs' claims for attorney fees and/or litigation costs.

**I. Withdrawal of Appeal.**  Upon final approval, Defendants shall withdraw their Appeal.

**J. Notice of Final Approval.**  Not later than 14 days after entry of final approval of the Agreement (unless this time period is modified by written agreement of the Parties' counsel or by order of the Court), the Parties shall provide an Updated Class Notice (in English and Spanish), substantially in the form of Exhibit E, to the same websites and distribution lists as set forth in Section IV.E.

**K. Termination.** This Settlement Agreement shall terminate 548 days after the Effective Date, except that the Court shall have jurisdiction to enforce Paragraph III.A of this Agreement until three years after the superseding memorandum's effective date.

## V.    RETENTION OF JURISDICTION, NON-COMPLIANCE, AND ENFORCEMENT

**A. Retention of Jurisdiction.** This Court shall retain exclusive jurisdiction to supervise the implementation of this Settlement Agreement and to enforce its provisions and terms until the Termination Date, except that the Court shall retain jurisdiction over Paragraph III.A (USCIS superseding memorandum) until the Termination Date – USCIS Memorandum, and the terms of this Agreement shall be incorporated into the order of the Court approving the Agreement.

**B. Compliance Reports.** Defendants shall report to the Court and Class Counsel on their compliance with Paragraphs III.E and III.F of this Agreement within 30 days of the end of each time period for compliance that is specified within those paragraphs. No later than 180 days after the Effective Date, and each 180 days thereafter, Defendants will report on compliance with Paragraphs III.A through G inclusive of this Settlement Agreement. Such Compliance Reports will be substantially in the form of the relevant sections of Exhibit F to this Settlement Agreement.

**C. Response to Compliance Reports**. Following the provision of each Compliance Report described in Paragraph V.B, Plaintiffs, through Class Counsel, shall submit a response to any Compliance Report within 30 days of service, and allow Defendants 30 days to respond to any concerns Plaintiffs raise in their response. The Parties shall meet and confer regarding any issues related to the Compliance Report, and if the Parties are unable to resolve any such issues, either party may request a hearing with the Court.

**D. Noncompliance with This Agreement.** In the event of an alleged noncompliance with this Settlement Agreement, on an individual or class-wide basis, the complaining Class Member(s) or their legal representative(s) shall provide written notice of the alleged noncompliance, to Class Counsel at the email address identified in Section VIII.L. Defendants shall send a written response to Class Counsel within a reasonable period of time not to exceed 60 days after receiving written notice of the alleged noncompliance from Class Counsel. Within 90 days of Defendants' receipt of the written notice of the alleged noncompliance from Class Counsel, Defendants and Class Counsel shall meet and confer in a good faith effort to resolve the dispute informally. If the dispute cannot be resolved, the complaining Class Member(s) may move to enforce the Agreement on an individual basis before the Court and Class Counsel may elect to move to enforce the Agreement on an individual or class-wide basis before the Court. Once such a motion to enforce is initiated, the complaining Class Member shall not be removed from the United States unless and until the matter has been resolved in favor of Defendants.

## VI. RELEASES

**A.** As of the Effective Date, Plaintiffs, by operation of the final approval entered by the Court, shall have fully, finally, and forever released, relinquished, and discharged the Defendants of and from any and all Settled Claims, and the Plaintiffs shall forever be barred and enjoined from bringing or prosecuting any Settled Claim against any of the Defendants. This release shall not apply to claims that arise or accrue after termination of this Agreement.

**B.** Nothing in this Agreement shall be construed as affecting any Class Member's right or interest in challenging the adjudication of their individual asylum application, or challenging any related removal order. Individual Class Members expressly maintain the right to challenge the adjudication of such applications and orders.

**C.** The above releases do not include any release of claims to enforce the terms of this Agreement prior to termination of obligations under this Agreement as provided in Section IV.K.

## VII. ATTORNEY FEES, COSTS, AND EXPENSES

Plaintiffs may attempt to negotiate, request, seek, or solicit attorney fees and/or litigation costs in this Action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or any other provision independent of this Agreement. Any application for fees and/or costs shall be filed no later than 30 days after the Court issues its final approval of this Settlement Agreement. Nothing in this Settlement Agreement shall be understood to limit Plaintiffs' right to seek such fees and/or costs.

## VIII.  ADDITIONAL PROVISIONS

**A. Best Efforts.**  The Parties' counsel shall use their best efforts to cause the Court to grant preliminary approval of this Agreement and Settlement as promptly as practicable, to take all steps contemplated by this Agreement to effectuate the Settlement on the stated terms and conditions, and to obtain final approval of this Agreement and Settlement.

**B. Change of Time Periods.**  The time periods and/or dates described in this Agreement with respect to providing notice of the preliminary approval of the Agreement, the fairness hearing, and the final approval of the Agreement are subject to approval and change by the Court or by the written agreement of the Parties' counsel, without notice to Class Members.

**C. Time for Compliance.**  The dates described herein refer to calendar days, unless otherwise stated. If the date for performance of any act required by or under this Agreement falls on a Saturday, Sunday, or court holiday, that act may be performed on the next business day with the same effect as if it had been performed on the day or within the period of time specified by or under this Agreement.

**D. Entire Agreement.**  The terms and conditions set forth in this Agreement constitute the complete and exclusive statement of the agreement between the Parties relating the subject matter of this Agreement, superseding all previous negotiations and understandings, and may not be contradicted by evidence of any prior or contemporaneous agreement. The Parties further intend that this Agreement constitute the complete and exclusive statement of its terms as between the Parties, and that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving the interpretation of this Agreement.

**E. No Modification.** No change or modification of this Agreement shall be valid unless it is contained in writing and signed by or on behalf of Plaintiffs and Defendants and approved by the Court.

**F. Severability.** If any provision of this Agreement is declared null, void, invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect.

14

**G. Advice of Counsel.** The determination of the terms of, and the drafting of, this Agreement have been by mutual agreement after negotiation, with consideration by and participation of all Parties and their counsel.

**H. Joint Drafting.** In the event of ambiguity in or dispute regarding the interpretation of the Agreement, interpretation of the Agreement shall not be resolved by any rule providing for interpretation against the drafter. The Parties expressly agree that in the event of an ambiguity or dispute regarding the interpretation of the Agreement, the Agreement will be interpreted as if each Party participated in the drafting.

**I. Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of the Parties' respective heirs, successors, and assigns.

**J. No Waiver.** The waiver by any Party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

**K. Extensions of Time.** The Parties reserve the right, by agreement and subject to the Court's approval, to grant any reasonable extension of time that might be needed to carry out any of the provisions of this Agreement.

**L. Notices.** Except as specified elsewhere in this Agreement, all notices required or permitted under or pertaining to this Agreement shall be made in writing. Any notice shall be deemed to have been completed upon mailing or emailing. Notices shall be delivered to the Parties at the following addresses until a different address has been designated by notice to the other Party:

*For the Plaintiffs:*

DG-JOPClassCounsel@goodwinlaw.com

Kevin J. DeJong
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
KDeJong@goodwinlaw.com

*For the Defendants*:

Vickie LeDuc
Matthew Haven
U.S. Attorney's Office
District of Maryland
36 S. Charles St., 4th Floor
Baltimore, MD 21201
Vickie.LeDuc@usdoj.gov
Matthew.Haven@usdoj.gov

15

**IN WITNESS WHEREOF**, the Parties have executed this Agreement, which may be executed in counterparts, and the undersigned represent that they are authorized to execute and deliver this Agreement on behalf of their respective Parties.

Consented and agreed to by:

DATED: June 7, 2024

For the Plaintiffs:

_____

Kevin J. DeJong*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
KDeJong@goodwinlaw.com

Kristen Jackson*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
KJackson@publiccounsel.org

Michelle N. Mendez (Bar No. 20062)
National Immigration Project of the
National Lawyers Guild
1200 18th St. NW, Suite 700
Washington, DC 20036
Phone: 540-907-1761
Fax: 617-227-5495
Michelle@nipnlg.org

Rebecca Scholtz*
National Immigration Project of the
National Lawyers Guild
30 S. 10th Street (c/o University of St.
Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 202-742-4423
Fax: 617-227-5495

For the Defendants:

Digitally signed by MATTHEW
HAVEN
Date: 2024.06.17 15:54:42 -04'00'

Vickie LeDuc
Matthew Haven
U.S. Attorney's Office
District of Maryland
36 S. Charles St., 4th Floor
Baltimore, MD 21201
Phone: 410-209-4800
Vickie.LeDuc@usdoj.gov
Matthew.Haven@usdoj.gov

16

Page 045

Rebecca@nipnlg.org

Mary Tanagho Ross*
Bet Tzedek Legal Services
3250 Wilshire Blvd., #1300
Los Angeles, CA 90010
Phone: (323) 939-0506
Fax: (213) 471-4568

Wendy Wylegala*
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
WWylegala@supportkind.org

*admitted pro hac vice

17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| **J.O.P., M.A.L.C., M.E.R.E., K.A.R.C., E.D.G.,** and **L.M.Z. (by and through Next Friend Olivia Porter)** on behalf of themselves as individuals and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY**, **CHAD WOLF** (in his official capacity as Acting Secretary of Homeland Security), **U.S. CITIZENSHIP & IMMIGRATION SERVICES**, **KENNETH CUCCINELLI** (in his official capacity as Senior Official Performing the Duties of the Director of U.S. Citizenship & Immigration Services), **U.S. IMMIGRATION & CUSTOMS ENFORCEMENT**, and **JONATHAN FAHEY** (in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration & Customs Enforcement), <br><br> Defendants. | Civil Action No. 8:19-CV-01944-GJH <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **PUBLIC VERSION** |

## SECOND AMENDED COMPLAINT

Plaintiffs J.O.P., M.A.L.C., M.E.R.E., K.A.R.C., E.D.G., and L.M.Z., on behalf of

themselves and other similarly situated children seeking asylum, bring this class action

complaint against Defendants U.S. Department of Homeland Security ("DHS"); Chad Wolf, in

his official capacity as Acting Secretary of DHS; U.S. Citizenship and Immigration Services

("USCIS"); Kenneth Cuccinelli, in his official capacity as Senior Official Performing the Duties of the Director of USCIS; U.S. Immigration and Customs Enforcement ("ICE"); and Jonathan Fahey, in his official capacity as Acting Director of ICE.  Plaintiffs allege as follows:

### INTRODUCTION

1.    Plaintiffs are among thousands of unaccompanied immigrant children who have made the long and perilous journey to the United States to seek protection, fleeing violence and persecution in their countries of origin.  This class action challenges a federal agency's sudden shift in policy that retroactively strips Plaintiffs of critical, statutory asylum protections.

2.    Recognizing the vulnerability and special needs of unaccompanied immigrant children, Congress has enacted laws specifically designed to protect them.  In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").  The TVPRA provides multiple protections to unaccompanied immigrant children, who are often vulnerable to trafficking, persecution, trauma, and other harms en route to or while in the United States.

3.    The TVPRA draws on a prior statutory definition according to which an "unaccompanied alien child" ("UAC") is one whom the federal government determines to be without lawful immigration status, under the age of 18, and without a parent or legal guardian in the United States available to provide care and physical custody.  6 U.S.C. § 279(g)(2).

4.    Defendant DHS apprehended each Plaintiff upon entering the United States and determined that each Plaintiff satisfied this definition.  At or about the same time, Defendant DHS prepared legal documents to initiate proceedings in a United States immigration court pursuant to Section 240 of the Immigration and Nationality Act ("INA") against each Plaintiff to determine whether each Plaintiff should be removed from the United States ("removal

proceedings"). Such removal proceedings are conducted by immigration judges within the Executive Office for Immigration Review ("EOIR"), an agency of the U.S. Department of Justice.

5. The TVPRA relieves unaccompanied immigrant children of two procedural hurdles to accessing the asylum system, providing a more child-appropriate way for the government to process their claims to protection under U.S. and international law fairly.

6. First, the TVPRA creates an exception to the general requirement that asylum applicants facing removal proceedings present their asylum claims in an adversarial setting before the immigration court. Instead, through a grant of initial jurisdiction over their asylum claims to USCIS, the TVPRA allows unaccompanied immigrant children to pursue asylum in the first instance through a non-adversarial administrative interview with a trained asylum officer within USCIS, a process more appropriate for traumatized young applicants.

7. Second, the TVPRA exempts unaccompanied immigrant children from a one-year filing deadline that otherwise applies to asylum applicants. Without that TVPRA exemption, asylum applicants filing later than one year after entering the United States are ineligible for asylum unless they can establish that they merit an exception to the one-year filing deadline.

8. Under a policy USCIS adopted effective June 2013 to implement these TVPRA asylum protections, Plaintiffs, and all other unaccompanied immigrant children seeking asylum in the United States, were entitled to access the TVPRA asylum process once they had been determined to be a UAC upon their initial apprehension by DHS, as long as that determination remained in place when the child initially applied for asylum. Under this 2013 policy, USCIS exercised initial jurisdiction over an unaccompanied immigrant child's asylum claim even if the

applicant had turned 18 or had been reunited with a parent or appointed a legal guardian <u>before</u> applying for asylum.

9.      This rule was subject to a limited exception where the UAC determination had been terminated before the child filed for asylum, by an intervening "affirmative act" of the Department of Health and Human Services ("HHS"), or by the DHS component agencies ICE or U.S. Customs and Border Protection ("CBP").

10.      Moreover, under the 2013 policy, USCIS exercised its initial jurisdiction regardless of whether EOIR had made findings or determinations with respect to the statutory UAC definition or the merits of the asylum claim.

11.      In 2019, DHS unlawfully curtailed the permanent protections enacted by Congress in the TVPRA.  On June 14, 2019, Defendant USCIS posted a memorandum dated May 31, 2019 (the "2019 Redetermination Memo") to its website announcing significant changes to USCIS's implementation of the TVPRA, effective June 30, 2019.[1]

12.      USCIS did not publish the 2019 Redetermination Memo in the Federal Register, and the agency did not invite public comment on any of the new directives set forth in the memorandum.

