UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1519

J.O.P.; M.E.R.E.; K.A.R.C.; E.D.G.; L.M.Z., on behalf of themselves as individuals
and on behalf of others similarly situated,

Plaintiffs – Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED
STATES CITIZENSHIP AND IMMIGRATION SERVICES; KIKA SCOTT,
Senior Official Performing the duties of the Director, U.S. Citizenship &
Immigration Services; KRISTI NOEM, Secretary of Homeland Security; U. S.
IMMIGRATION & CUSTOMS ENFORCEMENT; TODD LYONS, Acting
Director US Immigration and Customs Enforcement,

Defendants – Appellants.

ORDER

Upon review of the submissions relative to the motion for stay pending appeal, the

court denies the motion. Entered at the direction of Judge Benjamin, with the concurrence

of Judge Gregory. Judge Benjamin filed a separate concurring opinion, in which Judge

Gregory joined. Judge Gregory filed a separate concurring opinion. Judge Richardson

filed a separate dissenting opinion.

DeANDREA GIST BENJAMIN, Circuit Judge, with whom Judge GREGORY joins, concurring:

In 2024, a group of noncitizens who entered the United States as unaccompanied children ("Plaintiffs") and the Government[1] signed a settlement agreement ending nearly half a decade of litigation concerning United States Citizenship and Immigration Services (USCIS) procedures for processing the asylum applications of unaccompanied noncitizen children.

The Settlement Agreement required the Government to "refrain from executing [a] Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement." *J.O.P. v. United States Dep't of Homeland Sec.*, No. 8:19-CV-01944-SAG (D. Md. PACER No. 199-2 at 9). Cristian[2] is a class member—the Government now admits this.[3] Appellants' Mot. Stay Pending Appeal (ECF No. 8) at 5, 10 (hereinafter "Stay Mot."). Nevertheless, the Government removed Cristian to El Salvador and the district court, exercising its authority

---

[1] The Government includes: the United States Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), United States Immigration and Customs Enforcement (ICE), and several officials of these agencies.

[2] "Cristian" is a pseudonym. Appellees' Opp'n Appellants' Mot. Stay Pending Appeal (ECF No. 24) at 5. Note, for this and all court documents cited herein, page numbers refer to the those contained in the red or blue headers that the CM/ECF system generates upon filing.

[3] Below, the Government argued that Cristian was not a Class Member and that the "court . . . lacks jurisdiction to review Plaintiffs' collateral challenge to Cristian's removal." *J.O.P. v. United States Dep't of Homeland Sec.*, No. 8:19-CV-01944-SAG (D. Md. PACER No. 248 at 16). In its motion to stay, the Government abandons these lines of argument.

to enforce the Settlement Agreement, granted the Plaintiffs' emergency motion to enforce the Settlement Agreement. The district court ordered that the Government "facilitate" Cristian's return to the United States to await adjudication of his asylum application on the merits. The Government now asks that we stay this order pending appeal. A majority of this panel votes to deny the Government's motion to stay pending appeal. I write to explain my view.

## I.

## A.

In 2019, pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution, Plaintiffs brought an action for declaratory and injunctive relief. The complaint alleged the Government, in a May 31, 2019, USCIS memorandum, unlawfully modified policies governing treatment of asylum applications by unaccompanied alien children ("UAC").[4]

In 2024, the parties reached a final settlement agreement that provided relief to a certified class of young asylum seekers previously determined to be UACs, and the district court granted final approval of the Settlement Agreement on November 25, 2024. The

---

[4] Under the Settlement Agreement, an "unaccompanied alien child" or "UAC" is " 'a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody,' as set forth in 6 U.S.C. § 279(g)(2)." *J.O.P.*, PACER No. 199-2 at 6.

Settlement Agreement defines the certified Class as "all individuals nationwide who prior to [February 24, 2025]: (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed their asylum application with USCIS, were 18 years of age or older, or had a parent or legal guardian in the United States who is available to provide care and physical custody; and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits." *J.O.P.*, PACER No. 199-2 at 5.

Section III.B provides that "USCIS will exercise Initial Jurisdiction over Class Members' asylum applications in accordance with the terms of this Settlement Agreement and adjudicate them on the merits." *Id.* at 7. Further, Section III.I provides that "[w]ith respect to any Class Member with a final removal order, ICE [United States Immigration and Customs Enforcement] will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement." *Id.* at 9. And Section V.D provides that "[i]n the event of an alleged noncompliance with this Settlement Agreement, . . . the complaining Class Member shall not be removed from the United States" once a motion to enforce the Settlement Agreement has been filed "unless and until the matter has been resolved in favor of Defendants." *Id.* at 14.

## B.

On March 14, 2025, President Donald J. Trump signed a proclamation titled "Invocation of the Alien Enemies Act ["AEA"] Regarding the Invasion of the United States by Tren de Aragua" (the "Proclamation"). Proclamation No. 10903, 90 C.F.R. § 13033

(March 14, 2025).  Section 1 of the Proclamation directed that "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua ("TdA")], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."  *Id.* at 13034.  Section 3 of the Proclamation provides that "all Alien Enemies described in section 1 of this proclamation are subject to immediate apprehension, detention, and removal, and further that they shall not be permitted residence in the United States."  *Id.*  Section 4 directs "the Attorney General and the Secretary of Homeland Security" to "apprehend, restrain, secure, and remove every Alien Enemy described in section 1."  *Id.*

The day after the President issued the Proclamation, ICE removed Cristian—a 20-year-old Class Member from Venezuela with a pending asylum application—from its custody in Texas to a prison in El Salvador.  *See* Stay Mot. at 10–11 (admitting Cristian "is a class member under the settlement agreement and has filed an asylum application before USCIS on December 20, 2022").  Plaintiffs contend that Cristian is being held at the Centro de Confinamiento del Terrorismo, commonly known as CECOT, Appellees' Opp'n Appellants' Mot. Stay Pending Appeal, (ECF No. 24) at 8 (hereinafter "Resp. Br."), "a notorious supermax prison known for widespread human rights violations," *see Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025) (hereinafter

"*Abrego Garcia I*") (Thacker, J., concurring).  In its reply, the Government does not deny this assertion.[5]

C.

Plaintiffs' Class counsel moved before the district court to enforce the Settlement Agreement, and the district court granted Class counsel's motion.  Pertinent here, the district court ordered that Defendants "facilitate Class Member Cristian's return to the United States to await the adjudication of his asylum application on the merits by USCIS under the terms of the Settlement Agreement.  Facilitation includes, but is not limited to, a good faith request by Defendants to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States." *J.O.P.*, PACER No. 254 at 2.

The Government then moved, under Fed. R. Civ. P. 60(b)(5), to vacate or stay the portion of the district court's order directing the Government to facilitate Cristian's return. *See J.O.P.*, PACER No. 261.  The Government pointed to a May 1, 2025 "Indicative Asylum Decision" USCIS issued wherein it declared that, if Cristian were returned to the United States, it would deny his asylum application based on (1) terrorist-related inadmissibility grounds (membership in TdA), and (2) as a matter of discretion, based on both membership in TdA and a felony conviction for possession of cocaine. *J.O.P.*, PACER No. 262 at 5 (SEALED).  The Government argued that facilitating Cristian's return

---

[5] Judge Richardson questions whether Cristian is actually at CECOT or some other facility in El Salvador. *See* Diss. Op. at 46 n.7.  For our purposes, however, two things matter.  First, that the Government removed Cristian from the United States—a fact not in dispute.  And second, that this removal violated the Settlement Agreement, as Cristian argues.

was no longer "warranted or equitable" because Cristian was "no longer a member of the class." *Id.* (SEALED). The district court held a hearing on the Government's motion.

The district court denied the motion to vacate but granted the motion to stay to permit the Government time to docket an appeal in this court. The Government docketed its appeal. It now moves to stay the district court's "facilitation" order and further challenges the district court's denial of its Rule 60(b)(5) motion.