13.      The 2019 Redetermination Memo mandated that, beginning on June 30, 2019, an asylum officer must make an independent factual inquiry to redetermine whether an applicant met the statutory definition of a UAC on their filing date—even if that filing date was years ago, when the prior policy was in effect.  Under the 2019 Redetermination Memo, if USCIS

---

[1] Ex. 1, U.S. Citizenship and Immigration Services, Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children (May 31, 2019), https://www.uscis.gov/humanitarian/refugees-asylum/asylum/minor-children-applying-asylum-themselves.

4

determined that the individual no longer satisfied the definition on the date the individual applied for asylum, USCIS would decline jurisdiction over the asylum application. Moreover, based on the same determination, USCIS was also directed to conclude that an applicant was not entitled to the related protection that exempts UACs from the one-year deadline for filing asylum applications.

14.     The 2019 Redetermination Memo also required that, if EOIR had explicitly determined that USCIS did not have jurisdiction over an asylum application because it was not one filed by a UAC, the asylum officer would defer to that determination.

15.     The 2019 Redetermination Memo thus called for USCIS to defer to intervening determinations by EOIR, abdicating USCIS's initial jurisdiction over a UAC asylum claim if an immigration court concluded, based on its own factual finding, that USCIS lacks jurisdiction over a child's case. In this way, the 2019 Redetermination Memo purported to authorize EOIR to preempt the statutory grant to USCIS of initial jurisdiction over an asylum application based solely on EOIR's own determination of jurisdictional factors and allow EOIR to adjudicate the merits of an asylum claim simply by reaching it more quickly than USCIS. The policy thus undermined the core purpose of the TVPRA to provide procedural protections to vulnerable children seeking asylum.

16.     By its terms, the 2019 Redetermination Memo applied to any USCIS decision issued on or after its effective date of June 30, 2019. Thus, the policy was to be implemented retroactively—applying to individuals who already had asylum applications pending before USCIS, even those whom USCIS already interviewed as of June 30, 2019, as well as to others who have relied upon USCIS's 2013 policy.

17.     The 2019 Redetermination Memo marked a drastic change in USCIS policy and a departure from the protections in the TVPRA that profoundly undermines Plaintiffs' rights, and the rights of other unaccompanied immigrant children who have filed for or plan to file for asylum in the United States.  Under the policy in place since 2013, Plaintiffs were entitled to seek asylum before USCIS, regardless of any EOIR determination to the contrary, and were relieved from the requirement to show that they either had filed within one year or qualified for an exception to that general deadline.  Under the 2019 Redetermination Memo, they will be deprived of their right to seek asylum before USCIS, and they will face an adversarial process in which an ICE prosecutor subjects them to cross examination and advocates for their deportation. Further, Plaintiffs may lose their eligibility to seek asylum entirely by retroactive imposition of a filing deadline that was inapplicable to their applications at the time they were filed.

18.     The 2019 policy, in calling for USCIS to defer to EOIR's jurisdictional determinations, results in EOIR taking action on a case where USCIS holds initial jurisdiction. Defendants have acted to ensure precisely this result:  ICE, in its role as prosecutor in immigration court, frequently advocates for EOIR to assert and/or exercise its jurisdiction in these cases so as to deprive USCIS of the opportunity to exercise initial jurisdiction.

19.     Following the filing of the initial Complaint in this action on July 1, 2019 and in response to Plaintiffs' motion for a temporary restraining order ("TRO") filed the same day, Defendants conceded during the July 19, 2019 hearing in this litigation that the policy set forth in the 2019 Redetermination Memo was unconstitutionally retroactive, offering entry of an order that would "take the retroactivity part of the case off the table."  7/19/19 Hearing Tr. at p. 6.

20.     The Court recognized Plaintiffs' likelihood of success on the merits of both the retroactivity and procedural claims, and entered a TRO on August 2, 2019 (extended multiple

6

times) and then, on Plaintiffs' unopposed motion, a preliminary injunction ("PI") on October 15, 2019, all requiring Defendants to continue to adjudicate UAC asylum cases pursuant to the 2013 policy.

21.     Faced with the Court's TRO and PI, Defendants continued to attempt to displace USCIS's statutory initial jurisdiction over UAC asylum claims with determinations by the immigration courts.  On information and belief, Defendant ICE has a policy or practice of advocating for immigration judges to conclude, contrary to the 2013 policy and despite the TRO and the PI, that applicants who have turned 18 or reunited with a parent before applying for asylum are not within USCIS's jurisdiction.  In so doing, ICE furthers USCIS's unlawful abdication of jurisdiction over those cases.

22.     On December 20, 2019, Plaintiffs filed an amended complaint making more explicit their challenges to Defendant USCIS's deference to EOIR jurisdictional determinations and Defendant ICE's advocating for EOIR jurisdiction contrary to the 2013 policy.  On July 7, 2020, Plaintiffs filed a motion to amend the PI to, *inter alia*, prohibit these policies and practices. On December 21, 2020, the Court issued an order certifying Plaintiffs' class (with J.O.P., M.A.L.C., M.E.R.E., and E.D.G. appointed as class representatives) and amending the PI.  The amended PI—in addition to continuing to require USCIS to adjudicate UAC asylum cases pursuant to the 2013 policy—prohibits USCIS from deferring to EOIR determinations in assessing jurisdiction over asylum applications filed by Plaintiffs and class members and prohibits ICE from taking the position in a Plaintiff's or class member's removal proceedings that USCIS does not have initial jurisdiction over the individual's asylum application.

23.     While the Court's TRO and PI have been in place, Defendant USCIS has continued to reject jurisdiction over asylum applications in a manner that is contrary to the 2013

policy.  Specifically, under the 2013 policy, USCIS was to accept jurisdiction over an asylum application for an applicant who had previously been determined to be a UAC, even if the applicant had turned 18 or been reunited with a parent.  The only exception to this rule in the 2013 policy was for applicants as to whom HHS, ICE, or CBP had taken an "affirmative act" to terminate the applicant's prior UAC determination.  Under the 2019 Redetermination Memo, on the other hand, USCIS was to deny jurisdiction over any applicant who had turned 18 or had been reunited with a parent or legal guardian before filing his or her asylum application.  Despite the Court's PI and TRO orders, USCIS has rejected jurisdiction over applications on the basis of a recognition or notation as to evidence that the applicant has turned 18 or has been reunited with a parent or legal guardian.  Through this policy or practice (the "Expanded Affirmative Act Policy"), USCIS has overstretched the 2013 policy's narrow "affirmative act" exception into a broad tool for reproducing the policies of the enjoined 2019 Redetermination Memo.

24.    In making these significant and harmful policy changes that undermine the purpose of and are inconsistent with the TVPRA, without providing notice or opportunity to comment, and by announcing their intent to apply the new policy retroactively, Defendants have violated the TVPRA itself, the Administrative Procedures Act ("APA"), and the constitutional due process rights of children who seek to access the statutory asylum system in the United States.

25.    Plaintiffs seek the Court's intervention so that they and others similarly situated may exercise their right to seek asylum before USCIS and maintain their statutory exemption from the general one-year filing deadline.  Defendants' actions have caused and, unless fully enjoined, will continue to cause serious and irreparable harm to Plaintiffs and to the class.

Plaintiffs therefore seek declaratory and injunctive relief from this Court to end these violations and harms.

## PLAINTIFFS

26.     Plaintiff J.O.P. is a 19-year-old from Guatemala, who currently resides with his mother at ████████████, College Park, Maryland (located in Prince George's County).

27.     J.O.P. fled Guatemala and came to the United States after witnessing a murder and receiving violent threats.

28.     J.O.P. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

29.     On or about November 25, 2015, agents for Defendant Department of Homeland Security determined that J.O.P. is a UAC.

30.     J.O.P. subsequently was reunified with his mother.

31.     On February 20, 2018, after reunifying with his mother, J.O.P. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy that has been in place since 2013.  In August 2020, USCIS conducted an asylum interview with J.O.P.  J.O.P. has not yet received a decision from USCIS on his asylum application.

32.     Plaintiff M.A.L.C. is a 22-year-old from Guatemala, who currently resides at ████████████, Los Angeles, California.

33.     M.A.L.C.'s parents were murdered in Guatemala, and thereafter, he continued to experience repeated threats of violence and extortion in Guatemala.  M.A.L.C. fled to the United States in August 2016.

34.     M.A.L.C. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

35.     Between August and October 2016, agents for Defendant Department of Homeland Security determined that M.A.L.C. is a UAC.

36.     On February 14, 2018, when he was 19 years old, M.A.L.C. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy in place since June 2013.  M.A.L.C. has yet to be interviewed by USCIS on his asylum application.

37.     Plaintiff M.E.R.E. is a 21-year-old from El Salvador, who currently resides at ███████████████, Temple Hills, Maryland (located in Prince George's County).

38.     M.E.R.E. fled El Salvador because of abuse, discrimination, and persecution that he experienced based on his sexual orientation.

39.     M.E.R.E. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

40.     On or about November 15, 2014, agents for Defendant Department of Homeland Security determined that M.E.R.E. is a UAC.

41.     M.E.R.E. subsequently was reunified with his mother.

42.     On March 30, 2018, when he was 18 years old and had already reunified with his mother, M.E.R.E. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy that has been in place since 2013.  In August 2020, USCIS conducted an asylum interview with M.E.R.E.  M.E.R.E. has not yet received a decision from USCIS on his asylum application.

43.     Plaintiff K.A.R.C. is a 21-year-old from El Salvador, who currently resides at ██ ███████████████, Gaithersburg, Maryland (located in Montgomery County).

44.     K.A.R.C. fled El Salvador because of abuse, discrimination, and persecution that he experienced based on his perceived sexual orientation.

45.     Around May 2016, agents for Defendant Department of Homeland Security determined that K.A.R.C. is a UAC.

46.     In the fall of 2017, when K.A.R.C. was 18 years old, he filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy in place since June 2013.  In November 2017, USCIS conducted the asylum interview with K.A.R.C.  In June 2020, USCIS granted K.A.R.C. asylum.

47.     In November 2020, the immigration judge granted K.A.R.C.'s motion to dismiss his removal proceedings without prejudice in light of his asylee status.

48.     Plaintiff E.D.G. is a 21-year-old from Honduras, who currently resides at ████ ████████████ Kansas City, Missouri.

49.     E.D.G. fled Honduras after years of being sexually, physically, and emotionally abused—as well as being targeted by a gang for recruitment and being grievously harmed by that gang for refusing to join.

50.     On or about July 4, 2016, agents for Defendant Department of Homeland Security determined that E.D.G. is a UAC.

51.     E.D.G. was placed into removal proceedings under 8 U.S.C. § 1229a, INA § 240 on July 5, 2016.

52.     In late 2017, when E.D.G. was 18 years old, he filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy in place since June 2013.  On March 6, 2018, USCIS conducted the asylum interview with E.D.G.

53.     Before USCIS issued a decision on E.D.G.'s asylum claim, an immigration judge ordered E.D.G. removed on October 10, 2018, after concluding that it had jurisdiction over E.D.G.'s asylum application and denying it on the merits. E.D.G.'s removal order is on appeal before the Board of Immigration Appeals ("BIA").

11

54. On July 25, 2019, USCIS rejected jurisdiction over E.D.G.'s asylum application under the 2019 Redetermination Memo because he had not established that he was under 18 years old at the time he filed it. On August 5, 2019, USCIS reopened E.D.G.'s case in compliance with this Court's TRO.

55. On September 30, 2019, while the Court's TRO remained in effect, USCIS again rejected jurisdiction over E.D.G.'s asylum application relying on the 2019 Redetermination Memo. USCIS issued a Notice of Lack of Jurisdiction on grounds that the "Immigration Judge made an affirmative act to terminate UAC status on October 10, 2018."

56. On November 22, 2019, Plaintiffs' counsel filed a motion to enforce the preliminary injunction now in effect, seeking an order requiring Defendants to retract USCIS's September 30, 2019 jurisdictional rejection in E.D.G.'s case and to adjudicate his case under the 2013 policy. On July 7, 2020, after E.D.G. had entered the case as a Plaintiff and the Court had denied the motion to enforce, Plaintiffs' counsel filed a motion to amend the preliminary injunction to, *inter alia*, expressly prohibit USCIS from deferring to EOIR determinations in assessing jurisdiction over asylum applications filed by Plaintiffs and members of the class. On December 21, 2020, the Court ordered the preliminary injunction amended accordingly.

57. Plaintiff L.M.Z. is a ten-year-old from Mexico, who currently resides at ███████ ███████, Phoenix, Arizona. He brings suit through his next friend, Olivia Porter.

58. L.M.Z. fled Mexico and came to the United States after his father subjected both him and his mother to severe physical and psychological domestic abuse.

59. L.M.Z. is currently in removal proceedings under 8 U.S.C. § 1229a, INA § 240.

60. On or about May 20, 2018, agents for Defendant Department of Homeland Security determined that L.M.Z. is a UAC.

61.    L.M.Z. subsequently was reunified with his mother.

62.    On February 8, 2019, after reunifying with his mother, L.M.Z. filed his asylum application with USCIS, exercising his right to seek asylum before USCIS based on the policy that has been in place since 2013.

63.    On February 5, 2020, L.M.Z. appeared with counsel for his scheduled asylum interview with USCIS.  The asylum officer did not ask questions about the merits of L.M.Z.'s asylum claim and instead asked a series of questions about his care and living situation with his mother.  Following these questions, the asylum officer ended the interview, stating that she was making a factual finding that L.M.Z. was not a UAC.

64.    On March 13, 2020, USCIS issued a "Notice of Lack of Jurisdiction (Non-UAC)," denying jurisdiction over L.M.Z.'s asylum application.  The notice states that "USCIS has determined that we do not have initial jurisdiction over your asylum application as a UAC" because L.M.Z. was "not unaccompanied at the time of filing your I-589 because you had a parent or legal guardian in the United States who was available to provide care and physical custody of you."