## II.

### A.

"A stay is not a matter of right," but is "instead an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (cleaned up). As the party seeking relief, the Government bears the burden of demonstrating "that the circumstances justify an exercise of that discretion." *Id.* at 433–34. In making that determination, we must consider the following factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434. While the last two factors merge "when the Government is the opposing party," *id.* at 435, they remain "distinct" here, where the Government is the party seeking the stay, *Abrego Garcia I*, 2025 WL 1021113, at *2 (Thacker, J., concurring) (quoting *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 353 (5th Cir. 2022)). The Government argues it is

entitled to a stay because: (1) it is likely to succeed on the merits and (2) the equities favor the Government.

B.

Federal Rule of Civil Procedure 60(b)(5) provides that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [where] . . . the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

"A party seeking modification of a decree as 'no longer equitable' has the 'burden of establishing that a significant change in circumstances warrants revision of the decree.' " *L.J. v. Wilbon*, 633 F.3d 297, 304–05 (4th Cir. 2011) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992)). "A party 'may meet its initial burden by showing either a significant change either in factual conditions or in law' that makes 'enforcement of the decree . . . detrimental to the public interest.' " *Id.* at 305 (quoting *Rufo*, 502 U.S. at 384). This court reviews the district court's denial of the Government's Rule 60(b)(5) motion for abuse of discretion. *Id.* at 304.

III.

A.

i.

I begin with whether the Government has made a "strong showing" of success on the merits. *See Nken*, 556 U.S. at 434. The Government presents a narrow argument—it did not breach the Settlement Agreement because removals pursuant to the AEA are not

8

"final removal orders" under the agreement.  Stay Mot. at 15–16.  Put differently, the Government argues that because removals under the AEA are not "final removal orders," ICE was not obliged to wait until USCIS had issued a "Final Determination" on Cristian's asylum application before removing him.  Cristian, by contrast, argues that the term "final removal order" is reasonably read to include AEA removals.  He further argues—and the Government does not contest—that the Proclamation expressly orders "removal" and that "Defendants have represented that such removals are 'final.' "  *See* Resp. Br. at 6; *see also generally* Reply Br.

ii.

Maryland[6] courts follow the objective theory of contract interpretation.  *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1053 (Md. 2022).  "Under that approach, unless the language of the contract is ambiguous, we interpret it 'based on what a reasonable person in the position of the parties would have understood the language to mean and "not the subjective intent of the parties at the time of formation." ' "  *Id.* (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019)).  Therefore, it is "the written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract."  *Id.* (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 681 (Md. 2015)).

---

[6] The parties agree that Maryland law governs interpretation of the Settlement Agreement.

I do not believe the Government has made a "strong" showing that the term "final removal order" excludes AEA removal orders. The Settlement Agreement defines many key terms—"Adjudicate on the merits" and "Final Determination" to name two—but does not define "final removal order." *See J.O.P.*, PACER No. 199-2 at 4–7. In context, reading "final removal order" to include removals under the AEA is not unreasonable. *See Credible Behav. Health,* 220 A.3d at 310–11 (quoting *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 691 (Md. 2010)) ("Ascertaining the parties' intentions requires us to consider the plain language of the disputed contractual provisions 'in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the "facts and circumstances of the parties at the time of execution." ' ").

The purpose behind the Settlement Agreement was to prevent asylum applicants from being removed during the pendency of their application—or, as the district court put it, to stop "a USCIS policy that would have resulted in the improper removal of many Class Members by causing their asylum applications to be rejected for lack of jurisdiction" and to allow "Class Members in removal proceedings to have their asylum applications adjudicated on the merits by USCIS while they remain in the United States with access to their counsel." *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 8:19-CV-01944-SAG, 2025 WL 1180191, at *5 (D. Md. Apr. 23, 2025) (cleaned up). This context shows the broad scope of the litigation and highlights that the parties *chose* not to link the definition of "final removal order" to asylum proceedings only.

The Settlement Agreement's enforcement mechanism's text likewise supports this inference. Section V.D provides that when a motion to enforce the Settlement Agreement

10

is filed, removal of *any* kind is forbidden. *J.O.P.*, PACER No. 199-2 at 14 ("Once such a motion to enforce is initiated, the complaining Class Member shall not be removed from the United States unless and until the matter has been resolved in favor of Defendants."). This language is free of qualifiers from which a reasonable person could assume that removals under the AEA would be excluded. "[T]he written language embodying the terms of an agreement . . . govern the rights and liabilities of the parties," *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 318 A.3d 1221, 1230 (Md. 2024) (quoting *Tapestry*, 286 A.3d at 1053), not their "subjective intent . . . at the time of formation," *Tapestry*, 286 A.3d at 1053 (quoting *Credible Behav. Health*, 220 A.3d at 310). Accordingly, Section V.D's structure supports the inference that the parties deliberately chose not to limit the types of removals which trigger Section III.I's protections.

In sum, reading "final removal order" to apply to the Government's conduct here demonstrates fidelity to the Settlement Agreement's language. *See Calomiris v. Woods*, 727 A.2d 358, 368 (Md. 1999) (quoting *Canaras v. Lift Truck Servs.*, 322 A.2d 866, 873 (Md. 1974)) ("It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.' "). It heeds the factors Maryland law contemplates—the "contract's character, purpose, and 'the facts and circumstances of the parties at the time of execution.' " *Ocean Petroleum, Co.*, 5 A.3d at 691 (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)); *see Auction & Est. Representatives, Inc. v. Ashton*, 731 A.2d 441, 444 (Md. 1999) ("[T]he clear and unambiguous language of an agreement will not give way to what the parties

thought the agreement meant or was intended to mean.") (citing *Adloo v. H.T. Brown Real Estate, Inc.*, 686 A.2d 298, 305 (Md. 1996)).

B.

As to the remaining *Nken* factors, I believe they favor Cristian.

i.

a.

The Government argues it will suffer irreparable harm because the President's authority under the AEA will be "undermine[d]" if it is required to facilitate Cristian's return to the United States. The Government's argument entirely ignores the Supreme Court's decision in *Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025) (hereinafter "*Abrego Garcia II*"). There, the Government wrongfully removed Kilmar Armando Abrego Garcia to El Salvador despite his withholding of removal order specifically forbidding his removal to that country. *Id.* at 1018. The district court required that the Government "facilitate" Abrego Garcia's return to the United States. The Supreme Court unanimously affirmed that "the [District Court's] order *properly requires* the Government to 'facilitate' Abrego Garcia's *release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador.*" *Id.* (emphasis added); *see also Abrego Garcia I*, 2025 WL 1021113, at *6 (Wilkinson, J., concurring) ("In this situation, I think it legitimate for the district court to require that the government 'facilitate' the plaintiff's return to the United States so that he may assert the rights that all apparently agree are due him under law. It is fair to read the district court's order as one requiring that the government facilitate Abrego Garcia's release, rather than demand it.").

12

Here, Cristian was removed from the United States in breach of the Settlement Agreement. The argument that the Government would be "irreparably harmed" by facilitating Cristian's return rings hollow. *See Abrego Garcia I*, 2025 WL 1021113, at *5 (Thacker, J., concurring) ("[T]he Government is not irreparably harmed by facilitating and effectuating the return of a person within its control who was wrongfully removed from the United States.").

b.

The dissent chastises the district court for going beyond what the Supreme Court and this court endorsed in *Abrego Garcia*. That could not be further from the truth.

In *Abrego Garcia II*, the Supreme Court agreed with a prior concurring view of our colleague—Judge Wilkinson—in finding that a court could order the government to "facilitate" the return of an improperly deported individual but could not demand it. *See* 145 S. Ct. at 1018. On remand, the district court defined facilitate as "at a minimum, to take the steps available to [the government] toward aiding, assisting, or making easier Abrego Garcia's release from custody in El Salvador and resuming his status quo ante." *Abrego Garcia v. Noem*, No. 8:25-CV-00951-PX, 2025 WL 1113440, at *2 (D. Md. Apr. 15, 2025). This court affirmed. *See Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025) (hereinafter "*Abrego Garcia III*"). The court made clear that "facilitate" is "an active verb" and "requires that steps be taken" to achieve the relief *Abrego Garcia II* deemed proper. *Id.* at 1. This court further made clear "[t]he Supreme Court's decision does not . . . allow the government to do essentially nothing." *Id.*

Here, the district court required Defendants make "a good faith request . . . to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States." *J.O.P.*, PACER No. 254 at 2. Judge Richardson claims that this command constitutes forced "negotiation with a foreign state." Diss. Op. at 36. But the Government cannot facilitate Cristian's return telepathically—it must express in words to the government of El Salvador that Cristian be released for transport back to the United States. *See Abrego Garcia III*, 2025 WL 1135112, at *1 (rejecting the government's argument that "all it must do is 'remove any *domestic* barriers to [Abrego Garcia's] return' " and emphasizing that the argument was "not well taken in light of the Supreme Court's command that the government facilitate Abrego Garcia's *release from custody in El Salvador*"). In sum, the district court's command here was no different than the language we approved in *Abrego Garcia III*.