65.    In a declaration dated April 16, 2020 and provided to Plaintiffs' counsel by Defendants' counsel, the asylum officer who had conducted L.M.Z.'s interview stated that she concluded that L.M.Z.'s UAC finding had been terminated before he filed his asylum application through an "affirmative act" taken by ICE, consisting of entry of the following notation on August 14, 2018 in the comments tab of the ENFORCE Alien Removal Module ("EARM") database system:  "Subject is no longer designated a UAC under the TVPRA as of date of release to sponsor-mother- on 06/08/2018."  August 14, 2018 is the same date L.M.Z.'s immigration counsel emailed ICE attorneys to inform them that L.M.Z. had retained her, and to ask their

13

position on her planned motion to continue L.M.Z.'s upcoming immigration court master calendar hearing.

66.    Defendants did not notify L.M.Z. of ICE's purported "affirmative act" or afford him an opportunity to respond before concluding that the purported "affirmative act" had terminated the prior UAC determination.  L.M.Z. learned of the purported "affirmative act" and termination of his UAC determination nearly 20 months after it purportedly occurred, and only through Plaintiffs' counsel's efforts.

67.    In the motion to amend the preliminary injunction filed on July 7, 2020, Plaintiffs' counsel highlighted Defendants' conduct in L.M.Z.'s case in seeking an amendment to the preliminary injunction.  Plaintiffs sought to expressly prohibit USCIS from rejecting jurisdiction on the basis of an "affirmative act" consisting of a recognition or notation as to evidence that the applicant has turned 18 or has been reunited with a parent or legal guardian. On December 21, 2020, the Court denied this portion of Plaintiffs' motion to amend the preliminary injunction, but granted Plaintiffs leave to amend their complaint to encompass USCIS's expansion of the "affirmative act" exception from the 2013 Kim Memorandum.

## **DEFENDANTS**

68.    Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet department responsible for implementing and enforcing the Immigration and Nationality Act ("INA") (*see* 8 U.S.C. § 1103) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).

69.     Defendant Chad Wolf is the Acting Secretary of Homeland Security and therefore the "head" of the Department of Homeland Security.[2]  6 U.S.C. § 112(a)(2).  He is charged with administering and enforcing the federal immigration and nationality laws.  8 U.S.C. § 1103(a)(1), (3).  He is sued in his official capacity.

70.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is a bureau within DHS (6 U.S.C. § 271) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).  USCIS is the "agency" that issued the 2019 Redetermination Memo and adopted the policy or practice of treating recognitions or notations as to evidence that a child has turned 18 or been reunited with a parent or legal guardian as "affirmative acts" that affect its jurisdiction.

71.     Defendant Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services and therefore the "head" of that agency (6 U.S.C. §§ 113(a)(1)(E) & 271(a)(2)).  He is sued in his official capacity.

72.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is a bureau within DHS (6 U.S.C. § 252) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).  ICE attorneys act as prosecutors before the immigration courts, advocating for the government's position with respect to, *inter alia*, an immigration judge's jurisdiction, the removability of respondents in removal proceedings, and whether a continuance or other

_____

[2] Defendants Wolf and Cuccinelli are named in the acting capacities they claim to hold on the date of this filing.  Federal district courts have held that each is, or likely is, unlawfully claiming his title due to defects in their appointments.  *See, e.g., CASA de Maryland, Inc. v. Wolf*, 2020 U.S. Dist. Lexis 16613 (D. Md. Sept. 11, 2020) (Wolf likely invalidly appointed); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d. 1 (D.D.C. 2020) (Cuccinelli invalidly appointed).  Because Defendants Wolf and Cuccinelli are sued only in their official capacities; because Plaintiffs make no claim that the acts challenged here are invalid because of the potential invalidity of their appointments; and because, by operation of Fed. R. Civ. P. 17(d) and 25(d), such defendants need not be specifically named and will have their successors in office automatically substituted, Plaintiffs take no position on the validity of their claims to the titles in the caption.

15

postponement of the immigration court case is warranted to allow USCIS to adjudicate an application pending before that agency.  6 U.S.C. § 252(c).[3]

73.    Defendant Jonathan Fahey is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement and is therefore the "head" of that agency (6 U.S.C. §§ 113(a)(1)(G) & 252(a)(2)).  He is sued in his official capacity.

## JURISDICTION AND VENUE

74.    This Court has federal question jurisdiction over Plaintiffs' complaint under 28 U.S.C. § 1331.  It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706(1), 706(2)(A)-(D); and its general equitable powers.

75.    The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court."  5 U.S.C. § 704.  That condition is met in this case because the 2019 Redetermination Memo (including USCIS's policy of deference to EOIR jurisdictional determinations), as well as USCIS's related policy or practice of treating as "affirmative acts" recognitions or notations as to evidence that a child has turned 18 or been reunited with a parent or legal guardian, are "final agency actions" within the meaning of the statute, as is the declining or preemption of USCIS's initial jurisdiction over asylum in a particular UAC's case, and there is no other adequate remedy available in any other court.

---

[3] Defendants ICE and Mr. Fahey's predecessor (then Matthew Albence) were added in the First Amended Complaint for clarity of pleading and in an abundance of caution, in light of the additional allegations regarding ICE's role in furthering the unlawful policy of the 2019 Redetermination Memo.  Because ICE is an instrumentality of original Defendant DHS, under the control and acting at the direction of original Defendant Acting Secretary of DHS, it would be bound by this Court's interim orders and final judgment whether or not it and its acting director were separately named.

16

76.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are officers or agencies of the United States and one or more Plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

77.     This case is properly assigned to the Southern Division of the District of Maryland because all Plaintiffs residing in Maryland reside in that Division. *See* Local Rule 501.

## FACTUAL BACKGROUND

### Passage of the TVPRA in 2008

78.     Before 2002, the care and placement of unaccompanied immigrant children in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service ("INS").  In 2002, Congress enacted the Homeland Security Act ("HSA").  Pub. L. No. 107-296, 116 Stat. 2153.  The HSA created DHS and transferred most immigration functions formerly performed by INS to the newly formed DHS and its components, including USCIS, CBP, and ICE.

79.     The HSA defined an "unaccompanied alien child" as a child who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."  HSA 462(g)(2); 6 U.S.C. § 279(g)(2).  Congress transferred to the Office of Refugee Resettlement ("ORR"), within HHS, the responsibility for the care of UACs "who are in Federal custody by reason of their immigration status."  HSA 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A).

80.     Six years later, Congress passed the TVPRA, which was signed into law on December 23, 2008 and took effect in March 2009.  In addition to measures to combat international and domestic human trafficking, including trafficking of children, the TVPRA

17

recognized the vulnerability of children fleeing their countries of origin to seek protection in the United States, and responded with multiple provisions addressing safe custody and child-appropriate procedures for unaccompanied immigrant children.

81.    In structuring the TVPRA, Congress placed legal protections for UACs, including provisions on asylum, in a section of the statute titled "Permanent protection for certain at-risk children." TVPRA § 235(d); *see* 8 U.S.C. § 1232(d).

82.    Among other safeguards, the TVPRA provides that USCIS has "initial jurisdiction" over a UAC's asylum application, even where the UAC is in removal proceedings—a deviation from the ordinary rule that "affirmative" asylum before USCIS is only available to those who are not in removal proceedings. TVPRA § 235(d)(7); 8 U.S.C. § 1158(b)(3)(C). Conferring initial jurisdiction on USCIS instead of an immigration judge provides a non-adversarial system more sensitive to the special needs of child immigrants who lack understanding of how to navigate an immigration system designed for adults. Instead of having to be cross-examined in an adversarial courtroom by trained government lawyers (without the right to appointed counsel), a UAC applicant is seen by USCIS asylum officers trained to conduct non-adversarial interviews and apply child-sensitive and trauma-informed interview techniques.

83.    Generally, asylum applicants must file their asylum application within one year after entering the United States unless they can prove that they fall within one of two limited exceptions. 8 U.S.C. § 1158(a)(2)(B). Recognizing that children were forced to struggle through a system designed for adults, even though they lack the capacity to understand nuanced legal principles, let alone courtroom and administrative procedures, the second TVPRA protection at issue here makes the one-year filing deadline inapplicable to UACs. TVPRA

18

§ 235(d)(7); 8 U.S.C. § 1158(a)(2)(E).  Accordingly, a UAC who was unable to file within one

year will not be required to demonstrate changed or extraordinary circumstances relating to the

delay in filing the application, and that the application was nonetheless filed in a reasonable time.

*See* 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 208.4(a)(5).

84.     The TVPRA also requires that federal officials who discover a UAC must transfer

the UAC to the custody of HHS within a 72-hour period (absent exceptional circumstances), for

care and custody.  TVPRA § 235(b)(3); 8 U.S.C. § 1232(b)(3).  This requirement places UACs

under the care of an agency set up to provide for their safety and welfare, rather than an agency

whose mission is to enforce immigration laws.  For example, HHS contracts with agencies who

have social workers on staff who are trained to work with children.

85.     Nothing in the TVPRA directs or authorizes any government agency to rescind a

determination that a child is a UAC, or to abrogate the asylum procedures that apply to a child

determined to be a UAC.

86.     In the words of Senator Dianne Feinstein, a co-author of the TVPRA provisions,

their purpose was "to ensure that unaccompanied children receive humane and appropriate

treatment while in the custody of the U.S. Government"[4] and to "give unaccompanied minors

access to pro bono legal counsel and someone to look after their best interest."  154 Cong. Rec.

S10886 (daily ed. Dec. 10, 2008).  Senator Feinstein explained that:

> I believe we have a special obligation to ensure that these children are treated
> humanely and fairly.  Unfortunately, without this legislation, there would be no
> procedure to make sure that happens.  Currently, when a child is apprehended by
> immigration authorities, that child usually knows nothing about U.S. courts or
> immigration policies and frequently does not speak English.

---

[4] July 31, 2008 Press Release, available at
https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=7b292e44-b306-86d0-
a0b4-981389abaf5d.

*Id.*

87.    Congress instructed USCIS, in order to properly administer the TVPRA, to enact "regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied alien children's cases."  TVPRA § 235(d)(8); 8 U.S.C. § 1232(d)(8).  USCIS has failed to enact any such regulations in the twelve years since Congress passed the TVPRA.

### Initial Implementation of the TVPRA and the September 2012 Office of the Citizenship and Immigration Services Ombudsman's Report

88.    In 2009, USCIS issued a memorandum instructing asylum officers on the rules to follow for evaluation of asylum applications filed by UACs in removal proceedings.  Ex. 2 (March 25, 2009 Memorandum re: *Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*).  The memorandum instructs asylum officers that they must make an initial determination as to USCIS's jurisdiction for all asylum applications filed by UACs in removal proceedings.  *Id.* at 4.  Further, according to the 2009 memorandum, asylum officers are to determine whether, at the time of filing, the child was under 18 years of age and unaccompanied.  *Id.* at 4-5.  The 2009 memorandum states that "[f]ederal regulations will ultimately be promulgated in order to reflect the procedures established for USCIS initial jurisdiction."  *Id.* at 1.

89.    The procedures set forth in the 2009 memorandum were contrary to the TVPRA, as acknowledged by the Citizenship and Immigration Services Ombudsman ("Ombudsman").[5]

---

[5] The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.  *See* 6 U.S.C. § 272.

On September 20, 2012, the Ombudsman issued a report, titled *Ensuring a Fair and Efficient Asylum Process for Unaccompanied Minor Children* (the "2012 Ombudsman Report") (Ex. 3), providing an independent analysis of problems encountered by UACs seeking asylum in the United States, and recommendations to improve the process.  The Ombudsman recognized that USCIS had failed to implement the "statutorily required regulations" for UACs seeking asylum. Instead, USCIS had "developed and implemented certain temporary policies and procedures for UAC asylum-seekers."  *Id.* at 3.

90.     To complete its review, the Ombudsman "interviewed USCIS Asylum Division manager and staff at Headquarters and seven of the eight Asylum Offices, EOIR officials, and stakeholders throughout the country."  Ex. 3 at 2.  The Ombudsman "also studied case assistance requests and reported incidents submitted directly to [its] office by stakeholders."  *Id.*

91.     According to the Ombudsman, "Congress did not provide language indicating that the filing of an asylum application should trigger a new or successive UAC determinations that could eliminate statutory protections or remove the UAC from [removal] proceedings."  *Id.* at 5.

92.     The Ombudsman also recognized that the "TVPRA's procedural and substantive protections were designed to remain available to UACs throughout removal proceedings, housing placement, and the pursuit of any available relief.  Subjecting a child seeking asylum to multiple UAC determinations as is required by USCIS' temporary guidance appears at odds with the TVPRA's express purpose, namely, to provide timely, appropriate relief for vulnerable children."  *Id.*

93.     The Ombudsman recognized that, when a child is placed in removal proceedings, the apprehending entity, whether ICE or CBP, "must make a finding that the child is unaccompanied."  *Id.*  However, in the period between enactment of the TVPRA and

promulgation of the 2013 policy, USCIS routinely revisited determinations that a child was a UAC, inquiring into whether the applicant was a UAC at the date of filing an asylum application and at the date of the asylum interview. *Id.* at 3-4. Based on such redeterminations, USCIS declined to exercise its initial jurisdiction over some children who had filed applications with USCIS pursuant to the TVPRA provisions. *Id.* at 6.

94. In the 2012 Ombudsman Report, the Ombudsman outlined numerous problems that flowed from redetermining UAC status at asylum interviews, including inefficiencies attendant upon scheduling and conducting interviews only to disclaim jurisdiction in nearly half the cases (*id.* at 6); officers assessing complex parent-child relationships without specialized training (*id.* at 7); and undermining predictability and uniformity in the handling of children's cases (*id.* at 6). The Ombudsman explained that instead of "facilitating expedited, non-adversarial interviews envisioned by Congress," the USCIS policy of undertaking a redetermination of UAC status at every asylum interview created "delay and confusion." *Id.* at 4.