I highlight one last point. The district court required that the Government's request to El Salvador be "a good faith" one. This requirement is critical. *Abrego Garcia II* held that the government can be ordered to "facilitate" the return of wrongfully removed individuals. *See* 145 S. Ct. at 1018. The Supreme Court could not have possibly contemplated permitting the Government to act in *bad faith* when facilitating a wrongfully removed individual's return—that would defy logic. *See Abrego Garcia III,* 2025 WL 1135112, at *1 ("The Supreme Court's decision does not . . . allow the government to do essentially nothing."). The district court's use of the phrase "good faith request" only explained the minimum that the Government must do and does not run afoul of Supreme Court precedent.

In sum, the second *Nken* factor favors Cristian.

ii.

*Nken* factor three—injury to the other party in the proceeding: here, Cristian—also weighs in Cristian's favor. Cristian contends, and the Government does not dispute, that he is being held at CECOT, "a notorious supermax prison known for widespread human rights violations." *See Abrego Garcia I*, 2025 WL 1021113, at *1 (Thacker, J., concurring). Issuing the Government's requested stay would likely harm Cristian—both physically and by depriving him of his rights under the Settlement Agreement to have his asylum application adjudicated on the merits. Therefore this factor clearly favors Cristian.

Last, the public interest lies with denying the Government's motion to stay. Pointing to the Indicative Asylum Decision—which I discuss in the next section—the Government argues Cristian is a terrorist who cannot obtain asylum. "Perhaps, but perhaps not." *See Abrego Garcia III*, 2025 WL 1135112, at *1. The Settlement Agreement provided that Cristian's asylum application would be heard in person on the merits—not denied by default because Cristian had been removed from the United States and accused, *in absentia*, of charges to which he cannot practically respond. *Cf. Abrego Garcia I*, 2025 WL 1021113, at *6 (Thacker, J., concurring) ("[U]pholding constitutional rights surely serves the public interest.") (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Accordingly, the final *Nken* factor favors Cristian.

iii.

Judge Richardson views the equitable question differently. *See* Diss. Op. at 42–48. He contends that the equities favor the Government because Cristian cannot prove that he

is *not* a terrorist.  *See, e.g.*, *id.* at 43.  This gets things backward.  Cristian's injury arises from the fact that instead of having his asylum application adjudicated on the merits—as the Settlement Agreement guaranteed—he was summarily removed.  The removal denied Cristian the chance to dispute on the merits the very accusations the Government now puts forth on appeal to justify its breach.  The Government's breach denied Cristian the benefit of the bargain and the process he was due.  This deprivation is exactly the "real-world harm" the Settlement Agreement was designed to protect against.  *Id.* at 45.

\*          \*          \*

For the above reasons, I do not believe that the *Nken* factors favor a stay pending appeal.

## IV.

Finally, I consider the district court's denial of the Government's Rule 60(b)(5) motion.  The Government moved the district court to vacate the facilitation order based on USCIS's May 1, 2025 "Indicative Asylum Decision."  The Government contended that Cristian's return was "no longer equitable or appropriate" because USCIS had determined that Cristian—if returned to the United States for adjudication of his application—would be "barred" from obtaining asylum.  *J.O.P.*, PACER No. 262 at 11–12 (arguing that Cristian's claims for relief were "moot" because the Indicative Asylum Decision was in fact an "adjudication on the merits," the "precise relief" Cristian sought) (SEALED).

## A.

Before discussing its contents, I explain the context of the Indicative Asylum Decision's issuance.

Cristian was removed from the United States on March 15, 2025. On April 23, 2025, the district court entered its order to enforce the Settlement Agreement and required that the Government facilitate Cristian's return. Eight days later, on May 1, 2025, USCIS issued the Indicative Asylum Decision. And three days later, on May 4, 2025, the Government moved under Rule 60(b)(5) to vacate the district court's facilitation order based on "significant" changed circumstances—namely the Indicative Asylum Decision's issuance.

## B.

With this context in mind, I now describe the Indicative Asylum Decision. This document states that USCIS possessed evidence showing Cristian was ineligible for asylum. USCIS asserted it possessed "government records provided by a federal law enforcement partner[] [stating that] the applicant [Cristian] admitted to being a member of TdA." *J.O.P.*, PACER No. 263 at 3 (SEALED). USCIS also asserted it reviewed "law enforcement records containing statements from state law enforcement partners that the applicant was identified as TdA by a 'reliable CI,' " "information about [Cristian's] social media activity," and "photographic evidence of tattoos." *Id.* (SEALED).

The district court denied the Government's Rule 60(b)(5) motion. The district court observed that the Government was measuring changed circumstances, "futility," and the equities by "the wrong yardstick." *See J.O.P.*, PACER No. 272 at 29–30. The question, the district court continued, was not whether Cristian "ultimately received asylum," but

"whether he ha[d] received the process that the class bargained for when the Settlement Agreement was entered." *Id.* at 30. The district court then rejected the contention that the Indicative Asylum Decision was "an adjudication on the merits." *See id.* This was because it "prejudge[d] the outcome of the asylum proceeding" without providing Cristian the "ability . . . to provide any input into the process"—such as presenting evidence to refute the Government's assertions as to his ineligibility. *See id.*

C.

I see no abuse of discretion here. The district court accurately articulated why the Government's argument was—and remains—unconvincing: "Cristian is not here to receive the process only because the Government removed him. T[he] . . . order required Cristian to be returned to this country[] to *get the process*" the Settlement Agreement guaranteed him. *See id.* at 31 (emphasis added). The Indicative Asylum Decision does not change this. It was not an "adjudicat[ion] on the merits" or a "Final Determination" as those terms are defined in the Settlement Agreement. *See J.O.P.*, PACER 199-2 at 4–5 (defining "Final Determination" to require an "adjudication on the merits" and defining "Adjudicate on the merits" to require a "decision on the substance of an asylum claim"); Reply Br. at 10 (now admitting—contrary to the assertion put forth in the Government's Rule 60(b)(5) motion—that the Indicative Asylum Decision is not an adjudication on the merits).

Further, as Cristian argues, the Indicative Asylum Decision—created five days after the district court's facilitation order was issued—was not an authentic change in factual circumstances. Cristian contends that neither "USCIS regulation, policy, [n]or practice"

provides for "Indicative Asylum Decisions." Resp. Br. at 21 ("[S]uch a practice appears nowhere in the agency's 271-page procedural manual . . . ."). Cristian concludes that the Indicative Asylum Decision is a "litigation-driven" document—a "contrivance" "created just for this case." *Id.* The Government has no response to this charge—a deafening silence. *See generally* Reply Br.

In sum, the district court did not abuse its discretion in denying the Government's Rule 60(b)(5) motion.

V.

"[W]e fully respect the Executive's robust assertion of its Article II powers." *Abrego Garcia III*, 2025 WL 1135112, at *1. And we will continue to give "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Id.* (quoting *Abrego Garcia II*, 145 S. Ct. at 1018). Nothing here is meant to pass judgement on whether Cristian is entitled to asylum—that question is beside the point. Rather, the Settlement Agreement guaranteed Cristian an adjudication of his asylum application on the merits—something his summary removal deprived him of.

"Both the Executive and the Judiciary have an obligation to follow the law." *A.A.R.P. v. Trump*, 145 S. Ct. 1034, 1036 (2025) (Alito, J., dissenting). And our obligation to "say what the law is" forces us to intervene. *See Marbury v. Madison*, 1 Cranch 137, 177 (1803). The task is delicate but cannot be shirked, for our "Nation's system of laws is designed to prevent, not enable," a degradation of *effective* judicial review. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1011 (2025) (Sotomayor, J., dissenting); *cf. Comm. for Nuclear*

*Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) ("An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with the Constitution and with the mandates of Congress which define and limit the authority of the executive. Any claim to executive absolutism cannot override the duty of the court to assure that an official has not exceeded his charter or flouted the legislative will.").