95. Recognizing the deficiencies in this process, the Ombudsman made a number of recommendations "[t]o address confusion related to UAC redeterminations, facilitate improved interview techniques and adjudications, and reduce post-interview processing delays." *Id.* at 1-2. As the Ombudsman noted:

> A child's living circumstances or relationship with his or her family may be dynamic, so the child may fall both within and without of the UAC definition while present in the United States. Given this fluidity, as well as inconsistencies in practice by DHS and EOIR, legal advocates believe that the UAC definition itself is too vague and impractical, and that the status, once attached, should remain with a child through the pendency of his or her case.

22

*Id.* at 4.[6]

96.     The Ombudsman recommended that USCIS accept jurisdiction of an asylum

application filed by a child whom a federal agency had previously determined to be a UAC.  *Id.*

at 4-5.

97.     As the Ombudsman correctly concluded based on its extensive assessment,

"[e]liminating the practice of USCIS redetermining UAC status during the asylum interview

would also restore a level of fairness that comes from having a predictable and uniform process."

*Id.* at 6.  According to the Ombudsman, the practice of "adopt[ing a] UAC determination made

for custody purposes by CBP and ICE . . . will positively affect all minors apprehended and

placed into federal custody with the HHS, helping to ensure a consistent process for scores of

children who seek asylum in the United States."[7]

### USCIS Response to the Ombudsman's Report and the 2013 Kim Memorandum

98.     On April 11, 2013, USCIS responded to the Ombudsman's Report, thanking the

Ombudsman "for the opportunity to respond to [the Ombudsman's recommendation] to ensure a

fair and effective asylum process."  Ex. 5 at 1.  USCIS recognized that "there is room to

improve," and agreed with the Ombudsman's recommendation that USCIS should accept

jurisdiction of asylum applications filed by children DHS previously determined to be UACs.  *Id.*

at 2-3.

99.     On May 28, 2013, USCIS issued a memorandum authored by Ted Kim, Acting

Chief, Asylum Division, regarding "*Updated Procedures for Determination of Initial*

---

[6] The Ombudsman's report quotes an article from the American Immigration Lawyers
Association, Immigration Practice Pointers 2011- 2012 Edition, "The ABCs of Representing
Unaccompanied Children," (June 2011) at p. 588.
[7] Ex. 4, Annual Report 2013, Citizenship and Immigration Services Ombudsman (June 27,
2013).

*Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*" (the "2013 Kim Memorandum") (Ex. 6).  The 2013 Kim Memorandum provides procedures for "determining jurisdiction in applications for asylum filed by unaccompanied alien children (UACs) under the initial jurisdiction provision of the [TVPRA]."  Ex. 6 at 1.

100.    The 2013 Kim Memorandum implemented the Ombudsman's recommendation that USCIS accept jurisdiction of the asylum applications of those children whom a federal agency had already determined met the statutory definition of a UAC.  *Id.* at 2.  Under the 2013 Kim Memorandum, "[i]n cases in which CBP or ICE has already determined that the applicant is a UAC, Asylum Offices will adopt that determination and take jurisdiction over the case."  *Id.* Further, if as of the date of initial filing of the asylum application, that UAC status determination was still in place—not having been terminated by an "affirmative act" of HHS, ICE, or CBP— "USCIS will take initial jurisdiction over the case, even if there appears to be evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CBP or ICE determination."  *Id.*

101.    An edition of USCIS's Affirmative Asylum Procedures Manual, updated after the 2013 Kim Memorandum took effect on June 10, 2013, provides asylum officers with only a single example of an "affirmative act," namely, "the act of ICE taking an individual out of ORR custody and placing the individual in ICE custody as an adult detainee, either because the individual has turned 18 or it has been determined that the original finding that the individual was under 18 was not correct."

102.    The 2013 Kim Memorandum does not permit USCIS to reject jurisdiction on the basis of an "affirmative act" consisting of a recognition or notation as to evidence that the applicant has turned 18 or has reunited with a parent or legal guardian.  Under the 2013 Kim

Memorandum, it was not USCIS practice to treat the recognition or notation as to "evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CBP or ICE determination" as an "affirmative act" by HHS, ICE, or CBP. ICE regularly noted in its files and database systems that a child had been released to a parent. And ORR—a component of HHS—regularly noted in its files and database systems when a child had been released to a parent or had been released from ORR custody upon turning 18. USCIS did not have a practice of treating such notations as affirmative acts under the 2013 Kim Memorandum. Indeed, such a practice is inconsistent with the express terms of the 2013 Kim Memorandum, under which USCIS has jurisdiction based on a prior UAC determination "even if there appears to be evidence that the applicant may have turned 18 years of age or may have been reunited with a parent or legal guardian since the CBP or ICE determination."

103.    Between the issuance of the 2013 Kim Memorandum and early in the Trump Administration, on information and belief, most attorneys representing children who filed asylum applications with USCIS under the TVPRA's initial jurisdiction provision *never* received a USCIS jurisdictional rejection based upon an "affirmative act" by HHS, ICE, or CBP. Those who did most often were representing clients who had been placed into ICE custody as adult detainees prior to filing their asylum applications, as outlined in the AAPM example above.

104.    The 2013 Kim Memorandum does not refer to EOIR as an agency whose determination would be binding upon USCIS or even relevant to USCIS's jurisdictional determination.

105.    Under the 2013 Kim Memorandum, USCIS is not permitted to defer to an EOIR jurisdictional determination.

106.    Prior to issuance of the 2019 Redetermination Memo, USCIS asylum officers were not instructed that immigration judges had the authority to make any determinations about UAC status or to terminate UAC findings.

107.    Just weeks before issuing the 2019 Redetermination Memo, on May 20, 2019, USCIS confirmed to public stakeholders that the asylum policy and procedures set forth in the 2013 Kim Memorandum remained in effect.  Ex. 7 (USCIS Asylum Division Quarterly Meeting Agenda, May 20, 2019) at 3.  This was the most recent reaffirmation in a series of public statements to stakeholders in which USCIS confirmed that "[t]he May 28, 2013 Memorandum on initial jurisdiction over asylum applications filed by UACs and the related June 2013 policy documents remain in effect."  *Id.*

108.    In reliance on the rules set forth in the 2013 Kim Memorandum, Plaintiffs, and other unaccompanied immigrant children similarly situated, filed asylum applications with USCIS prior to June 30, 2019.  In anticipation of this Court's order of injunctive relief, or pursuant to this Court's TRO and PI, additional unaccompanied immigrant children amenable to USCIS jurisdiction under the 2013 Kim Memorandum filed asylum applications with USCIS on or after June 30, 2019.

**The 2019 Redetermination Memo Issued by USCIS**

109.    On June 14, 2019, USCIS published a memorandum on its website that drastically changed the rules for determining whether a child is eligible to seek asylum before USCIS.  The 2019 Redetermination Memo, dated May 31, 2019, is authored by John Lafferty (Chief, Asylum Division) and titled "*Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children*" (Ex. 1).  Although the memorandum is dated May 31, 2019, USCIS did not publish this memorandum on its website until June 14, 2019.

26

110.    The 2019 Redetermination Memo acknowledges that the asylum policy in place since 2013 allowed "asylum officers to adopt prior UAC determinations made by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE) without further factual inquiry, so long as those determinations were still in place on the date of filing the asylum application."  Ex. 1 at 2.

111.    Reversing the 2013 policy, the 2019 Redetermination Memo directed that all asylum officers must "mak[e] independent factual inquiries in all cases in order to determine whether the individual met the UAC definition on the date of first filing the asylum application" which in turn determines whether USCIS will exercise jurisdiction, and "examine whether the individual was a UAC at the time of first filing for the purposes of determining whether the one-year filing deadline applies."  *Id.*  The 2019 Redetermination Memo also instructs that if EOIR has explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer is to defer to that determination.  *Id.* at 4 n.5.

112.    Under the policy set forth in the 2019 Redetermination Memo, an individual who was previously determined to be a UAC and who applied for asylum with USCIS after turning 18 or reunifying with a parent or legal guardian relying on existing USCIS policy would have their asylum application rejected by USCIS for lack of jurisdiction.  The same is true if EOIR had determined that USCIS lacked jurisdiction over the asylum application because it was not filed by a UAC.  That individual could also lose eligibility for asylum in any forum due to the retroactive application of the one-year bar on filing.

113.    The 2019 Redetermination Memo states that its "updated procedures" "apply to **any** USCIS decision issued on or after the effective date" of the memorandum (emphasis in

original). *Id.* at 1. The 2019 Redetermination Memo is dated May 31, 2019 and purported to take effect on June 30, 2019, which is 30 calendar days from the date of the memorandum.

114.    Under the 2019 Redetermination Memo, an individual who was previously determined to be a UAC, and who applied for asylum relying on the procedures set forth in the 2013 Kim Memorandum, could arrive at an asylum interview to find that USCIS would decline jurisdiction because the asylum officer determined, based on an independent decision or in deference to an EOIR pronouncement, that the applicant was not a UAC at the time of application. Indeed, the 2019 Redetermination Memo called for the same retroactive jurisdictional denial in cases interviewed years ago and still awaiting decision when the 2019 Redetermination Memo took effect. In those and other postures, if an asylum officer determines that, at the time the application was filed, the child was over 18 or had a parent or legal guardian in the United States who the asylum officer determines was "available to provide care and physical custody," or if the asylum officer is aware of an EOIR determination to that effect, then the asylum officer had to decline jurisdiction. For those unaccompanied immigrant children in removal proceedings who applied for asylum when they were 18 or older or after joining a parent or guardian, USCIS will, based on its redetermination, refer the children's asylum claims to the immigration court where they will await an adversarial process. Moreover, as the CIS Ombudsman noted with reference to the initial 2009 policy, any record made in the USCIS interview is then transmitted to ICE, allowing an ICE attorney to use it to cross-examine the applicant in the adversarial immigration court process. The UAC applicant has no opportunity to challenge those USCIS notes, taken in the course of a process USCIS now claims not to have jurisdiction to conduct.

115.    There are many reasons an unaccompanied child may have filed for asylum after one year, after turning 18, or after a parent or legal guardian in the United States became able to take custody of the child.

116.    As Congress recognized in passing the TVPRA, unaccompanied immigrant children are particularly unable to access complex immigration systems without the aid of a legal representative, and it could take a child a substantial period of time to find legal representation—if she ever does. The TVPRA's procedural protections allow a child additional time to find legal representation and access the asylum process. Many unaccompanied immigrant children, including one or more of the Plaintiffs, find legal representation after turning 18 or more than one year after entry, and subsequently file for asylum before USCIS.

117.    Other children may find legal representation, but then pursue a form of immigration relief or protection other than asylum first, knowing that that the TVPRA asylum process remains available. For example, many unaccompanied immigrant children suffered neglect, abandonment, or abuse by a parent that qualifies them for special immigrant juvenile status ("SIJS") under 8 U.S.C. § 1101(a)(27)(J)—a form of protection that was substantially broadened by the TVPRA—or qualify for forms of relief such as T and U visas for victims of trafficking and other crimes. For many reasons, including speed of processing, ability to avoid revisiting trauma, and availability of visas, a UAC and his or her legal representative may decide to pursue SIJS or another form of potential relief prior to filing for asylum before USCIS.

118.    In applying for one of these other forms of relief since 2013, a child applicant could rely on the opportunity to later file for asylum before USCIS, exempt from the one-year filing deadline, and still be entitled to the child-appropriate non-adversarial interview process in the first instance. Then, under the system Congress created, if the child were unsuccessful in the

USCIS process, she would have the case referred back to immigration court, where she could again present her asylum evidence to the immigration judge in an adversarial procedure.

119.    USCIS has during a period of many months delayed scheduling asylum interviews for unaccompanied child applicants, preventing them from securing relief under the established policy.  USCIS delayed scheduling interviews in anticipation of the pronouncement of a new policy.  Further, USCIS may have delayed interviews and adjudications in anticipation of an effective date such as that of the 2019 Redetermination Memo, with the effect of applying the policy retroactively to bar otherwise qualified children from benefitting from the protections of the TVPRA.

120.    USCIS asserted in the 2019 Redetermination Memo that USCIS adopted the new asylum policy in order to bring USCIS practice in line with a precedential Board of Immigration Appeals ("BIA") decision regarding jurisdiction over asylum applications.  According to USCIS, the 2019 Redetermination Memo was necessary "[t]o ensure USCIS is making these jurisdictional determinations in a manner consistent with Immigration Judge determinations on the same issue."  Ex. 1 at 2.

121.    The BIA decision referenced in the 2019 Redetermination Memo, *Matter of M-A-C-O-*, 27 I. & N. Dec. 477 (BIA 2018), does not divest USCIS of its authority to determine whether it has jurisdiction over an asylum application.  Indeed, USCIS recognized this in the 2019 Redetermination Memo, stating "both the Immigration Judge and USCIS have authority to make this jurisdictional determination."  Ex. 1 at 2.  USCIS also recognized in its May 20, 2019 report that the *Matter of M-A-C-O-* decision "does not address USCIS determinations about its own jurisdiction.  USCIS continues to make its jurisdictional determinations under its own procedures."  Ex. 7 at 3.  However, the 2019 Redetermination Memo does state that if EOIR has

explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer will defer to that determination.  Ex. 1 at 4 n.5.

122.    The BIA decision does not mandate any changes to USCIS policy.  It does not invalidate the asylum policy set forth in the 2013 Kim Memorandum or direct USCIS to implement new procedures.

123.    Nonetheless, through ICE's advocacy before the immigration courts, Defendants have implemented a policy that abdicates USCIS's statutorily mandated role of determining and taking initial jurisdiction and instead permits EOIR to determine such cases on the merits despite initial jurisdiction lying with USCIS, thus denying UAC applicants the initial non-adversarial hearing to which the TVPRA entitles them.  In the absence of affirmative steps by USCIS to give effect to its initial jurisdiction, and/or due to substantial delays in USCIS's processing of these cases, ICE is regularly in a position to advocate that an immigration court act on a case notwithstanding a pending UAC asylum claim before USCIS.  By affirmatively arguing that EOIR has jurisdiction and by opposing requests by applicants that EOIR stay its hand, ICE facilitates USCIS's abdication of its exercise of initial jurisdiction.