With that said, and for the reasons discussed above, I vote to deny the motion to stay pending appeal.

GREGORY, Circuit Judge, concurring:

It is telling that the dissent makes no effort to justify the President's invocation of the Alien Enemies Act ("AEA"). While our colleague attempts to frame this as a mere "contract case," Diss. Op. at 27, this is not so. The equities question before us is whether the judiciary is powerless to enforce a clear, binding contract because questions of foreign policy are afoot. This equitable balancing necessitates an analysis of the Executive's justifications for breaching said contract; no valid reason is apparent from any of the briefing or writings in this matter.

The President's ipse dixit declaration that the nation of Venezuela, albeit through Tren de Aragua ("TdA") as a proxy, has engaged in an "invasion" or "predatory incursion" against territory of the United States is unsupportable. Even worse, the government's argument in this case is that this plainly invalid invocation of the Act can be used to void any and all contractual obligations of the federal government. That cannot be—and is not––the rule of law.

To begin, the AEA has been invoked sparingly and only during wartime. The AEA was enacted by the Fifth Congress in 1798 during the Quasi-War, fearing a military invasion by France. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *9 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *id.* at *15 (Millett, J., concurring); Act of July 6, 1798, ch. 66, 1 Stat. 577. The Act "confers on the president very great discretionary powers respecting [alien enemies]," *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948), allowing him to detain or deport anyone from the proclaimed "hostile nation or government," 50 U.S.C. § 21. But this otherwise "near-blanket authority" has a "central

21

limit," requiring that the United States be at war or under invasion or predatory incursion. *J.G.G.*, 2025 WL 914682, at *2 (Henderson, J., concurring).

Before now, the AEA has been invoked only three times during our nation's history: the War of 1812, World War I, and World War II. *See Lockington v. Smith*, 15 F. Cas. 758, 758-759 (C.C.D. Pa. 1817) (discussing the War of 1812 proclamation); Proclamation, 40 Stat. 1651 (1917) (World War I); Proclamation: Alien Enemies–Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) (World War II). The last of these began the day after the attack on Pearl Harbor in 1941 and was used as the legal mechanism for Japanese internment.[*] *See* 6 Fed. Reg. 6321. In each of these three instances, judicial review was available to noncitizens removed or detained, as required by the AEA. *See* Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963, 967–77 (2007). The Act provides that when a "complaint against" an "alien enemy resident" is presented to a court of the United States, it is the court's "duty" to provide "a full examination and hearing on such complaint" and decide whether there is "sufficient cause" to have that person removed or otherwise detained. 50 U.S.C. § 23.

Now, for only the fourth time, President Donald Trump has invoked the AEA, and without affording the required process. On March 14, 2025, President Trump signed a

---

[*] I would be remiss not to note that this internment was later deemed unconstitutional. *See Trump v. Hawaii*, 585 U.S. 667, 710 (2018). The Supreme Court explained that "[t]he forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority." *Id.* The Court continued that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear— has no place in law under the Constitution." *Id.* (quotation and citation omitted).

Proclamation invoking his authority under the AEA to apprehend, detain, and remove "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua]" and who are not "naturalized or lawful permanent residents of the United States." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025).

Relevant to this case, the invocation of the AEA is being used for an entirely new purpose: to set aside contractual obligations of the United States. The dissent makes a mountain of the political interests that justify doing so, but it makes no effort to defend the President's invocation of the Act. I have severe difficulty in accepting that the invocation of the AEA can justify the voiding of all contractual obligations of the United States, particularly without any analysis of the legality of that invocation. Thus, I explain briefly why the President's invocation of the Act plainly violates its terms.

As mentioned above, the AEA's conditional clause requires (i) "a declared war between the United States and any foreign nation or government, or" (ii) an "invasion or predatory incursion [ ] perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," and (iii) a presidential "public proclamation of the event." 50 U.S.C. § 21. President Trump has made his proclamation, but no one asserts that there is a declared war. Thus, the question becomes whether there is an invasion or predatory "incursion . . . by any foreign nation or government."

We need not wade into the thicket of political questions surrounding whether the Maduro regime truly directs the activities of TdA, relevant to whether the supposed invasion is attributable to a "foreign nation or government." That is because, as nearly

every court to have reached the question has concluded, TdA's actions cannot constitute an invasion or predatory incursion within the ordinary meaning of the AEA's text. As a sister circuit so thoroughly explained, dictionary definitions, statutory context, and history reveal that "an invasion is a military affair, not one of migration." *J.G.G.*, 2025 WL 914682, at *8–10 (Henderson, J., concurring). As for "predatory incursion," text and history again show that the term "referred to a form of hostilities against the United States by another nation-state, a form of attack short of war. Migration alone did not suffice." *J.G.G.*, 2025 WL 914682, at *10; *see also J.A.V. v. Trump*, --- F. Supp. 3d ---, 2025 WL 1257450, at *15–16 (S.D. Tex. May 1, 2025) (discussing historical records to support idea that "invasion" and "predatory incursion" refer to an attack by military forces); *D.B.U. v. Trump*, --- F.Supp. 3d ---, 2025 WL 1304288, at *6 (D. Col. 2025) (relying on "Founding-era definitions and historical sources" to conclude the same). I agree that "invasion" and "predatory incursion" require some type of military attack, evidence for which was present in all previous instances where the AEA was invoked.

Turning to the text of President Trump's recent Proclamation, I see no evidence of any kind to suggest any "invasion" or "predatory incursion" is afoot. The President cannot, by fiat, declare legal conclusions of whether there is or is not an invasion without providing underlying supportive facts. *See Baker v. Carr*, 369 U.S. 186, 214 (1962) (even in emergency circumstances prompting political questions, a "court is not at liberty to shut its eyes to an obvious mistake"); *United States v. Abbott*, 110 F.4th 700, 736 (5th Cir. 2024) ("To be sure, a state of invasion under Article I, section 10 does not exist just because a State official has uttered certain magic words.") (Ho, J., concurring). Without broader facts

explaining that an invasion or incursion is underway, courts are powerless to exercise our necessary role in reviewing executive action. *See, e.g.*, *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) ("An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with the Constitution and with the mandates of Congress which define and limit the authority of the executive."); *Boumediene v. Bush*, 553 U.S. 723, 783 (2008) (even in the most dire circumstances, courts "must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain"). Even assuming the truth of any factual aspects of the Proclamation, there are no underlying facts that suggest a military attack by or on behalf of the nation of Venezuela. TdA is a brutal criminal organization, but there is nothing aside from the President's unsupported assertion that suggests any military action within the meaning of the AEA. Thus, I would find that the AEA was illegally invoked in this case.

Now, we are left with this troubling situation: an unjustified Presidential proclamation being used to justify voiding the United States' contractual obligations. Our courts have always endorsed the fundamental public interest in the enforcement of settlement agreements and contractual rights. *See, e.g.*, *Evans v. Jeff D.*, 475 U.S. 717, 732-33 (1986). Yet, it appears our colleague is willing to throw these principles to the wind. I cannot—and will not—join in this departure from established norms.

As is becoming far too common, we are confronted again with the efforts of the Executive Branch to set aside the rule of law in pursuit of its goals. It is the duty of courts to stand as a bulwark against the political tides that seek to override constitutional

protections and fundamental principles of law, even in the name of noble ends like public safety.  The district court faithfully applied the contractual provisions in dispute here, and it properly ordered the United States to remedy the violation of its explicit promises.  I cannot more fully concur in the denial of the stay pending appeal in this matter.

RICHARDSON, Circuit Judge, dissenting:

This "dissent makes no effort to justify the President's invocation of the Alien Enemies Act." *Supra* at 21 (Gregory, J., concurring). For this case does not present any questions about the lawfulness of that proclamation or the process due to those removed under it.

Instead, this is a contract case. Appellee, a Venezuelan national proceeding under the pseudonym "Cristian," was part of a class-wide settlement agreement with the government that it would not execute any "final removal order" he might receive without first adjudicating his asylum application. Without concluding removal proceedings or issuing a final order of removal, the government sent him to El Salvador under the Alien Enemies proclamation. Cristian's sole claim is that this breached the agreement.