124.    Neither the BIA decision nor the 2019 Redetermination Memo undertake any examination of the reasons USCIS adopted the asylum policy set forth in the 2013 Kim Memorandum.  Nor do they consider any of the legislative history or congressional intent in enacting the TVPRA.

125.    The 2019 Redetermination Memo is a final agency action under 5 U.S.C. § 704. The action "mark[s] the 'consummation' of the agency's decisionmaking process" and it is not "of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  The memorandum marks the culmination of USCIS's process for setting rules governing its

31

jurisdiction and legal consequences will flow from it, as existing asylum applicants will lose the right to seek relief from the asylum office and, in some instances, will have their applications denied as time barred unless they can establish an exception to the bar.

126.    For any particular Plaintiff or class member whose asylum application under the TVPRA is rejected by USCIS on jurisdictional grounds, that rejection is itself a final action of USCIS on the case.

127.    For any particular Plaintiff or class member in whose case ICE advocates for EOIR's exercise of jurisdiction in derogation of USCIS's initial jurisdiction, ICE acts to bring about the final action of foreclosing a hearing of the claim in a non-adversarial setting and effectively transferring initial jurisdiction of the case to EOIR.

128.    The directives in the 2019 Redetermination Memo establish a binding norm and leave asylum officers with no discretion.  Specifically, the 2019 Redetermination Memo states, "The asylum officer **must** evaluate whether the asylum application was filed by a UAC by making an independent factual inquiry as to whether the individual met the UAC definition at the time of first filing the asylum application."  Ex. 1 at 3 (emphasis added).  Additionally, "[i]f EOIR has explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer **will** defer to that determination."  Ex. 1 at 4 n.5 (emphasis added).

129.    The 2019 Redetermination Memo imposes new legal burdens on and alters the legal rights and interests of asylum seekers who have previously been determined to be UACs.  Specifically, the 2019 Redetermination Memo provides, "As the party invoking USCIS jurisdiction, the individual filing for asylum bears the burden to establish that he or she met the UAC definition, which includes the applicant's burden to establish his or her age, and that the

applicant was unaccompanied, at the time of first filing the asylum application."  Ex. 1 at 3.  It also specifically defers to EOIR's determination that USCIS lacks jurisdiction because the asylum application is not one filed by a UAC.  Ex. 1 at 4 n.5.

130.    Defendants did not undertake notice-and-comment rulemaking prior to issuing the 2019 Redetermination Memo.

131.    The policy announced in the 2019 Redetermination Memo sets forth legislative rules and is thus not exempt from the APA's requirements of notice and comment.  The 2019 Redetermination Memo reflects a legislative policy judgment, not merely interpretive guidance.

**The Expanded Affirmative Act Policy Adopted by USCIS**

132.    This Court issued a temporary restraining order (extended three times) and a preliminary injunction, each of which required Defendants to proceed with "consideration of such case[s] applying the 2013 [Kim] Memorandum."  The preliminary injunction bars Defendants from "rejecting jurisdiction over any asylum applications . . . [which] would have been accepted under the 2013 Kim Memorandum."  Yet Defendant USCIS has departed from this memorandum and rejected jurisdiction over asylum applications on the basis of purported "affirmative acts" consisting of a recognition or notation as to evidence that the applicant has turned 18 or has reunited with a parent or legal guardian—termed here the "Expanded Affirmative Act Policy."  This policy—which is tailored to achieve the same outcome as the enjoined 2019 Redetermination Memo under a different guise—violates the express terms of the 2013 Kim Memorandum without any explanation, and abruptly and unlawfully departs from USCIS's prior interpretation of the 2013 Kim Memorandum.  It undermines predictability and uniformity in the handling of children's asylum claims.

33

133.    Under this policy, USCIS treats notations made by ICE—whether in its databases or other documents, such as Forms I-213, memoranda, or immigration court filings—that the applicant has turned 18 or has reunited with a parent or legal guardian as "affirmative acts" that terminate a prior UAC finding.

134.    These notations vary in form.  Some reflect the simple fact of the applicant's turning 18 or having been released to a parent or legal guardian.  Others state that an applicant "is no longer a UAC" or "is accompanied" for one of those reasons.  Still others state that the applicant "is no longer designated a UAC" or is "re-designated as accompanied" for one of those reasons.

135.    ICE does not routinely provide children with notice of these notations having been made, contemporaneous or otherwise.  And USCIS also does not routinely provide children notice of these notations, which it treats as "affirmative acts," before relying upon them to reject jurisdiction over their asylum applications, despite its obligation to do so under 8 C.F.R. § 103.2(b)(16)(i) (requiring notice and an opportunity to respond if USCIS intends to render an adverse decision based on derogatory information of which an applicant is unaware).  As a result, children may be stripped of their UAC status determinations without any ability either to challenge an "affirmative act" determination or to adjust their actions in order to retain their legal rights (*e.g.*, filing an asylum application before the one-year filing deadline).

136.    USCIS has supported ICE's actions to strip children of the TVPRA's protections through "re-designation."  In the January 2018 DHS document that paved the way for the 2019 Redetermination Memo, then-DHS Secretary Kirstjen Nielsen simultaneously instructed USCIS to rescind the 2013 Kim Memorandum and "[a]uthorize[d] ICE, as a matter of policy, to re-designate UACs as accompanied juvenile aliens, when appropriate, upon release of the child by

HHS to a parent or legal guardian." The document reflects that "USCIS supports ICE's plan to make UAC re-designations." At least some of ICE's notations that USCIS now treats as "affirmative acts" were the result of ICE's secret re-designation policy, a policy that became public nearly three years after the fact and only through this litigation.

137.    Upon information and belief, a former Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement Tony H. Pham issued a directive on UAC re-determinations on December 29, 2020. Pursuant to this directive, ICE immigration officers must determine whether a young person meets the UAC statutory definition every time an officer interacts with the young person's case, including when the officer merely becomes aware of information. If the officer determines that a child previously found to be a UAC no longer meets the definition, the officer must document the re-determination in a memorandum to file and in the applicable case management system, such as EARM. USCIS has treated notations such as these as "affirmative acts" under the Expanded Affirmative Act Policy, and has rejected jurisdiction over children's asylum applications as a result.

138.    Upon information and belief, under the Expanded Affirmative Act Policy, USCIS also treats notations made by HHS (specifically ORR)—whether in its databases or other documents—that the applicant has turned 18 or has reunited with a parent or legal guardian as "affirmative acts" that terminate a prior UAC finding.

139.    Upon information and belief, HHS does not provide children with notice of these notations having been made, contemporaneous or otherwise. And upon information and belief USCIS also does not provide children notice of these notations, which it treats as "affirmative acts," before relying upon them to reject jurisdiction over their asylum applications, despite its obligation to do so under 8 C.F.R. § 103.2(b)(16)(i) (requiring notice and an opportunity to

respond if USCIS intends to render an adverse decision based on derogatory information of which an applicant is unaware). As a result, children may be stripped of their UAC status determinations without any ability either to challenge an "affirmative act" determination or to adjust their actions in order to retain their legal rights (*e.g.*, filing an asylum application before the one-year filing deadline).

140. USCIS's Expanded Affirmative Act Policy has come to light since this Court enjoined Defendants from relying upon the 2019 Redetermination Memo to reject jurisdiction over asylum applications, including through USCIS's conducting in-person "jurisdictional interviews" with children, in the midst of a pandemic, that appear designed to facilitate rejections under the policy. This policy has resulted in USCIS rejecting jurisdiction over the asylum applications of Plaintiff L.M.Z. and other members of the class despite this Court's preliminary injunction requiring USCIS to proceed with "consideration of such case[s] applying the 2013 [Kim] Memorandum."

141. Under the Expanded Affirmative Act Policy, an individual who was previously determined to be a UAC and who applied for asylum with USCIS relying on the 2013 Kim Memorandum's express language and USCIS's narrow interpretation of its "affirmative act" exception will have their asylum application rejected by USCIS for lack of jurisdiction based upon nothing more than a recognition or notation as to evidence that the applicant has turned 18 or has reunited with a parent or legal guardian. Decisions made under the policy suggest that it applies equally to newly filed cases and to those filed years ago, requiring the same retroactive jurisdictional denial in cases already interviewed and still awaiting decision when the policy took effect.

36

142.    An individual over whose asylum application USCIS rejects jurisdiction on the basis of the Expanded Affirmative Act Policy will find their asylum claim referred to the immigration court where they will await an adversarial process.  Moreover, as the CIS Ombudsman noted with reference to the initial 2009 policy, any record made in the USCIS interview is then transmitted to ICE, allowing an ICE attorney to use it to cross-examine the applicant in the adversarial immigration court process.  The UAC applicant has no opportunity to challenge those USCIS notes, taken in the course of a process USCIS now claims it lacked jurisdiction to conduct.  The applicant could also lose eligibility for asylum in any forum due to the retroactive application of the one-year bar on filing.

143.    The Expanded Affirmative Act Policy was adopted without any indication that USCIS had considered the serious reliance interests of asylum applicants who had relied on the express terms of the 2013 Kim Memorandum and the longstanding practice under the 2013 Kim Memorandum and without any reasoned explanation for the change of course.

144.    The Expanded Affirmative Act Policy is a final agency action under 5 U.S.C. § 704.  The action "mark[s] the 'consummation' of the agency's decisionmaking process" and it is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178 .  The policy marks the culmination of USCIS's process for setting rules governing its jurisdiction and legal consequences will flow from it, as existing asylum applicants will lose the right to seek relief from the asylum office and, in some instances, will have their applications denied as time barred unless they can establish an exception to the bar.

145.    For any particular Plaintiff or class member whose asylum application under the TVPRA is rejected by USCIS on jurisdictional grounds, that rejection is itself a final action of USCIS on the case.

146.    The Expanded Affirmative Act Policy is binding on individual asylum officers, leaving them with no discretion to retain jurisdiction over an application filed by a young person who was 18 years old or older or living with a parent or legal guardian when they filed their application if a notation by ICE, HHS, or CBP regarding UAC status appears in the applicant's file.

147.    The policy imposes new legal burdens and alters the legal rights and interests of asylum seekers who have previously been determined to be UACs.

148.    Defendants did not undertake notice-and-comment rulemaking prior to adopting the Expanded Affirmative Act Policy.

149.    The Expanded Affirmative Act Policy sets forth legislative rules and is thus not exempt from the APA's requirements of notice and comment.  It reflects a legislative policy judgment that binds asylum officers, not merely interpretive guidance.

**Defendants' Failure to Promulgate Regulations Despite the TVPRA's Mandate to Do So**

150.    The TVPRA expressly directs USCIS to promulgate regulations governing the handling of asylum claims by UACs:  "Applications for asylum and other forms of relief from removal in which an unaccompanied alien child is the principal applicant shall be governed by regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied children's cases."  TVPRA § 235(d)(8); 8 U.S.C. § 1232(d)(8).

151.    In the fall of 2011, DHS and USCIS included in the Unified Agenda a proposed rule titled "Application of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 to Unaccompanied Alien Children Seeking Asylum."  RIN 1615-

AB96.[8]  The notice indicated that the proposed "rule implements the provisions of the TVPRA" and acknowledged that "[t]he TVPRA mandated promulgation of regulations taking into account the specialized needs of unaccompanied alien children and addressing both procedural and substantive aspects of handling unaccompanied children's cases."  The agencies did not publish the text of the proposed rule.

152.    DHS and USCIS included the same notice in the Unified Agenda again in 2012, Spring 2013, Fall 2013, Spring 2014, Fall 2014, Spring 2015, Fall 2015, Spring 2016, Fall 2016, Spring 2017, Fall 2017, Spring 2018, and Fall 2018.  Yet in the nine years since first including this notice in the Unified Agenda, the agencies have not published a Notice of Proposed Rulemaking, and have made no progress toward promulgating regulations implementing the UAC provisions of the TVPRA.

### Plaintiffs Relied on USCIS's 2013 Policy and the TVPRA, Will Be Deprived of Their Right to Seek Asylum Before USCIS Under the New Policies, and Will Be Severely Harmed

153.    Plaintiff M.E.R.E. entered the United States when he was 15 years old.  Upon apprehension, he was determined by DHS to be a UAC.

154.    In reliance on the 2013 policy, M.E.R.E. first sought other forms of protection from removal, ultimately applying for asylum in March 2018 after having been reunited with his mother and reaching the age of 18.  M.E.R.E. had an asylum interview in August 2020.  As of this filing, M.E.R.E. has not received a decision on his asylum application.

155.    Under the new policy set forth in the 2019 Redetermination Memo, USCIS will decline jurisdiction over M.E.R.E.'s asylum application because he filed after turning 18.

---

[8] Available at https://reginfo.gov/public/do/eAgendaViewRule?pubId=201110&RIN=1615-AB96.

M.E.R.E. remains in removal proceedings before an immigration judge wherein an ICE prosecutor may advocate for EOIR jurisdiction and against USCIS jurisdiction. If the immigration judge makes a determination that USCIS does not have jurisdiction over M.E.R.E.'s asylum application, USCIS will reject jurisdiction over M.E.R.E.'s asylum application under the 2019 Redetermination Memo. Under the Expanded Affirmative Act Policy, USCIS will decline jurisdiction over M.E.R.E.'s asylum application if it locates a recognition or notation as to evidence—allegedly made by HHS, ICE, or CBP before he filed his asylum application—that he had turned 18 or reunited with his mother. In all of these scenarios, M.E.R.E. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in immigration court where he will be cross-examined about the abuse and persecution he suffered as a child. This will further delay the already extended period of time M.E.R.E. has waited for his asylum application to be decided. The added delay will continue to prevent M.E.R.E. from pursuing his education.