To resolve that legally ordinary claim, the district court imposed a novel injunction. Although in my view Cristian did not show a breach of the agreement, Paragraph 2 of the district court's order requires the government to "facilitate" his return, and expands upon that verb to "include[] . . . a good faith request by Defendants to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States."

As I see it, that is not what the district court, this Court, or the Supreme Court approved in *Abrego Garcia*. Many options may be available to district courts seeking to craft appropriate relief in response to deportations they find unlawful. But directing diplomatic negotiations to the Executive Branch is not among them.

I would stay Paragraph 2 of the district court's order. Because the panel does not, I respectfully dissent.

As Judge Benjamin observes, this case did not begin with the President's Alien Enemies proclamation—or any of this administration's acts.  It began instead six years ago as a challenge to a USCIS policy statement that adjusted the procedure by which the agency would consider certain asylum applications.

A

Normally, asylum applications by those in removal proceedings are decided by immigration judges.  *See* 8 C.F.R. §§ 208.2(b), 1208.2(b).  But by statute, USCIS has jurisdiction over asylum applications by "unaccompanied alien children," a term of art referring to minors without lawful immigration status who do not have parents or guardians to support them.  *See* 8 U.S.C. § 1158(b)(3)(C) (conferring jurisdiction); 6 U.S.C. § 279(g) (defining "unaccompanied alien child").  Until 2013, USCIS would check whether an asylum applicant was a UAC to determine if it had jurisdiction to decide the application.  In 2013, the agency shifted gears and began accepting any determination by another agency that an applicant was a UAC "without another factual inquiry."  Memorandum from Ted Kim, Acting Chief, Asylum Div. 2 (May 28, 2013).  Then in 2019, USCIS reversed course and again began making "independent factual inquiries."  Memorandum from John Lafferty, Chief, Asylum Div. 2 (May 31, 2019).

In response to this return to the old policy, plaintiffs sued.  They complained on behalf of a putative class that the 2019 reversion violated the Administrative Procedure Act and the Due Process Clause.  After granting a TRO, the district court certified the class, and the parties negotiated a settlement agreement in 2024.  That agreement covers the class:

"all individuals nationwide who [before the 2019 reversion] (1) were determined to be a UAC; and (2) who filed an asylum application that was pending with USCIS; and (3) on the date they filed . . . were 18 years of age or older, or had a parent or legal guardian in the United States . . . and (4) for whom USCIS has not adjudicated the individual's asylum application on the merits." *J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 8:19-cv-09144 (D. Md. July 30, 2024), ECF 199-2 at 4.[1]  Relevant to the lawsuit's initial aim, the 2024 agreement requires USCIS to make new rules and to accept jurisdiction over, then decide, the class members' applications. *See id.* at 6.  And relevant here, it provides that "[w]ith respect to any Class Member with a final removal order, ICE will refrain from executing the Class Member's final removal order until USCIS issues a Final Determination on one properly filed asylum application under the terms of this Agreement." *Id.* at 8.  In sum, the agreement provides that for class members with final removal orders, the government cannot execute those orders without first adjudicating their asylum claims on the merits.

The agreement also contains an enforcement mechanism.  It requires the government to submit compliance reports and allows the class to reply. *See id.* at 12–13.  And it establishes a procedure to resolve disputes.  Should one party believe the other to be in breach, the parties must meet and confer to sort things out.  "If the dispute cannot be resolved, the complaining Class Member(s) may move to enforce the Agreement" as to themselves, and "Class Counsel may elect to move to enforce the Agreement on an

---

[1] By including only persons who filed for asylum after turning 18 or uniting with parents or guardians in the United States, the class strictly *excludes* unaccompanied alien children.  So the settlement provides the protections afforded those who are unaccompanied alien children only to those who were wrongly determined at some time to qualify.

individual or class-wide basis." *Id.* at 13. "Once such a motion to enforce is initiated, the complaining Class Member shall not be removed from the United States unless and until the matter has been resolved in favor of Defendants." *Id.* When it approved the settlement, the district court also "directed" the parties "to implement and consummate the Agreement according to [its] terms" and retained "jurisdiction to enforce the Agreement." ECF 205 at 3.

## B

Cristian applied for asylum in 2022 when he was already 18. In January 2025, that application remained undecided. But the government took Cristian into immigration custody following his felony conviction for possessing cocaine. The government then began removal proceedings, arguing that Cristian was inadmissible because he was present without having been admitted and because of his cocaine conviction.

While both asylum and removal proceedings pended, the President directed by proclamation that members of Tren de Aragua, a Venezuelan crime syndicate and designated Foreign Terrorist Organization, be removed from the country under the Alien Enemies Act. *See* Proclamation No. 10903, 90 Fed. Reg. 13033, 13034 (Mar. 14, 2025); *see also* 50 U.S.C. § 21 *et seq.* Soon after, Cristian was removed to El Salvador under that proclamation.

Class counsel then contacted the government, arguing that Cristian was a class member and that his removal breached the agreement. The government confirmed that Cristian had been removed to El Salvador but disagreed that this was a breach. So class

counsel moved to enforce the agreement, seeking an order that "Defendants shall promptly return Cristian to the United States." ECF 227-4.

The district court obliged. Despite finding no facts about where Cristian was, whether he was confined, or under whose authority; despite no sound argument from Cristian that his removal "execut[ed]" a "final removal order" that he never had, ECF 199-2 at 8; and despite the Supreme Court's recent admonition about "the deference owed to the Executive Branch in the conduct of foreign affairs," *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025), the district court entered a novel injunction. Under Paragraph 2 of its order, the government must "facilitate Class Member Cristian's return to the United States"—and "[f]acilitation includes, but is not limited to, a good faith request by Defendants to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States." ECF 254 at 2. Simply put, the district court ordered the Executive Branch to engage in diplomatic negotiations with a foreign power.

II

This injunction finds no support in precedent or the facts. Though I understand the district court's unease with the Executive's recent conduct, its remedy does not fit this case. Cristian presents a contract claim, not a quarrel with the Alien Enemies proclamation. Yet in resolving the contract dispute, the district court entangled the judiciary in the roil of foreign affairs. And it did so based on a claim that does not work: Cristian's case is difficult to reconcile with the agreement's text and does not warrant injunctive relief because even winning all he seeks would give Cristian little prospect of real-world benefit.

A

"The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Cong. 613 (1800) (statement of Rep. John Marshall). His power to speak for the country "in the field of international relations" is both "plenary and exclusive." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936). This does not mean only the President can make foreign policy. Congress must ratify treaties, confirm ambassadors, regulate foreign commerce, and declare war. U.S. Const. art. II, § 2; art. I, § 8. In this sense, some "[p]residential powers . . . depend[] upon their disjunction or conjunction with those of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).[2]

But when it comes to negotiating with foreign states, precedent is clear: "The President has the sole power to negotiate treaties." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13 (2015); *see also Curtiss-Wright*, 299 U.S. at 319 ("Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it."). This power to negotiate, in my view, reaches more than official-channel communiques that result in formal agreements. Diplomacy takes place in a wide array of fora, through many actors within the Executive Branch. *See Zivotofsky*, 576 U.S. at 13–14. Yet seldom will either nation know whether diplomatic discussions will result in a treaty until those

---

[2] Reasonable people disagree about just how much the content of foreign policy depends on Congress. The Founding generation certainly did. *Compare* 7 *The Works of Alexander Hamilton* 76–117 (John C. Hamilton ed., 1851), *with The Federalist* No. 75, at 505–06 (Hamilton) (Jacob E. Cooke ed., 1961), *and* 6 *The Writings of James Madison* 138–88 (Gaillard Hunt ed., 1906); *see also* 10 *The Writings of Thomas Jefferson* 410–11 (Albert Ellery Bergh ed., 1907) (taking a middle position).

discussions are well underway. There is no such thing as a trifling discussion between heads of state; matters perceived as unimportant in the moment may unexpectedly bloom into trade pacts and environmental protocols—or deteriorate into war. As a practical reality, then, the power to negotiate treaties with foreign states is just the power to negotiate with foreign states.