156.    Because of the new policy set forth in the 2019 Redetermination Memo and the Expanded Affirmative Act Policy, the government may conclude that M.E.R.E. is ineligible for asylum since he filed his application more than one year after entering the United States.

157.    Plaintiff M.A.L.C. entered the United States when he was 17 years old. Upon apprehension, he was determined by DHS to be a UAC.

158.    In reliance on the 2013 policy, M.A.L.C. applied for asylum in February 2018, when he was 19 years old. As of this filing, USCIS has not interviewed M.A.L.C. and his asylum application is still pending.

159.    Under the new policy set forth in the 2019 Redetermination Memo, USCIS will decline jurisdiction over M.A.L.C.'s asylum application because he filed after turning 18.

40

M.A.L.C. remains in removal proceedings before an immigration judge wherein an ICE prosecutor may advocate for EOIR jurisdiction and against USCIS jurisdiction. If the immigration judge makes a determination that USCIS does not have jurisdiction over M.A.L.C.'s asylum application, USCIS will reject jurisdiction over M.A.L.C.'s asylum application under the 2019 Redetermination Memo. Under the Expanded Affirmative Act Policy, USCIS will decline jurisdiction over M.A.L.C.'s asylum application if it locates a recognition or notation as to evidence—allegedly made by HHS, ICE, or CBP before he filed his asylum application—that he had turned 18. In all of these scenarios, M.A.L.C. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in immigration court where he will be cross-examined about the abuse and persecution he suffered as a child. This will further delay the already extended period of time M.A.L.C. has waited for his asylum application to be decided.

160.    Further, M.A.L.C. may be deemed ineligible for asylum at all because his application was filed more than one year after he entered the United States.

161.    Plaintiff K.A.R.C. entered the United States when he was 17 years old. Upon apprehension, he was determined by DHS to be a UAC.

162.    In reliance on the 2013 policy, K.A.R.C. applied for asylum in the fall of 2017, when he was 18 years old. K.A.R.C. had an asylum interview in November 2017. In June 2020, USCIS granted K.A.R.C. asylum.

163.    Plaintiff J.O.P. entered the United States when he was 14 years old. Upon apprehension, DHS determined him to be a UAC.

164.    In reliance on the 2013 policy, J.O.P. applied for asylum in February 2018, still under the age of 18, but after being reunited with his mother in the United States. J.O.P. had an

asylum interview in August 2020. As of this filing, J.O.P. has not received a decision on his asylum application.

165.    Under the new policy set forth in the 2019 Redetermination Memo, USCIS will decline jurisdiction over J.O.P.'s asylum application because he filed after reuniting with his mother. J.O.P. remains in removal proceedings before an immigration judge wherein an ICE prosecutor may advocate for EOIR jurisdiction and against USCIS jurisdiction. If the immigration judge makes a determination that USCIS does not have jurisdiction over J.O.P.'s asylum application, USCIS will reject jurisdiction over J.O.P.'s asylum application under the 2019 Redetermination Memo. Under the Expanded Affirmative Act Policy, USCIS will decline jurisdiction over J.O.P.'s asylum application if it locates a recognition or notation as to evidence—allegedly made by HHS, ICE, or CBP before he filed his asylum application—that he had reunited with his mother. In all of these scenarios, J.O.P. will lose the protections associated with USCIS jurisdiction over his asylum application and instead will be subject to an adversarial process in immigration court where he will be cross-examined about the murder he witnessed and threats he received in his home country. This will further delay the already extended period of time J.O.P. has waited for his asylum application to be decided.

166.    Plaintiff E.D.G. entered the United States when he was 17 years old. Upon apprehension, he was determined by DHS to be a UAC.

167.    In reliance on the 2013 policy, E.D.G. applied for asylum with USCIS in late 2017, when he was 18 years old. E.D.G. had an asylum interview with USCIS in March 2018. On October 10, 2018, before USCIS issued a decision on E.D.G.'s asylum claim, an immigration judge issued a decision concluding that it had jurisdiction over E.D.G.'s asylum application,

42

denying it on the merits, and ordering E.D.G. removed.  E.D.G. appealed his removal order to the BIA, and that appeal remains pending.

168.    Under the new rules set forth in the 2019 Redetermination Memo, USCIS rejected jurisdiction over E.D.G.'s asylum application in July 2019 because he had not established that he was under 18 years old at the time he filed it.  On August 5, 2019, USCIS reopened E.D.G.'s case in compliance with this Court's TRO.  On September 30, 2019, while the Court's TRO remained in effect, USCIS again rejected jurisdiction over E.D.G.'s asylum application relying on the 2019 Redetermination Memo, this time deferring to the IJ's October 10, 2018 determination that E.D.G. was not a UAC.  Specifically, USCIS issued a Notice of Lack of Jurisdiction on grounds that the "Immigration Judge made an affirmative act to terminate UAC status on October 10, 2018."

169.    Because of the application of the new rules set forth in the 2019 Redetermination Memo, E.D.G. has lost the protections associated with USCIS jurisdiction over his asylum application.  USCIS's denial of jurisdiction over E.D.G.'s asylum application robs him of a basis upon which to move the BIA to remand his removal proceedings to the IJ to await USCIS's decision on the asylum application.  Had USCIS found jurisdiction over E.D.G.'s asylum application and granted E.D.G. asylum, E.D.G. could have moved the IJ or the BIA to terminate his removal proceedings.  USCIS's delay in adjudicating his asylum claim forced E.D.G. into the painful position of having to testify for the second time to traumatic events that included sexual abuse for years as a child, this time in an adversarial setting that involved cross-examination by a DHS attorney.

170.    Plaintiff L.M.Z. entered the United States when he was seven years old.  Upon apprehension, DHS determined him to be a UAC.

171.    In reliance on the 2013 policy, L.M.Z. applied for asylum in February 2019, still under the age of 18, but after being reunited with his mother in the United States.

172.    On February 5, 2020, L.M.Z. attended an asylum interview scheduled for him by USCIS.

173.    Under the new rules set forth in the 2019 Redetermination Memo and the Expanded Affirmative Act Policy, USCIS rejected jurisdiction over L.M.Z.'s asylum application on the basis that he had not established that he was unaccompanied at the time he filed his application.  Instead of reaching the merits of L.M.Z.'s asylum claim during L.M.Z.'s February 2020 interview, the asylum officer stated that she was making a factual finding that L.M.Z. was not a UAC and ended the interview.  On March 13, 2020, USCIS issued a "Notice of Lack of Jurisdiction (Non-UAC)," denying jurisdiction over L.M.Z.'s case.  The notice states that "USCIS has determined that we do not have initial jurisdiction over your asylum application as a UAC" because L.M.Z. was "not unaccompanied at the time of filing your I-589 because you had a parent or legal guardian in the United States who was available to provide care and physical custody of you."  In a declaration dated April 16, 2020, the asylum officer stated that she concluded that L.M.Z.'s UAC finding had been terminated before he filed his asylum application through an "affirmative act" taken by ICE, consisting of entry of the following notation on August 14, 2018 in the comments tab of the EARM database system: "Subject is no longer designated a UAC under the TVPRA as of date of release to sponsor-mother- on 06/08/2018."

174.    Because of the application of the new rules set forth in the 2019 Redetermination Memo and the Expanded Affirmative Act Policy, L.M.Z. has lost the protections associated with USCIS jurisdiction over his asylum application and will now be subject to an adversarial process in immigration court where he will be cross-examined about the physical and psychological

abuse he suffered at the hands of his father.  This will further delay the already extended period of time L.M.Z. has waited for his asylum application to be decided.  Moreover, L.M.Z. suffered unnecessary stress and emotional harm when he—as a nine-year-old child—spent approximately five hours preparing with his counsel to testify at his USCIS interview about the harm he suffered in Mexico, only to have USCIS terminate the interview and decline to hear his claim, without notice or an opportunity to respond to that determination.

175.    Even if USCIS retracts its jurisdictional denial based on the purported "affirmative act," L.M.Z. remains in removal proceedings before an immigration judge wherein an ICE prosecutor may advocate for EOIR jurisdiction and against USCIS jurisdiction.  If the immigration judge makes a determination that USCIS does not have jurisdiction over L.M.Z.'s asylum application, USCIS will again reject jurisdiction over L.M.Z.'s asylum application under the 2019 Redetermination Memo.

### Defendants Have Continued to Delay or Obstruct USCIS Adjudication of Properly Filed Cases, Resulting in the Abdication of USCIS's Exercise of Initial Jurisdiction Through Delay or Deference to EOIR

176.    This Court, as noted above, issued a temporary restraining order (extended three times) and a preliminary injunction, each of which required Defendants to proceed with "consideration of such case[s] applying the 2013 UAC Memorandum."  And the current preliminary injunction bars Defendants from "rejecting jurisdiction over any asylum applications . . . [which] would have been accepted under the 2013 Kim Memorandum."  Yet Defendant USCIS has rejected jurisdiction over asylum applications not only on the basis of the Expanded Affirmative Act Policy, but also where EOIR has wrongly asserted its own jurisdiction based on its own factual determination as to a child's age or the availability of a parent or guardian prior to the application date.

177.    ICE acts as the prosecuting entity in the immigration courts.  Rather than acting in furtherance of longstanding USCIS policy regarding the scope of USCIS initial jurisdiction, ICE actively opposes unaccompanied immigrant children's efforts to hold their asylum claims in removal proceedings in abeyance while those claims are properly before the USCIS asylum office.  ICE is a component of Defendant DHS, and therefore subject to this Court's Orders, yet ICE regularly takes the position in immigration court that EOIR, not USCIS, has jurisdiction over an asylum claim that was properly filed with USCIS, and regularly advocates for the scheduling of an adversarial hearing on that claim in immigration court, rather than agreeing to continuances or other postponement to allow USCIS time to exercise and act on its initial jurisdiction over the claim.

178.    Defendants have maintained a policy and practice that erroneously deprives Plaintiffs and the putative class members of USCIS's statutory initial jurisdiction over their asylum applications, including through USCIS's failure to act upon pending cases, and in continuing to follow the instruction in the 2019 Redetermination Memo that USCIS defer to EOIR's determinations of USCIS's jurisdiction.  ICE not only fails to contest such EOIR action but actively opposes immigration court postponements to allow USCIS to exercise its initial jurisdiction.  These practices are inconsistent with the TVPRA's conferral of "initial jurisdiction" to USCIS in those cases.

## CLASS ALLEGATIONS

179.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

180.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a certified nationwide class of all other persons similarly situated.

181.    Plaintiffs represent the following nationwide class:

All individuals nationwide who prior to the effective date of a lawfully promulgated policy prospectively altering the policy set forth in the 2013 Kim Memorandum (1) were determined to be an Unaccompanied Alien Child; and (2) who had filed an asylum application that was pending with United States Citizenship and Immigration Services ("USCIS"); and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits.

182.    Plaintiffs are each adequate representatives of the class.

183.    The class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.

184.    On information and belief, there are thousands of individuals who fit within the class.

185.    The class meets the commonality requirements of Rule 23(a)(2).  The members of the class are all subject to the 2019 Redetermination Memo, the related USCIS policy of deference to EOIR jurisdictional determinations, and the related Expanded Affirmative Act Policy and will lose their right to proceed before USCIS on the basis of these new policies.  This lawsuit raises questions of law common to all members of the class, including whether Defendants have violated the class members' due process rights; whether the policies are arbitrary and capricious under the APA; and whether the policies are unlawful because they were not promulgated pursuant to notice-and-comment as required by the APA.

186.    The class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class.  Plaintiffs and the class share the same legal claims, which assert the same substantive and procedural rights under the due process clause, the APA, and the TVPRA.

187.    The class meets the adequacy requirements of Rule 23(a)(4).  The representative Plaintiffs seek the same relief as other members of the class and have identical interests to the

47

class members in vigorously pursuing that relief. In defending their own rights, Plaintiffs will defend the rights of all class members fairly and adequately.

188.    The class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds that are generally applicable to each class member. Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## COUNT I
### (Administrative Procedure Act – The 2019 Redetermination Memo Is Arbitrary, Capricious, or Otherwise Not in Accordance with Law)

189.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

190.    Title 5, U.S. Code § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion (e.g., irrational), or otherwise not in accordance with law, or in excess of statutory jurisdiction or authority.

191.    The asylum policy set forth in the 2019 Redetermination Memo is arbitrary, capricious, an abuse of discretion, not in accordance with law, and is inconsistent with the TVPRA, and therefore in violation of 5 U.S.C. § 706(2).

192.    The 2019 Redetermination Memo violates the TVPRA because the asylum rules set forth therein are contrary to its plain language. The 2019 Redetermination Memo mandates that all asylum officers must evaluate, in all cases, whether an applicant met the statutory definition of a UAC at the time of filing the asylum application, and that all asylum officers must defer to EOIR's determination that USCIS lacks jurisdiction over an asylum application because it is not one filed by a UAC. This mandate applies in all cases, even where an individual had previously been determined to be a UAC. These mandates are contrary to the structure and text of the TVPRA, which plainly establish that a child's UAC status determination occurs upon the child's initial contact with a federal government department or agency and is not subject to

redetermination by USCIS, and that once filed, USCIS has initial jurisdiction over the application.

193.    The 2019 Redetermination Memo applies retroactively to individuals who already had asylum applications pending before USCIS, even those whom USCIS already interviewed as of the Memo's effective date, as well as to others who have relied upon the 2013 Kim Memorandum.  However, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Because Congress did not grant Defendants the power to promulgate retroactive rules under the TVPRA that would add new legal consequences to events completed prior to their promulgation, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994), the 2019 Redetermination Memo is arbitrary and capricious, not in accordance with law, and in excess of statutory authority.