Despite disagreements about the President's foreign-affairs power generally, scholars of all stripes have affirmed this narrower principle that the President retains "dominance over diplomatic communications." Harold H. Koh, *The National Security Constitution* 81 (1990); *see also* Edward S. Corwin, *The President* 184 (4th ed. 1957) ("[T]here is no more securely established principle of constitutional practice than the exclusive right of the President to be the nation's intermediary in its dealing with other nations." (emphasis and citation omitted)).

And indeed, some advocates of the Constitution argued that this was the whole point of placing treaty-making power with the Executive. Some thought that "negotiations between nations" required discretion and purposefulness that "numerous bodies" could not easily replicate. 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 119–20 (Jonathan Elliot ed., William S. Hein & Co. 2d ed. 1996) (1891) (statement of William Davie); *see also* 4 *id.* at 269 (statement of John Pringle) (similar); *The Federalist* No. 72, *supra*, at 486 (Hamilton) (explaining that "[t]he actual conduct of foreign negotiations" "falls peculiarly within the province of the executive department"). Others advanced efficiency rationales. Hamilton opined that Congress would have too little time to legislate unless "the management of foreign negotiations" were assigned to

someone else. *The Federalist* No. 84, *supra*, at 585–86. Given these views, it is little surprise that the Constitution gave Congress "no constitutional power that would enable it to initiate diplomatic relations with a foreign nation." *Zivotofsky*, 576 U.S. at 14.

The "consequence" of this constitutional structure is twofold: "[T]he demand of a foreign nation can only be made on [the President]," and it is the President who holds "the power of demanding a . . . performance" from a foreign government. 10 Annals of Cong., *supra*, at 613–14. "[I]t is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky*, 576 U.S. at 21. But only the President has the power to speak. *Id.*

The judiciary plays a limited role in this scheme. The Constitution "grants substantive authority in foreign affairs both to Congress in Article I and to the Executive in Article II. No such substantive power is granted to the Judiciary." *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring). If either the first or second branch exceeds its constitutional role, we can say so—and must, when a case requires it. But the Constitution does not place the President's power to speak to a foreign state under the direction of the courts. As Justice Jackson once wrote for the Court,

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Following this reasoning, the Court has consistently rebuffed invitations to micromanage the Executive's

diplomatic and national-security activities.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005); *Martin v. Mott*, 25 U.S. 19, 30 (1827).

I do not mean to suggest that this case presents only (or any) political questions beyond the cognizance of the judiciary.  But the power to decide a case is not the power to impose just any remedy.  Foreign diplomacy is entrusted to "the President alone." *Curtiss-Wright*, 299 U.S. at 319.  And "being entrusted to the executive, the decision of the executive is conclusive." *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

Cristian's briefing all but concedes this.  He argues at length that his situation justifies doing *something* to help him return.  But Cristian does not mention—much less defend—the part of the district court's order that expands upon "facilitate" to "include[] . . . a good faith request by Defendants to the government of El Salvador to release Cristian to U.S. custody for transport back to the United States."  ECF 254 at 2.  Instead, he insists without explaining that the injunction is "virtually identical" to the order the Supreme Court approved in *Abrego Garcia*.  Opposition at 21.  It is not.  Recall, the district court in *Abrego Garcia* ordered the government "to facilitate and effectuate the return of" Abrego Garcia.  *Abrego Garcia v. Noem*, No. 8:25-cv-00951, ECF 21 (D. Md. Apr. 4, 2025).  Unlike the district court here, it did not expand upon what it means to "facilitate."  And given the other word, "effectuate," it is hard to imagine that the *Abrego Garcia* district court had such a broad meaning in mind.

Judge Benjamin, too, treats this order like the one the Court approved in *Abrego Garcia*.  Unlike Cristian, she does not reach this conclusion by ignoring the district court's

expansion of "facilitate." Instead, Judge Benjamin insists that diplomacy is just what "facilitate" means. With respect for my good colleague, I do not agree. On the first appeal to this Court in *Abrego Garcia*, Judge Wilkinson construed that order to require facilitation only—rejecting the stronger verb for fear that it would "breach[] the sovereignty of another nation" and "intru[de] into what rightly are executive diplomatic powers." *Abrego Garcia*, 2025 WL 1021113, at *8 (Wilkinson, J., concurring). And even the facilitation order, he maintained, "must afford [the Executive Branch] latitude as to how the facilitation [could] best be accomplished." *Id.*

The Supreme Court seemingly agreed with Judge Wilkinson. It held that "facilitate" was "proper[]" but that "'effectuate' . . . may exceed the District Court's authority." *Abrego Garcia*, 145 S. Ct. at 1018. As Justice Sotomayor pointed out, "facilitate" is a well-known term among immigration-related agencies. *See id.* at 1019 (Sotomayor, J., respecting the Court's disposition). The policy document Justice Sotomayor relied on defines that term this way:

> To engage in activities which allow a lawfully removed alien to return to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry. Facilitating an alien's return does not necessarily include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien.

U.S. Immigr. & Customs Enf't, Directive 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens* § 3.1 (2012). Needless to say, none of these activities resembles court-commanded negotiation with a foreign state. Given this

established usage and the Court's apparent accord, I would not read the Court's order to give "facilitate" so much breadth.[3]

In an appropriate case, then, a district court may "properly require[] the Government to 'facilitate' [someone's] release from custody in El Salvador." *Abrego Garcia*, 145 S. Ct. at 1018. And as a panel of this Court explained on remand in *Abrego Garcia*, that is not a toothless remedy: "Facilitate" is an "active verb" that "does not . . . allow the government to do essentially nothing." *Abrego Garcia v. Noem*, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025). It may cover more than "remov[ing] . . . domestic barriers." *Id.* (emphasis deleted). We do not yet know just how far "facilitate" may legitimately reach.

But however far "facilitate" goes, it cannot encompass an order requiring specific diplomatic communication from the Executive Branch. So far as I can tell, no district court has ever done such a thing. And when district courts have tried to enjoin the Executive's foreign-affairs conduct, they have been met with swift rebuke. *See, e.g.*, *Holtzman v. Schlesinger*, 414 U.S. 1304, 1315 (1973) (Marshall, J., in chambers) ("[T]he proper response to an arguably illegal action is not lawlessness by judges.").

The district court did not have to take that road here. It had options short of ordering the Executive to contact a foreign government and request Cristian's release. As evidence, just consider the district-court proceedings on remand in *Abrego Garcia* itself. The court

---

[3] My colleague emphasizes the requirement that the government generally act in "good faith." *Supra* at 14 (Benjamin, J., concurring) (quoting ECF 254 at 2). In isolation, I agree that the Government should act in good faith. But my concern is the specific act that good faith modifies: "request by Defendants to the government of El Salvador to release Cristian to U.S. custody."

(and the parties) have spent weeks toiling on detailed discovery so that the court can identify an appropriate remedy with the benefit of full information—all to fulfill the Supreme Court's mandate to "clarify" the court's order and give "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Abrego Garcia*, 145 S. Ct. at 1018. Troubled as it may have been by the President's actions here, this district court should not have intruded into the Executive's prerogative without some similar process.

B

Caution was particularly warranted here because Cristian's claim is dubious on the merits. To start, consider what this case is not about. Cristian has not challenged here the legitimacy of the President's Alien Enemies Act proclamation. He has not sought "'judicial review' as to 'questions of interpretation and constitutionality' of the Act" or whether he "is in fact an alien enemy." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 & n.17 (1948)). Nor has he claimed that the circumstances of his removal raise due process problems. *See id.* (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Instead, he argues only that his removal breached a settlement agreement.

That agreement has nothing to say about his removal under these circumstances. We can presume that Cristian is a member of the settlement class. But the agreement does not give class members a general right not to be removed from the country. Instead, it provides that for any class member who has a "final removal order, ICE will refrain from executing the Class Member's final removal order." ECF 199-2 at 8.

This phrase carries a narrow, specialized meaning. "[I]n the deportation context, a 'final order of removal' is a final order 'concluding that the alien is deportable or ordering deportation.'" *Nasrallah v. Barr*, 590 U.S. 573, 579 (2020) (quoting 8 U.S.C. § 1101(a)(47)(A)). In fact, the section of the Immigration and Nationality Act on which *Nasrallah* relies created the term by express definition. And by limiting the term to apply "in this chapter"—a chapter containing all and only the major immigration provisions in Title 8—the statute makes clear that "final order of removal" is a creature of Title 8. 8 U.S.C. § 1101(a).