194.    The 2019 Redetermination Memo is arbitrary and capricious because, for example, it does not address, nor acknowledge, any of the reasons for adopting the asylum policy in place since 2013 for UACs seeking asylum before USCIS.  Defendants have failed to provide any explanation, much less a reasoned explanation, of how the 2019 Redetermination Memo addresses the issues leading to the adoption of the 2013 Kim Memorandum, or why consistency with Board of Immigration Appeals precedent relates to whether a UAC has subsequently been reunited with a parent or assigned a legal guardian.

195.    The 2019 Redetermination Memo is also arbitrary and capricious because it fails to consider the reliance interests of children, including Plaintiffs, with pending asylum applications who had relied in good faith on the asylum policy in place since 2013.

196.    Notwithstanding the Court's preliminary injunction, Defendants have perpetuated this arbitrary and capricious policy by advocating for EOIR determinations of UAC status, by delaying USCIS determination of cases and thereby allowing EOIR adversarial merits hearings to go forward without any USCIS adjudication.

## COUNT II
### (The 2019 Redetermination Memo Violates Due Process)

197.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

198.    Defendants violate Plaintiffs' due process rights by retroactively applying the asylum rules set forth in the 2019 Redetermination Memo.  Plaintiffs filed for asylum reasonably expecting to benefit from all the protections and rights accorded by the TVPRA to UACs, as outlined by the 2013 Kim Memorandum.  Yet the 2019 Redetermination Memo will actually penalize the Plaintiffs' past conduct taken in reliance on USCIS policy in place since 2013.

199.    The asylum policy set forth in the 2019 Redetermination Memo changes the legal landscape for child asylum applicants by radically rewriting the terms under which applicants like the Plaintiffs, who have been determined to be UACs, can seek asylum.  Pursuant to the asylum policy promulgated by the 2013 Kim Memorandum, USCIS had initial jurisdiction over each of the Plaintiffs' asylum applications based on DHS's prior determination that each Plaintiff was a UAC.  Without any meaningful notice to the public, USCIS has changed the rules and stated unequivocally that it will apply its new jurisdictional requirements even to applications that were pending with the agency before the new policy's effective date.  Application of the new asylum policy will prevent USCIS from hearing the Plaintiffs' asylum claims, thereby depriving them of the protections Congress provided for UACs in the TVPRA.   By subjecting Plaintiffs to a one-year bar on filing an asylum applications, application of the new asylum

policy will render Plaintiffs completely ineligible for asylum unless they are able to carry the

burden of establishing one of two narrow exceptions to the bar in immigration court.

200.    The 2019 Redetermination Memo violates the procedural protections of the Fifth

Amendments' Due Process Clause.  The 2019 Redetermination Memo is therefore "contrary to

constitutional right, power, privilege, or immunity" and invalid under 5 U.S.C. § 706(2)(B).

## COUNT III
### (Failure to Follow APA Procedure with the 2019 Redetermination Memo)

201.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

202.    Under the Administrative Procedure Act, an agency must provide "[g]eneral

notice of proposed rulemaking . . . published in the Federal Register" whenever the agency seeks

to promulgate a rule.  5 U.S.C. § 553(b).  Exempt from this requirement are "interpretive rules,

general statements of policy, or rules of agency organization, procedure, or practice."  *Id.*  After

the agency has published the required notice, "the agency shall give interested persons an

opportunity to participate in the rule making through submission of written data, views, or

arguments."  *Id.* § 553(c).

203.    Defendants did not provide notice of proposed rulemaking, nor did they invite

comments from interested persons before issuing the 2019 Redetermination Memo.

204.    None of the statutory exceptions to the requirement of notice-and-comment

rulemaking is applicable here.  *See* 5 U.S.C. § 553(b).

205.    The asylum rules set forth in the 2019 Redetermination Memo are legislative

rules, not interpretive rules, because, for example, they effect a substantive change in existing

law.

206.    The 2019 Redetermination Memo is not a statement of policy that is exempt from public notice, including because it establishes binding rules on all asylum officers without leaving room for any exercise of discretion.

207.    The asylum policy set forth in the 2019 Redetermination Memo does not constitute rules of agency organization, procedure, or practice.

208.    The May 2019 Policy Memorandum was issued "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

## COUNT IV
**(Administrative Procedure Act – Failure to Exercise Initial Jurisdiction in Deference to EOIR Determinations Is Arbitrary, Capricious, and Otherwise Not in Accordance with Law)**

209.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

210.    Title 5, U.S. Code § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion (e.g., irrational), or otherwise not in accordance with law, or in excess of statutory jurisdiction or authority.

211.    USCIS's adoption of a policy to defer to an EOIR determination as to whether an asylum applicant is a UAC, as specifically announced in the 2019 Redetermination Memo, is arbitrary and capricious because it departs from the 2013 Kim Memorandum without acknowledgement or adequate explanation and is contrary to the TVPRA.  Under the statutory grant of UAC asylum initial jurisdiction in the TVPRA, USCIS must make its own jurisdiction determinations and may not merely defer to another agency's jurisdictional findings.  Under the 2013 Kim Memorandum, UAC asylum applicants are entitled to seek asylum before USCIS, regardless of any EOIR determination to the contrary.

212.    A USCIS policy to defer to an immigration judge's determination as to whether an asylum applicant is a UAC is arbitrary and capricious because it fails to consider the serious reliance interests of asylum applicants who relied on the 2013 Kim Memorandum.

213.    The USCIS policy to defer to an immigration judge's determination as to whether an asylum applicant is a UAC applies retroactively to individuals who already had asylum applications pending before USCIS, even those whom USCIS already had interviewed when the policy was adopted, as well as to others who have relied upon the express terms of the 2013 Kim Memorandum and the longstanding practice under the 2013 Kim Memorandum. However, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen* 488 U.S. at 208 (1988). Because Congress did not grant Defendants the power to promulgate retroactive rules under the TVPRA that would add new legal consequences to events completed prior to their promulgation, *see Landgraf*, 511 U.S. at 270, the USCIS policy to defer to an immigration judge's determination as to whether an asylum applicant is a UAC is arbitrary and capricious, not in accordance with law, and in excess of statutory authority.

## COUNT V
**(USCIS's and DHS's Deference to EOIR Determinations Fails to Follow APA Procedure)**

214.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

215.    Under the Administrative Procedure Act, an agency must provide "[g]eneral notice of proposed rulemaking . . . published in the Federal Register" whenever the agency seeks to promulgate a rule. 5 U.S.C. § 553(b). Exempt from this requirement are "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* After the agency has published the required notice, "the agency shall give interested persons an

53

opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

216.    USCIS did not provide notice of proposed rulemaking, and did not invite comments from interested persons, before engaging in a policy of deferring to an immigration judge as to whether an asylum applicant qualifies as a UAC, as it announced in the 2019 Redetermination Memo.

217.    None of the statutory exceptions to the requirement of notice-and-comment rulemaking is applicable here. *See* 5 U.S.C. § 553(b).

218.    USCIS's policy was adopted "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

<u>**COUNT VI**</u>
**(Administrative Procedure Act – The Expanded Affirmative Act Policy Is Arbitrary, Capricious, or Otherwise Not in Accordance with Law)**

219.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

220.    Title 5, U.S. Code § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion (*e.g.*, irrational), or otherwise not in accordance with law, or in excess of statutory jurisdiction or authority.

221.    The Expanded Affirmative Act Policy is arbitrary, capricious, an abuse of discretion, not in accordance with law, and therefore in violation of 5 U.S.C. § 706(2).

222.    USCIS's adoption of the Expanded Affirmative Act Policy is arbitrary and capricious because it departs from the express terms of the 2013 Kim Memorandum and the longstanding practice under the 2013 Kim Memorandum without acknowledgement or adequate explanation.  Under the 2013 Kim Memorandum, USCIS is not permitted to reject jurisdiction on the basis of an "affirmative act" consisting of a recognition or notation as to evidence that the

applicant has turned 18 or has reunited with a parent or legal guardian—and USCIS's
longstanding practice respected that rule.

223.    The Expanded Affirmative Act Policy is also arbitrary and capricious because it
fails to consider the serious reliance interests of asylum applicants who had relied on the express
terms of the 2013 Kim Memorandum and the longstanding practice under the 2013 Kim
Memorandum.

224.    The Expanded Affirmative Act Policy applies retroactively to individuals who
already had asylum applications pending before USCIS, even those whom USCIS already had
interviewed when the policy was adopted, as well as to others who have relied upon the express
terms of the 2013 Kim Memorandum and the longstanding practice under the 2013 Kim
Memorandum.  However, "a statutory grant of legislative rulemaking authority will not, as a
general matter, be understood to encompass the power to promulgate retroactive rules unless that
power is conveyed by Congress in express terms."  *Bowen*, 488 U.S. at 208.  Because Congress
did not grant Defendants the power to promulgate retroactive rules under the TVPRA that would
add new legal consequences to events completed prior to their promulgation, *see Landgraf*, 511
U.S. at 270, the Expanded Affirmative Act Policy is arbitrary and capricious, not in accordance
with law, and in excess of statutory authority.

<u>**COUNT VII**</u>
**(Failure to Follow APA Procedure with the Expanded Affirmative Act Policy)**

225.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

226.    Under the Administrative Procedure Act, an agency must provide "[g]eneral
notice of proposed rulemaking . . . published in the Federal Register" whenever the agency seeks
to promulgate a rule.  5 U.S.C. § 553(b).  Exempt from this requirement are "interpretive rules,
general statements of policy, or rules of agency organization, procedure, or practice."  *Id.*  After

the agency has published the required notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

227.    Defendants did not provide notice of proposed rulemaking, nor did they invite comments from interested persons before adopting the Expanded Affirmative Act Policy.

228.    None of the statutory exceptions to the requirement of notice-and-comment rulemaking is applicable here. *See* 5 U.S.C. § 553(b).

229.    The Expanded Affirmative Act Policy sets forth legislative rules, not interpretive rules, because, for example, they effect a substantive change in existing law.

230.    The Expanded Affirmative Act Policy is not a statement of policy that is exempt from public notice, including because it establishes binding rules on all asylum officers without leaving room for any exercise of discretion.

231.    The Expanded Affirmative Act Policy does not constitute rules of agency organization, procedure, or practice.

232.    The Expanded Affirmative Act Policy was adopted "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

### **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs request that the Court:

a)    Declare that the 2019 Redetermination Memo, the USCIS policy of deferring to EOIR jurisdictional determinations, and the Expanded Affirmative Act Policy are unlawful;

b)    Vacate the 2019 Redetermination Memo, the USCIS policy of deferring to EOIR jurisdictional determinations, and the Expanded Affirmative Act Policy;

c)    Enjoin Defendants DHS, USCIS, and the respective Acting Directors from enforcing or applying any aspect of the 2019 Redetermination Memo, the USCIS policy of deferring to EOIR jurisdictional determinations, and the Expanded Affirmative Act Policy;

d) Order that Defendants are permanently enjoined and restrained from relying on the 2019 Redetermination Memo, the USCIS policy of deferring to EOIR jurisdictional determinations, and the Expanded Affirmative Act Policy as bases to decline jurisdiction over asylum applications, to subject an asylum applicant to the one-year time limit for filing described at 8 U.S.C. § 1158(a)(2)(B), or for any other purpose;

e) Order that, consistent with the terms of the 2013 Kim Memorandum, with respect to Plaintiffs and members of the class, USCIS shall:

    1. Exercise initial jurisdiction over such individuals' asylum applications;

    2. Adjudicate such applications on the merits regardless of whether HHS, ICE, or CBP has recognized or made a notation as to evidence that the applicant has turned 18 or has reunited with a parent or legal guardian;

    3. Adjudicate such applications on the merits regardless of whether EOIR has asserted jurisdiction over the asylum claim; and

    4. In conducting such merits adjudications, apply 8 U.S.C. § 1158(a)(2)(E) to hold such applicants exempt from the one-year time limit for filing asylum applications;

f) Enjoin Defendants ICE and Fahey from ICE advocacy during the immigration court removal proceedings of any Plaintiff or member of the class (including EOIR proceedings before immigration judges and members of the Board of Immigration Appeals) seeking any of the following:

    1. Determinations of jurisdictional facts pertaining to age or unaccompanied status;

    2. Denials of continuances or other postponements in order to await adjudication of an asylum application that has been or will be filed with USCIS;

    3. EOIR exercise of jurisdiction over any asylum claim where USCIS has initial jurisdiction under the terms of the 2013 Kim Memorandum; or

    4. Otherwise taking the position in such individual's removal proceedings that USCIS does not have initial jurisdiction over the individual's asylum application; and

g) Order that USCIS will retract any adverse decision already rendered in an individual case applying the 2019 Redetermination Memo, the USCIS policy of deferring to EOIR jurisdictional determinations, or the Expanded Affirmative Act Policy and reinstate consideration of such case under the 2013 Kim Memorandum by a date certain;

h) Enjoin Defendants from taking adverse adjudicatory or enforcement action against Plaintiffs or members of the class during the pendency of this litigation;

i)    Grant Plaintiffs their costs in this action, including reasonable attorneys' fees incurred pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

j)    Award other relief that the Court deems just and proper.