The Supreme Court and this one thus recognize that "final order of removal" is a term of art. It is not a generic reference to just any order under which someone might be removed; it specifically refers to the product of removal proceedings conducted according to Title 8. *See, e.g.*, *Monsalvo Velázquez v. Bondi*, 145 S. Ct. 1232, 1239–40 (2025). And as *Nasrallah* says, a "final order of removal" need not conclusively authorize the government to remove someone from the country. Often, such an order only settles "removability" but may not result in actual removal because withholding or other proceedings are ongoing. *Salgado v. Garland*, 69 F.4th 179, 181–82 (4th Cir. 2023) (emphasis omitted); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 539 (2021).

Removal orders under Title 8 are just one of many ways the government can compel an alien's departure. For instance, the government can extradite those wanted abroad. *See* 18 U.S.C. § 3181 *et seq.* During the pandemic, it removed aliens under provisions in Title 42. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). And even in a Title 8 proceeding, the government can grant voluntary departure "in lieu of removal."

*See* 8 U.S.C. § 1229c(a)(1), -(b)(1).  Given that the expulsion of aliens comes in many forms but "final order of removal" consistently refers to only one of them, it is implausible to read the settlement agreement's use of the phrase to reach just any order under which someone is removed.

The agreement itself reinforces this distinction.  Once a class member has filed a motion to enforce, the agreement *does* categorically provide that "the complaining Class Member shall not be removed from the United States."  ECF 199-2 at 13.  Of course, if the earlier section already categorically forbade the government to remove class members, no matter the procedure, this extra provision would be superfluous.  In the narrow situation where the parties have already begun to litigate the scope of the agreement, though, it makes sense to automatically stay any removal.  But this affords no help to Cristian, who was removed weeks before moving to enforce the agreement.

Judge Benjamin's ordinary-meaning approach buckles under the weight of this context.  Of course, Judge Benjamin is right that by default, we read contracts as though they speak ordinary language.  But contracts often use terms of art in addition to laymen's terms—not least because without them, "[c]ontracts would become massive and unwieldy treatises."  *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 47 (1998).  Just as with statutes, "the context of these words—the water in which they swim—indicates" whether the parties "used them as terms of art."  *United States v. Hansen*, 599 U.S. 762, 775 (2023).  And it is no surprise that sophisticated parties settling an important question in a field rife with specialized language would use that language to make their agreement.  *Cf. Corning Glass Works v. Brennan*, 417 U.S. 188, 202 (1974) ("While a layman might assume that

time of day worked reflects one aspect of a job's 'working conditions,' the term has a different and much more specialized meaning in the language of industrial relations."). For this term, settled usage and the rest of the agreement together leave little doubt that "final removal order" refers to the product of Title 8 proceedings.

Even supposing "final removal order" reached beyond Title 8, fitting Cristian's situation into the agreement requires a second premise: that "the President's AEA Proclamation" *is* a final removal order. Opposition at 12. But this too strains the text and context of the agreement. The agreement does not talk about removal orders in the abstract; the antiremoval provision says that it applies to "any Class Member *with* a final removal order." ECF 199-2 at 8 (emphasis added); *see also id.* (forbidding ICE to "execut[e] *the Class Member's* final removal order" (emphasis added)). So the orders contemplated by the agreement are specific to particular class members. Of course, the generalized proclamation is not.

\*

At bottom, the district court imposed an injunction that exceeds its power. And it did so to remedy government action that did not breach the agreement—unlawful though it may have been in other ways. Because the injunction goes too far, and the government's success on the merits is therefore all but assured, I would grant a stay.[4]

---

[4] For its part, the government floats a more fundamental reason for us to suspend the district court's order. In its view, that court lacked jurisdiction because "[c]hallenges to removal under the AEA . . . must be brought in habeas." *J.G.G.*, 145 S. Ct. at 1005; *see* Reply at 6 & n.2. I have my doubts. To begin, although the Court in *J.G.G.* quoted a case that uses the word "jurisdiction," context makes clear that its habeas-only holding sounded (Continued)

III

If any doubt remained, the equities confirm that this injunction must be stayed.

A

To start, it is hard to see how this order could meaningfully benefit Cristian. Since his removal, USCIS has made clear that his asylum application has no chance of success. And even if Cristian got asylum, he would remain removable anyway. Those circumstances make it hard to justify equitable relief—much less this equitable relief.

---

in "venue." *Id.* *Rumsfeld v. Padilla* does indeed say that "for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." 542 U.S. 426, 443 (2004). But this strikes me as "a characterization left over from days when we were less than meticulous in our use of the term 'jurisdictional.'" *Hamer v. Neighborhood Housing Servs.*, 583 U.S. 17, 27 (2017) (quotation omitted). And venue, of course, can be waived—which scuttles the government's late-breaking bid to avoid the merits.

Plus, whether construed as jurisdiction or venue, the government's argument cannot account for *Abrego Garcia*. There, as in *J.G.G.*, a plaintiff challenged his confinement and removal under the AEA. *Abrego Garcia*, 145 S. Ct. at 1018. And like J.G.G., Abrego Garcia sought an injunction—not habeas. If the federal courts had no jurisdiction to hear such claims, the Supreme Court's *Abrego Garcia* opinion had no reason to opine on whether the district court's injunction breached Article II.

*J.G.G.*'s reliance on the *Heck* bar and its kin gives us another good reason to think it is not jurisdictional: The *Heck* bar itself is not jurisdictional. *See, e.g.*, *Brunson v. Stein*, 116 F.4th 301, 307 n.8 (4th Cir. 2024). Like venue, it is a waivable defense. It would be strange to read *J.G.G.* as weaving a jurisdictional quilt from this nonjurisdictional fabric.

With these principles in mind, it becomes apparent that despite their facial similarities, J.G.G.'s and Abrego Garcia's claims are legally quite different. The *J.G.G.* plaintiffs challenged their confinement by federal officers who planned to deport them. Proving that they could not be removed would "'necessarily imply the invalidity' of their confinement," so their claim triggered the *Heck* bar and they needed to use habeas. *J.G.G.*, 145 S. Ct. at 1005 (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022)). By contrast, Abrego Garcia sued only after he had left U.S. custody. To the extent he challenged a confinement, it was not confinement by federal officers pending his removal but rather his postremoval confinement in El Salvador. Given this, he could seek an injunction requiring federal officers to facilitate his return.

Federal courts wielding the equity powers conferred by Article III and the first Judiciary Act may not "restrain an act" that does not threaten substantial "injurious consequences." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (quoting *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900)). "An injunction should issue only where the intervention of a court of equity is essential," which means that without an injunction the claimant will sustain "irreparable injury." *Id.* at 312 (quotation omitted). For this reason, an injunction may not sweep more broadly than necessary to stave off that injury. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 160–61 (2010); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Cristian's claim and the district court's order fail this standard twice over. First, Cristian seemingly cannot get asylum. The evidence appears uncontroverted that he is a member of Tren de Aragua. Tren de Aragua is a designated Foreign Terrorist Organization. And membership in a Foreign Terrorist Organization is a categorical bar to asylum. 8 U.S.C. § 1158(b)(2)(A)(v) (authority to grant asylum "shall not apply" to a knowing member of a terrorist organization—someone falling within subclause (VI) of section 1182(a)(3)(B)(i)). Reflecting this obligation to deny asylum to members of terrorist groups, USCIS has indicated that Cristian's "application for asylum would be denied." Motion at 2. True, Cristian's theory is not just that he cannot get asylum without returning to the country but that returning would give him a chance to participate in the asylum-application process. Yet asylum is a matter of grace, not right; it is up to the Executive Branch's "discretion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987); *see also*

8 U.S.C. § 1158(b)(1)(A) (providing that the Executive "may grant asylum"). And here, "the asylum decision has already been made," which means "those procedures would be futile." *Huisha-Huisha*, 27 F.4th at 731.[5]

Cristian replies that he could contest this mandatory bar in an asylum interview by offering evidence that he is not associated with Tren de Aragua. Maybe so. But he gives us no reason to think that he has persuasive arguments or evidence that would likely change the result. The government's evidence that Cristian belongs to Tren de Aragua is no doubt substantial enough to withstand judicial review of the agency's decision. And even if it were not, "the Attorney General's discretionary judgment whether to grant [asylum] shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4). USCIS has indicated that alongside the mandatory terrorism bar, it would deny Cristian asylum as a matter of its discretion because of his criminal record—a record that he does not dispute.