Dated: January 11, 2021

Respectfully submitted,

/s/ Brian T. Burgess

Brian T. Burgess (Bar No. 19251)
Stephen R. Shaw*
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Phone: 202-346-4000
Fax: 202-346-4444
BBurgess@goodwinlaw.com
SShaw@goodwinlaw.com

Elaine Herrmann Blais*
Sarah K. Frederick*
Kevin J. DeJong*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Fax: 617-523-1231
EBlais@goodwinlaw.com
SFrederick@goodwinlaw.com
KDeJong@goodwinlaw.com

Scott Shuchart (Bar No. 21487)
Kids in Need of Defense
1201 L Street, NW, Floor 2
Washington, DC 20005
Phone: 202-318-0595
Fax: 202-824-0702
SShuchart@supportkind.org

Wendy Wylegala*
Kids in Need of Defense
252 West 37th Street, Suite 1500W
New York, NY 10018
Phone: 646-970-2913
Fax: 202-824-0702
WWylegala@supportkind.org

Michelle N. Mendez (Bar No. 20062)
Catholic Legal Immigration Network
(CLINIC)
8757 Georgia Avenue, Suite 850
Silver Spring, MD 20910
Phone: 540-907-1761
Fax: 301-565-4824
MMendez@cliniclegal.org

Rebecca Scholtz*
Catholic Legal Immigration Network
(CLINIC)
30 S. 10th Street (c/o University of St.
Thomas Legal Services Clinic)
Minneapolis, MN 55403
Phone: 651-962-4833
Fax: 301-565-4824
RScholtz@cliniclegal.org

Kristen Jackson*
Mary Tanagho Ross*
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
Phone: 213-385-2977
Fax: 213-201-4727
KJackson@publiccounsel.org
MRoss@publiccounsel.org

*Attorneys for Plaintiffs*

 * admitted pro hac vice

# EXHIBIT 1

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Refugee, Asylum and International*
*Operations Directorate*
Washington, DC 20529-2100



**U.S. Citizenship
and Immigration
Services**

**MAY 3 1 2019**

HQRAIO 120/12a

## Memorandum

TO:        All Asylum Office Staff

FROM:   John Lafferty
            Chief, Asylum Division

SUBJECT:  Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children

### I.    Purpose

This memorandum provides updated procedures to U.S. Citizenship and Immigration Services
(USCIS) asylum offices on asylum applications filed by unaccompanied alien children ("UACs", or
"UAC" when referencing an individual unaccompanied alien child) under section 235(d)(7)(B) of
the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)
(codified at 8 U.S.C. § 1158(b)(3)(C)). In particular, this guidance modifies the May 28, 2013,
memorandum *Updated Procedures for Determination of Initial Jurisdiction over Asylum
Applications Filed by Unaccompanied Alien Children*.

These updated procedures are effective 30 calendar days from the date that this memorandum is
issued. They apply to any USCIS decision issued on or after the effective date of this memorandum.
All asylum offices will receive train-the-trainer instruction from headquarters and are responsible for
conducting field training for staff prior to the memorandum's effective date.

### II.    Background

USCIS typically does not have jurisdiction to accept a Form I-589, *Application for Asylum and for
Withholding of Removal*, filed by an individual in removal proceedings.[1] Section 235(d)(7)(B) of the
TVPRA, however, modified section 208 of the Immigration and Nationality Act (INA) in order to
place initial jurisdiction over asylum applications filed by UACs with USCIS, even for those UACs
in removal proceedings. *See* INA § 208(b)(3)(C) ("An asylum officer...shall have initial jurisdiction
over any asylum application filed by an unaccompanied alien child...."). Therefore, in order for

---

[1] *See* 8 C.F.R. §§ 208.2(b), 1208.2(b).

Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children
Page 2

USCIS to have jurisdiction over an asylum application filed by an individual in removal
proceedings, a determination must be made whether the asylum application was filed by a UAC.

When USCIS first implemented the TVPRA in March 2009, asylum officers made independent
factual inquiries under the UAC definition[2] to determine whether USCIS had jurisdiction over an
asylum application filed by an individual in removal proceedings claiming to be a UAC. The UAC
determinations were based on an assessment of the individual's status as of the date the individual
filed the asylum application. The May 28, 2013 USCIS memorandum changed the procedures for
determining jurisdiction in these cases, allowing asylum officers to adopt prior UAC determinations
made by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement
(ICE) without further factual inquiry, so long as those determinations were still in place on the date
of filing the asylum application. In cases in which a UAC determination had not already been made,
asylum officers continued to make UAC determinations by making independent factual inquiries
under the UAC definition, following the procedures established in the 2009 TVPRA implementation
guidance, *Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over
Asylum Applications Filed by Unaccompanied Alien Children* ("2009 Memo").

On October 16, 2018, the Board of Immigration Appeals (BIA) issued a precedent decision related
to initial jurisdiction over asylum applications filed by individuals in removal proceedings who were
determined to be UACs at one time but turned 18 years of age prior to filing their asylum
applications. *See Matter of M-A-C-O-*, 27 I&N Dec. 477 (BIA 2018).[3] Dealing with the issue of
"whether the USCIS or the Immigration Judge [(IJ)] has initial jurisdiction over an asylum
application filed by a respondent who was previously determined to be a UAC but who turned 18
before filing the application," *id*. at 478, the BIA held that the immigration judge has jurisdiction to
determine that an individual who was 18 years of age at the time of filing an asylum application no
longer qualified as a UAC at that time; therefore, INA § 208(b)(3)(C) granting USCIS initial
jurisdiction over the asylum application was inapplicable and the IJ properly exercised initial
jurisdiction over the asylum application that was before the immigration court.

The BIA's decision, however, does not divest USCIS of its authority to determine whether an
application before it was filed by a UAC, such that USCIS has jurisdiction over it. Rather, both the
Immigration Judge and USCIS have authority to make this jurisdictional determination.

To ensure that USCIS is making these jurisdictional determinations in a manner consistent with
Immigration Judge determinations on the same issue under *Matter of M-A-C-O-*, USCIS is returning
to making independent factual inquiries in all cases in order to determine whether the individual met
the UAC definition on the date of filing the asylum application. This will help prevent incongruous
results where USCIS would otherwise have deferred to a prior UAC determination that fails to take

---

[2] *See* section 462(g)(2) of the Homeland Security Act of 2002, codified at 6 U.S.C. § 279(g)(2):
    the term "unaccompanied alien child" means a child who—
      (A) has no lawful immigration status in the United States;
      (B) has not attained 18 years of age; and
      (C) with respect to whom—
          (i) there is no parent or legal guardian in the United States; or
          (ii) no parent or legal guardian in the United States is available to provide care and physical custody.
[3] https://www.justice.gov/eoir/page/file/1101226/download

Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children
Page 3

into consideration the age and other circumstances of the applicant at the time of filing the application. Similar to the instructions contained in the 2009 Memo, this memorandum sets forth instructions for asylum officers on making the UAC determination.

### III.    UAC Determination

The asylum officer must evaluate whether the asylum application was filed by a UAC by making an independent factual inquiry as to whether the individual met the UAC definition at the time of first filing the asylum application, whether with USCIS or the Executive Office for Immigration Review (EOIR). The asylum officer should examine all available records and information, and elicit any additional information at the interview when necessary, in order to make a UAC determination. This may require obtaining both oral testimony and documentary evidence from the applicant. Documentary evidence establishing the applicant's age and identity will be especially important if the applicant appears to be over the age of 18 at the time of filing, or if there are questions about the applicant's identity. As the party invoking USCIS jurisdiction, the individual filing for asylum bears the burden to establish that he or she met the UAC definition, which includes the applicant's burden to establish his or her age, and that the applicant was unaccompanied, at the time of first filing the asylum application.

#### A.    Immigration Status

When making a UAC determination, the asylum officer must examine whether the individual established that he or she "[had] no lawful immigration status in the United States" at the time of first filing the asylum application. 6 U.S.C. § 279(g)(2)(A). If the asylum officer finds that, at the time of first filing with either EOIR or USCIS, an individual was without lawful immigration status in the United States, the asylum officer must make the additional determinations below.

#### B.    Age

The asylum officer must assess whether the applicant established that he or she was under 18 years old at the time of first filing the asylum application. *See* 6 U.S.C. § 279(g)(2)(B) ("the term 'unaccompanied alien child' means a child who…has not attained 18 years of age").

#### C.    Unaccompanied

The asylum officer must also determine whether the individual established that he or she was unaccompanied at the time of first filing the asylum application. Where, at the time of first filing, the individual had no parent or legal guardian in the United States who was available to provide care and physical custody, the individual was unaccompanied. *See* 6 U.S.C. § 279(g)(2)(C).

Legal guardianship refers to a formal (legal/judicial) arrangement. If the individual had a parent or legal guardian residing in the United States on the date of first filing and facts indicate that that parent or legal guardian was available at that time to provide care and physical custody to the individual, the asylum officer will find that the asylum application was not filed by a UAC.

Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children
Page 4

If the asylum officer finds that the individual has a parent or legal guardian in the United States, the individual must then establish that the parent or legal guardian was either unwilling or unable to provide such care and physical custody. It remains the individual's burden to establish the unavailability of a parent or legal guardian in order for USCIS to take jurisdiction over an asylum application filed by an individual in removal proceedings who claims to be a UAC.

### D. Evidence

An asylum applicant's burden to establish his or her identity is one of the threshold requirements in every case. All claims of asylum, withholding of removal, and protection under the Convention against Torture are country-specific, which means determinations of nationality and citizenship are especially important. To establish that USCIS has initial jurisdiction over an asylum application because it was filed by a UAC, the applicant must establish that he or she was unaccompanied and under the age of 18 at the time of filing the application. *See* 6 U.S.C. § 279(g)(2)(B) and (C). In some cases, unresolved questions about other aspects of an applicant's identity, such as nationality, may raise doubts about the reliability of an applicant's testimony about his age or family circumstances, and may indicate greater scrutiny of that testimony. In all cases, asylum officers must determine what weight to give the evidence they consider; some evidence may be determined to be more persuasive or reliable and justify giving it greater weight than other evidence. *See* INA § 208(b)(1)(B)(ii).

As on all issues for which the applicant bears the burden of proof, an asylum officer may request documentary evidence when testimony alone is not sufficient to meet that burden of proof. This evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain it. *See id.* Some examples of situations where an asylum officer may request additional evidence include, but are not limited to, instances when there are doubts about the applicant's real age or identity, or whether the applicant is unaccompanied at the time of filing or is instead being cared for by his or her parent or legal guardian. Careful attention should be paid if the applicant has provided contradictory evidence or testimony, such as by giving more than one name or nationality, or if the applicant appears to be over the age of eighteen at the time of filing. *See id.* at INA § 208(b)(1)(b)(iii).

### IV.    Purposes of the UAC Determination

### A. Jurisdiction

For individuals in removal proceedings, USCIS has jurisdiction over the asylum application only if it is determined that the asylum application was filed by a UAC.[4] Therefore, for an individual who is in removal proceedings, the asylum officer should examine whether the individual was a UAC at the time of first filing in order to determine whether USCIS has jurisdiction over the asylum application.[5]

---

[4] If an NTA has been served on the applicant but has not been served on EOIR, then the applicant is not yet in removal proceedings.
[5] EOIR has jurisdiction to determine its own jurisdiction. *See Matter of M-A-C-O-*, 27 I&N Dec. at 479. If EOIR has explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer will defer to that determination.

Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children
Page 5

### B. One-Year Filing Deadline and UAC Discovery Notification

Aside from jurisdictional considerations, asylum officers must make UAC determinations for two other purposes. First, if an individual was a UAC at the time of first filing, then he or she is not subject to the one-year filing deadline. The one-year filing deadline for asylum applications, at section 208(a)(2)(B) of the INA, requires that the date of asylum filing occur within one year after the date of the individual's arrival in the United States. Section 235(d)(7)(A) of the TVPRA added section 208(a)(2)(E) to the INA, exempting UACs from the one-year filing deadline. Therefore, asylum officers should examine whether the individual was a UAC at the time of first filing for purposes of determining whether the one-year filing deadline applies.

Second, asylum offices have an obligation to notify the Department of Health and Human Services (HHS) within 48 hours of "discovery" of a UAC. This obligation to notify HHS upon "discovery" of a UAC is separate from the issue of jurisdiction over the asylum application. Under section 235(b)(2) of the TVPRA, a federal agency that "discovers" a UAC must notify HHS of the discovery. In those cases where another federal government entity has already made a UAC determination, USCIS does not have an obligation to notify HHS. When, however, the asylum office is the first federal government entity to make a determination that the individual is a UAC, the asylum office must notify HHS that it has "discovered" a UAC. For purposes of this HHS notification, asylum officers should assess whether the individual is a UAC at the time of "discovery," which in this context is generally at the time of the interview.

Asylum officers must make UAC determinations for purposes of the one-year filing deadline and HHS notification, both for applicants not in removal proceedings who apply for asylum with USCIS and who appear to be UACs, as well as for those in removal proceedings. As a general matter, however, a UAC in removal proceedings would have been apprehended by a Department of Homeland Security (DHS) component and the notification to HHS should already have occurred.

### V.    Credible Fear and Reasonable Fear Screening Processes

Asylum offices ordinarily will not encounter UACs in the credible fear and reasonable fear screening processes.[6] If, in the credible fear or reasonable fear screening process, an asylum officer discovers evidence indicating that an individual is currently a UAC, the asylum officer should make a UAC determination and communicate such determination to the appropriate DHS enforcement component for purposes of issuing a charging document or taking other appropriate action. If the asylum office is the first federal government entity to make a determination that the individual is a UAC and the individual remains a UAC at the time of the credible fear or reasonable fear interview, then the asylum office will notify HHS that it has discovered a UAC.

---

[6] Section 235(a)(5)(D) of the TVPRA, codified at 8 U.S.C. § 1232(a)(5)(D), provides that any UAC whom DHS seeks to remove shall be placed in removal proceedings under section 240 of the INA. DHS may permit UACs from contiguous countries who meet special criteria to withdraw their applications for admission, as DHS does not seek to remove them, but instead allows their voluntary repatriation. Actual removal proceedings for UACs, whether from contiguous countries or not, however, must be under section 240.

Updated Procedures for Asylum Applications Filed by Unaccompanied Alien Children
Page 6

### VI.    Further Information

Further information on UAC-specific procedures can be found in the Affirmative Asylum Procedures Manual (AAPM). As a general matter, information provided prior to implementation of these updated procedures should not be relied upon if in conflict with the procedures specified in this memorandum.

If you have any questions concerning the procedures contained in this memorandum, please contact the headquarters UAC point or points of contact.

Attachments (3):
1. Notice of Lack of Jurisdiction (non-UAC): updated notice; internal use only
2. UAC Notice for Failure to Appear: updated notice; internal use only
3. UAC Decision Notice for Non-Eligibility: updated notice; internal use only