Second, even were Cristian to receive asylum, that status would not shield him from removal. Just as membership in a terrorist organization presents a categorical bar to asylum, it is a ground for revoking asylum already granted. *Id.* § 1158(c)(2), -(b)(2)(v). Given this, there would be little point returning Cristian to the United States to adjudicate

---

[5] Judge Benjamin objects that the indicative asylum decision is a "'litigation-driven' document," "not an authentic change in factual circumstances." *Supra* at 19 (quoting Reply at 21). But whatever weight we give what USCIS has said so far, it is also true that based on the evidence before us, Cristian is apparently ineligible for asylum. And if so, USCIS has no choice but to do what it has told us it intends to do.

a doomed request for executive grace—and certainly no prospect of real-world benefit solid enough to support the district court's tall order.[6]

To be sure, Cristian is correct that we sometimes enforce procedural rights for their own sake, independent of the substantive benefits that may follow. At the same time, the federal courts will not normally remedy the "deprivation of a procedural right without some concrete interest that is affected by the deprivation." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). The procedure must be tethered to some substance, however thin. And in equity, which does not take litigants' representations for granted the way standing does, the question posed to the district court's discretion is not just whether a defendant has broken the law but whether the remedy proposed is necessary to prevent real-world harm. Without a reason to think more process would change USCIS's mind, Cristian's asylum-process claim does not justify resort to equity—much less equity that directs the Executive's diplomatic communications.

---

[6] The Alien Enemies Act may permit removal without revoking asylum. The asylum statute provides that once someone has asylum, unless it is revoked, "the Attorney General . . . shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence." 8 U.S.C. § 1158(c)(1). But the Alien Enemies Act provides that "*all*" alien enemies "who shall be within the United States and not *actually naturalized*, shall be liable to be apprehended, restrained, secured, and removed." 50 U.S.C. § 21 (emphasis added). By its text, then, the Alien Enemies Act applies to alien enemies who have received asylum. Whether the asylum statute supersedes this sweeping language is unsettled. But the asylum statute's seemingly categorical language—"shall not remove"—may preclude only removal under Title 8, not removal generally. *See, e.g.*, *Castaneda-Castillo v. Holder*, 638 F.3d 354, 360–61 (1st Cir. 2011) (observing that so long as the relevant extradition treaty is "silen[t] on the issue, the Secretary of State may, in her discretion, order the extradition of an individual . . . even if that individual is granted asylum").

In turn, without a plausible claim to asylum, Cristian does not assert an injury that shifts the equities in his favor. The Supreme Court has told us that "the burden of removal alone cannot constitute" the sort of "irreparable injury" that equity requires. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And although the district court apparently assumed that Cristian is confined—which is likely true[7]—it did so without either evidence or a clear representation from either party about where he was or under what conditions. *See* ECF 253 at 4. In all events, any cause of action for these sorts of injuries themselves (rather than the asylum consequences that they may bring) does not arise from the agreement here.[8]

---

[7] The parties' representations have shifted on this front, both below and on appeal. In the introduction to its motion to enforce below, class counsel asserted that ICE "removed Cristian . . . to a maximum security prison in El Salvador." ECF 227-1 at 1. Yet the background section of that brief did not repeat or explain this claim; it only said that Cristian had been "removed . . . to El Salvador." *Id.* at 5. Counsel neither offered a citation nor said which prison or whether Cristian was still there. Now, counsel's position is that Cristian "has remained incarcerated in El Salvador at CECOT since" his removal, and so "for two months . . . has been consigned to a notorious supermax prison known for widespread human rights violations." Opposition at 9, 21 (quotation omitted). The citation offered for this premise is the *government's* stay motion—which, unsurprisingly, says no such thing. The government says only that Cristian "is currently in the custody of El Salvador." Motion at 7. Yet the government itself gets this premise not from a declaration by its personnel but from Cristian's motion below. And the cited page says nothing about prison—just that "ICE removed Cristian to El Salvador." ECF 227-1 at 5. By a telephone-game string of citations, a claim that Cristian was removed two months ago became a claim that he is in CECOT today. Again, this may well be true. But if it is, I fail to see how class counsel knows it. In my view, the district court should have collected more information and made findings of fact—as the district court in *Abrego Garcia* is still doing—before imposing an injunction.

[8] This is not to say that Cristian cannot challenge his removal and detention, if any, in another proceeding. Like anyone removed under the Alien Enemies Act, Cristian is entitled to the full measure of protection afforded by our due process jurisprudence. As in (Continued)

On the other side of the ledger lie weighty government interests. Ordering the government to negotiate threatens the foreign policy interests of the United States. The problems of foreign affairs are "important, complicated, [and] delicate." *Curtiss-Wright*, 299 U.S. at 319. Goodwill from foreign states is hard-won but easily lost. Toward the end of the Washington Administration, then-Senator and future-Chief Justice Oliver Ellsworth exhorted the Senate, "A correspondence with foreign nations [is] a business of difficulty and delicacy—the peace and tranquility of a country may hinge on it." 5 Annals of Cong. 32 (1796). In line with this maxim, federal courts have been quick to see danger in this area. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 395 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 385–86 (2000). As then-Judge Scalia warned, "extend[ing] judicial power into" the realm of foreign affairs is risky because "we do not know, and have no way of finding out, what serious harm we may be doing." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1551 (D.C. Cir. 1984) (Scalia, J., dissenting); *see also Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983) (recognizing courts' limited "competence in determining precisely when foreign nations will be offended by particular acts").

This danger looms above more everyday concerns—concerns that usually warrant a stay by themselves. Enjoining the government from enforcing duly enacted policies

---

*Abrego Garcia*, if Cristian is confined, he could seek injunctive relief on the grounds that his removal was erroneous or that the proclamation is unlawful. Important as those challenges may be, they are not presented here.

always counts as irreparable injury. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). The harm compounds when, as here, the injunction not only prevents prospective government action but orders a costly about-face. And the interest that injury impairs, "[p]rotection of the foreign policy of the United States[,] is a governmental interest of great importance, since foreign policy and national security cannot neatly be compartmentalized." *Haig v. Agee*, 453 U.S. 280, 307 (1981).

Given all this, I see the government's burden as met. *See Nken*, 556 U.S. at 426. The government should prevail on the merits because this injunction exceeds the district court's power and because Cristian's claim does not warrant it. Moreover, the injunction threatens important government interests that are easier to harm than heal, and it does so without offering Cristian any meaningful benefit in return. That is not how courts sitting in equity are supposed to proceed. I would stay the injunction.[9]

* * *

This is not a case about whether the President's Alien Enemies proclamation fits the statute. This is not a case about what process the Constitution and laws may afford those removed under that proclamation. And this is not a case where the courts are asked to thwart an effort "to stash away residents of this country in foreign prisons." *Abrego Garcia*, 2025 WL 1135112, at *1. It is instead a contract case. An important contract case,

---

[9] I take no position on how the district court should have resolved the government's Rule 60(b) motion. Only the government's stay motion is before us now, and that aims at the injunction itself—not the district court's refusal to vacate it.

perhaps, but not a case where either the Executive's powers or Cristian's liberties will be finally decided.

Still, it is in this case that the district court has directed the Executive to engage in specific diplomatic negotiations with a foreign power. Despite serious merits problems and little reason to think its order would help Cristian, the district court entered a more potent injunction than any other court has in the numerous Alien Enemies cases pending across the country. By contrast, consider *Abrego Garcia*, where the parties and court remain dutifully preoccupied with crafting appropriate relief that still gives "due regard for the deference owed to the Executive Branch." 145 S. Ct. at 1018. In cases like these, where "the branches come too close to grinding irrevocably against one another," *Abrego Garcia*, 2025 WL 1135112, at *3, caution should be our watchword.

As I would stay Paragraph 2 of the district court's order, I respectfully dissent.